```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
UNITED STATES OF AMERICA       :
                               :
     -against-                 :       No. 12 Cr. 691 (JFK)
                               :       **OPINION & ORDER**
JOSEPH ROMANO,                 :
                               :
          Defendant.           :
-------------------------------X
```

APPEARANCES

FOR UNITED STATES OF AMERICA
Eric H. Holder, Jr.
  Attorney General of the United States
William J. Hochul, Jr.
  United States Attorney, Western District of New York
By: Marshall L. Miller
    Una A. Dean

FOR DEFENDANT JOSEPH ROMANO
George R. Goltzer
Michael K. Bachrach

**JOHN F. KEENAN, United States District Judge:**

Before the Court is Defendant Joseph Romano's motion to suppress his post-arrest statements. For the reasons that follow, the motion is denied.

I.  Background

Defendant has been charged with conspiracy to murder a United States District Judge (the "Judge") and an Assistant United States Attorney (the "AUSA") in violation of Title 18, United States Code, Sections 1114 and 1117. The Government alleges that Defendant planned to hire one or more purported

1

"hit men" to murder the Judge, who had sentenced Defendant for his participation in a fraud relating to the telemarketing and sale of coins, as well as the AUSA, who had prosecuted the coin fraud case. Defendant's trial is scheduled to begin on December 2, 2013.

### A. Defendant's Suppression Motion and Affidavit

On February 19, 2013, as part of his pretrial omnibus motions, Defendant moved to suppress "any and all statements allegedly made by him to law enforcement." (Def. Mot. of Feb. 19, 2013 at 8.) He asserted that the agents who arrested him on October 9, 2012 "refus[ed] to cease questioning after he made an unequivocal statement that he wished to remain silent." (Id. at 11.) In connection with this motion, Defendant submitted a sworn affidavit, which states in relevant part:

> 5. I was placed in handcuffs and told that I was being arrested for a plot to kill a judge and a prosecutor and that I would be facing a lengthy prison term unless I cooperated.
> 6. I was very scared and confused as to what was going on and told my interrogators that I wanted a lawyer.
> 7. I was taken from the GEO facility in handcuffs and placed in a police car. During this time even though I had requested an attorney, I was still subjected to many questions.
> [...]
> 9. The questions continued non-stop as I was driven from the GEO detention center to the F.B.I. offices in Melville, New York.

> 10. After we arrived in Melville, the agents continued to ask me, where is Mirkovic,[1] and why does Mirkovic hate the judge and prosecutor?

(Def. Aff. of Feb. 19, 2013.) The affidavit concludes by stating that although Defendant signed the waiver of his Miranda rights, which the affidavit describes as a "card," he "did not knowingly waive [his] Miranda rights and [he] did not knowingly and voluntarily make statements to the police." (Id.)

Soon after Defendant's omnibus motions were filed, former defense counsel raised the issue of Defendant's competence to assist in his own defense. (ECF No. 41.) Ultimately, Defendant was examined by an expert selected by the parties, clinical psychologist Barry Rosenfeld, who issued two reports deeming Defendant fully competent to stand trial and to assist in his own defense. Neither the Government nor the defense objected to the reports, and the Court made the finding that Defendant was competent to stand trial and to assist his attorneys. (Evid. Hearing Tr. at 5.)

## B. The Evidentiary Hearing

This Court held an evidentiary hearing on Defendant's suppression motion on July 9, 2013. The Government called James Randolph Cox, a Criminal Investigator with the U.S. Attorney's Office for the Eastern District of New York. Along with FBI

---

[1] Dejvid Mirkovic, Defendant's alleged co-conspirator, has pleaded guilty.

3

Special Agent Edward Heslin and FBI Task Force Officer George Davis, Investigator Cox participated in Defendant's arrest and interview, and was present at all times relevant to Defendant's motion. Cox testified that about 8:00 A.M. on October 9, 2012, the agents arrived at the Queens Private Detention Facility (sometimes referred to as "Queens G.E.O." or "the G.E.O. facility") where Defendant was incarcerated in connection with his coin fraud conviction. Shortly thereafter, the agents arrested Defendant and took him into their custody. (Evid. Hearing Tr. at 15.) Cox testified that at that time, Defendant was told nothing about the new charges against him, nor was he questioned at all about the charges. (Id. at 16-17, 52.) Cox did hear a short exchange between Defendant and Officer Davis while Davis handcuffed Defendant. He believed that they were discussing the placement of Defendant's handcuffs. (Id. at 48.)

After the agents took Defendant into their custody, they drove him to the FBI field office in Melville, which took from about 8:10 A.M. to shortly after 9:00 A.M. (Id. at 18, 53.) According to Cox, it was during this drive that Defendant asked what was going on; Special Agent Heslin replied that Defendant "had been meeting an undercover agent in the jail," and that the agents had uncovered the charged conspiracy. (Id. at 19.) Cox characterized Defendant's reaction to this revelation as "very calm, nonplussed," and stated that Defendant did not appear to

4

be confused or nervous. (Id. at 20.) After a period of silence during the drive, Cox testified to sporadic conversations between Defendant and the agents, the topics of which included Defendant's co-conspirator, David Mirkovic; Defendant's perceptions of unfair treatment during his coin fraud prosecution; and even the Broadway show that Agent Heslin planned to see later that evening with his wife.

Cox also recalled some discussion of the potential for Defendant to cooperate. According to him, "Agent Heslin said, 'You know, we're going to go back to our office, I think the best thing to do would be [to be] cooperative in this case. We really have all the evidence.'" (Id. at 24.) After some conversation, Agent Heslin said, "'You know, listen I don't care what you do. At the end of the day, I'm going out with my wife later. I have tickets to a Broadway show, you know, so what you did doesn't matter to me as long as we get out of here on time.'" (Id. at 25.) Cox testified that the agents did not promise Defendant anything in exchange for his cooperation, (id. at 26), but did tell him that any cooperation "would be made known to the prosecutors and the judge," (id. at 58). Cox characterized the tone of this exchange as "very calm." (Id. at 26.)

Cox testified unequivocally that the agents did not ask Defendant any questions regarding the charged conspiracy, nor

5

did they attempt to elicit any admissions from him, during the car ride. (Id. at 27.) He also stated that Defendant never asked for an attorney during this period. (Id. at 28.) Indeed, Cox described Defendant's demeanor in the car as consistently calm, except for one instance when Defendant became "a little more animated," and "angry" while talking about his treatment in the coin fraud case. (Id. at 26-27.) Defendant made no admissions to the agents, either during his remarks about the underlying coin case or at any other time during the ride. (Id. at 27.).

After they arrived at the FBI field office in Melville, Defendant was uncuffed and escorted to an interview room. Cox testified that Defendant asked to see a copy of his arrest warrant, which Cox showed to him. (Id. at 29, 84.) Defendant was then given a Miranda warning, which was memorialized on a FBI "Advice of Rights" form that was received into evidence at the hearing. (Id. at 29-30.) At the top of the form, Heslin wrote in "10/9/12," "LIRA," denoting the Long Island field office, and "9:14 a.m." The form then lists the Miranda rights. Cox testified that Defendant appeared to read each of these rights to himself, and that each line was also read aloud to Defendant by Heslin, who "asked Mr. Romano if he understood and asked him to initial it if he did." (Tr. at 33.) Defendant's initials appear next to each right. The form then reads, "I

6

have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." Defendant's signature appears directly beneath this acknowledgment, followed by the signatures of Heslin and Cox as witnesses, and another time, "9:21 a.m.," filled in by Heslin. Cox testified that the 9:14 notation reflects the time that the agents began to review the form with Defendant, and that 9:21 refers to the time after Defendant had fully reviewed and signed the form. (Tr. at 68.) Cox further testified that Defendant did not ask the agents any questions about his rights before signing it, and did not ask to speak to a lawyer.

After Defendant was Mirandized, the agents questioned him for "about an hour." (Id. at 37.) According to Cox, the tone of the questioning was "calm" and "conversational." (Id. at 37-38.) Cox stated that Defendant admitted to his role in the charged conspiracy during this interview. Soon thereafter, Heslin left the interview room and hand-wrote a statement for Defendant to sign that memorialized his admissions, while Cox stayed in the interview room with Defendant. (Id. at 65.) Heslin returned with the statement and reviewed it aloud with Defendant, who signed it.

The statement acknowledges and incorporates by reference the FBI Advice of Rights form that Defendant signed. It also

7

states Defendant's intention "to cooperate with the FBI and provide statements about crimes I know of and crimes in which I was personally involved." The statement goes on to list several purported crimes, and acknowledges Defendant's role in the charged conspiracy. Each paragraph of the statement is initialed by Defendant. The document then acknowledges: "I make this statement freely and voluntarily, without threats, rewards or promises of immunity in return for it." Directly underneath that acknowledgement is Defendant's signature and that of two witnesses, Davis and Heslin.

After the questioning was over and the statement had been signed, Defendant's arrest was processed. At about 11:40 A.M., Cox and Davis left with Defendant for the federal courthouse in Central Islip. Cox testified that during this drive, Defendant still appeared calm except when discussing his earlier coin fraud case. (Tr. at 40-41.)

At the conclusion of Investigator Cox's testimony, the Government rested. The defense did not call any witnesses and also rested after Cox was finished on the stand.

## II. Discussion

### A. Legal Standard

"An arrested suspect, under the Fifth Amendment as interpreted in Miranda, has a right to silence and a limited

right to counsel to protect that right." United States v. Stern, 313 F. Supp. 2d 155, 165 (S.D.N.Y. 2003). See generally Miranda v. Arizona, 384 U.S. 436 (1966). Indeed, "[t]he purpose of the Miranda warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." United States v. Carter, 489 F.3d 528, 534 (2d Cir. 2007) (citing Miranda, 384 U.S. at 444-45). The Government bears the burden of proving by a preponderance of the evidence that a defendant made a valid waiver of his rights. United States v. Iodice, 525 F.3d 179, 192 (2d Cir. 2008). It must show "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995) (per curiam). "Only if the totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.'" United States v. Male Juvenile, 121 F.3d 34, 40 (2d Cir. 1997) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). Where the defendant asserts that his confession was the product of coercion, the court should consider "the accused's characteristics, the conditions of interrogation, and the

9

conduct of law enforcement officials." United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991).

## B. Analysis

In his post-hearing brief, Defendant argues that his statements must be suppressed for two reasons: first, because the Government failed to establish that he did not request an attorney; and second, because even if he did not request an attorney, his statements were coerced and involuntary. As explained below, neither contention has merit, and Defendant's statements will not be suppressed.

### 1. Defendant Did Not Request an Attorney

First, the Court finds that Defendant did not request an attorney at any time on the morning of October 9, 2012. The Court makes this finding after carefully reviewing Defendant's affidavit, Investigator Cox's testimony, and the submissions of both sides. The Court found Cox's testimony at the evidentiary hearing to be straightforward and credible. He testified consistently that Defendant never asked for an attorney — not at the Queens detention facility, not in the car, and not at the Melville field office. Additionally, with respect to the ride between Queens and Melville, Investigator Cox stated that (1) the agents did not ask Defendant any questions regarding the charged conspiracy; (2) the agents did not attempt to elicit any admissions from him; and (3) Defendant made no admissions to the

10

agents at that time. The Court credits this testimony, although it notes that the Government is not seeking to admit anything Defendant said in the car for its case in chief at trial. See Evid. Hearing Tr. at 8; Gov. Letter Br. of Aug. 5, 2013 at 1 n.1.

In contrast to Investigator Cox's testimony, Defendant's version of events is not credible. To begin with, Defendant exercised his right not to testify at the evidentiary hearing, which means that "the assertions in his affirmation can neither be tested by cross-examination nor corroborated by the Court's observation of his demeanor." United States v. Thompson, No. 10 Cr. 94, 2010 WL 3069668, at *5 (S.D.N.Y. July 29, 2010); see United States v. Chisholm, No. 07 Cr. 795, 2008 WL 5453242, at *2 (E.D.N.Y. Oct. 29, 2008). Although Defendant's initial motion papers repeatedly assert that he "made an unequivocal statement that he wished to remain silent and wanted an attorney," (Def. Mot. of Feb. 19, 2013 at 10-11), the defense now suggests in its post-hearing brief that Defendant may have quietly asked for an attorney only once, during a brief exchange with Officer Davis while Davis was securing Defendant at the Queens facility. That conjecture is not only far-fetched; it is also belied by the testimony at the hearing, where Investigator Cox credibly stated his belief that they were simply talking about the placement of the handcuffs. Additionally, it is

11

inconsistent with the established timeline of events, because the agents did not even mention the new charges to Defendant until after they had all left the Queens facility. It follows that, were Defendant to ask for a lawyer, it likely would not have been until he learned of the charges in the car on the way to Melville.

Although Investigator Cox's account is inconsistent with Defendant's sworn affidavit, the Court notes that the affidavit strains credulity in several respects. Most notably, it avers that the agents repeatedly asked Defendant, "where is Mirkovic, and why does Mirkovic hate the judge and prosecutor?" (Def. Aff. of Feb. 19, 2013 ¶ 10.) It is exceedingly unlikely that the agents inquired as to the whereabouts of Defendant's alleged co-conspirator, Dejvid Mirkovic, given that other FBI agents had already arrested Mirkovic in Florida. (Evid. Hearing Tr. at 12-14.) This was known to the agents interviewing Defendant, because according to Investigator Cox, they intentionally waited to arrest Romano until after they received word that Mirkovic was in custody. (Id.) The apparent falsity of Defendant's sworn assertion further buttresses the Court's finding that the affidavit is not credible in the face of Cox's testimony at the hearing. See Thompson, 2010 WL 3069668, at *5 & n.1.

In sum, the Court finds that Defendant did not ask for an attorney on the morning of October 9, 2012. His statements

12

cannot be suppressed on the basis of a request that he did not make.

## 2. Defendant's Statements Were Voluntary and Not Coerced

Defendant argues that even if he never requested an attorney, his statements must nevertheless be suppressed because they were involuntary and coerced by the agents. However, the record is clear that Defendant understood his rights and freely chose to waive them. His knowing and voluntary waiver is evidenced not merely by the waiver form that he admits initialing and signing, but by the totality of the circumstances on October 9, 2012.

As explained by Investigator Cox in his testimony at the evidentiary hearing, Defendant was not questioned by the agents until he had arrived at the FBI field office and had been given the Miranda warnings orally and in writing. Cox testified that he did not observe any external signs of confusion on Defendant's part; Defendant appeared to be calm and to understand what was happening. (Evid. Hearing Tr. at 37-38.) The Court credits this testimony. First, as previously noted, the Court found Cox to be worthy of belief at the hearing. Second, Cox's testimony on this point is more plausible than the Romano affidavit's assertion that he was so "scared and confused" as to not know what was happening. See Chisholm, 2008 WL 5453242, at *2 ("Absent [defendant's] live testimony and the

13

opportunity for cross-examination, the Court cannot assess his credibility or truthfulness. As a result, I credit the testimony of the live witnesses over the contents of defendant's affidavit where a conflict exists."). Third, Cox's testimony is consistent with the Court's own observations of Defendant over the past several months at various conferences in this case, at which Defendant has regularly demonstrated his keen understanding of, and engagement with, the proceedings.

In the face of the Miranda waiver and Investigator Cox's credible testimony, the defense offers two arguments to support its position that Defendant's statements were involuntary or coerced. First, the defense makes much out of the fact that the waiver bears the time 9:14 a.m. at the top and 9:21 a.m. on the bottom. During this window, each of the rights on the form was read to Defendant, he initialed each one, and he signed the acknowledgement. Cox testified to his belief that he and Agent Heslin signed the form as witnesses during this time as well, and he did not recall any other exchanges between Agent Heslin and Defendant in this window. (Evid. Hearing Tr. at 71, 73, 75.) There is absolutely nothing in the record to indicate that anything occurred that would undermine the waiver's validity. Cf. Stern, 313 F. Supp. 2d at 158 (identical waiver of rights form with sixteen-minute gap between the times written on top and bottom).

Second, the defense argues that the agents tricked Defendant into making admissions by leading him to believe that he was entering into a formal cooperation agreement with the Government. The Court rejects this argument as unsupportable both by the facts of this case and the law of the Second Circuit. As an initial matter, there is simply no evidence whatsoever of deceit by the agents. Moreover, although the agents suggested that cooperation would be in Defendant's best interests because "it would be made known to the prosecutors and the judge," (Evid. Hearing Tr. at 58), this falls far short of coercion under established Second Circuit precedent, see United States v. Awan, 384 F. App'x 9, 15 n.2 (2d Cir. 2012) (summary order) (noting that "law enforcement agents are free to discuss with a defendant the evidence against him and the reasons why he should cooperate") (citation and alterations omitted); Jaswal, 47 F.3d at 542 ("Generally, promises of leniency will not render a confession involuntary."); United States v. Guarno, 819 F.2d 28, 31 (2d Cir. 1987) (noting that "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials"). Summarily, there is no legitimate basis to suppress Defendant's statements on the grounds that they were the product of coercion.

### III. Conclusion

For the reasons stated above, Defendant's motion to suppress his statements is denied. Any statements made by Defendant after he was advised of his rights are admissible in the Government's case in chief at trial.

**SO ORDERED.**

Dated:  New York, New York
        September 18, 2013

*John F. Keenan*
John F. Keenan
United States District Judge