577

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X

UNITED STATES OF AMERICA,          : 12 CR 691
                                   :
                                   :
                                   :
        -against-                  : UNITED STATES COURTHOUSE
                                   : BROOKLYN, NEW YORK
                                   :
                                   :
                                   : JANUARY 9, 2014
JOSEPH ROMANO,                     : 10:00 O'CLOCK A.M.
                                   :
        Defendant.                 :

- - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOHN F. KEENAN
SITTING BY DESIGNATION
UNITED STATES SENIOR JUDGE, and a jury.

A P P E A R A N C E S:

For the Government: WILLIAM J. HOCHUL, JR.
                    United States Attorney
                    Western District of New York
                    138 Delaware Avenue
                    Buffalo, New York 14202
                    BY:  MARSHALL MILLER
                         UNA DEAN
                         Assistant United States Attorneys

For the Defendant:  GEORGE GOLTZER, ESQ.
                    200 West 57th Street, Suite 900
                    New York, New York 10019

                    MICHAEL BACHRACH, ESQ.
                    276 Fifth Avenue, Suite 501
                    New York, New York 10001

Court Reporter:     SHERRY J. BRYANT, RMR, CRR
                    225 Cadman Plaza East
                    Brooklyn, New York 11201
                    sbryant102@verizon.net
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

SB      OCR    RMR    CRR

PROCEEDINGS                                     578

 1              (In open court.)

 2              THE COURT:  I think I ought to see counsel at

 3    sidebar.

 4              (Sidebar conference.)

 5              THE COURT:  Just to report, Mr. Ryan -- I'm sorry.

 6              MR. GOLTZER:  Good morning, Judge.

 7              THE COURT:  I'll start again.  I just want to report

 8    something.  Mr. Ryan is going to call a certain juror first.

 9    What's the number?

10              THE CLERK:  Five.

11              THE COURT:  And the reason he's going to call 5

12    first is 5 is going to have to be excused, because apparently

13    there was a death in 5's family, somebody close, number one.

14              Number two, two jurors are missing.  They're trying

15    to find them.  They're missing.  I thought I'd let you know.

16              MR. MARSHALL:  Thank you, Your Honor.

17              (End of sidebar conference.)

18              THE CLERK:  The first juror is number 5.  If you

19    could come up to the sidebar, please, over here.

20              THE COURT:  If counsel wants to come up with juror

21    number 5.

22              MR. GOLTZER:  No, that's quite all right.

23              (Sidebar conference.)

24              THE COURT:  I understand there was a death in the

25    family.

PROCEEDINGS                                            579

1            THE PROSPECTIVE JUROR:  Yes.

2            THE COURT:  Who passed away?

3            THE PROSPECTIVE JUROR:  My mother-in-law's sister.

4   This is the second death in a year.

5            THE COURT:  You want to be excused?

6            THE PROSPECTIVE JUROR:  Yes.

7            THE COURT:  You're excused.  I told the lawyers.

8            THE PROSPECTIVE JUROR:  Thank you very much.  So

9   just -- thank you.

10           (End of sidebar conference.)

11           THE COURT:  All right.

12           THE CLERK:  The first juror is juror number 13.

13  Juror number 13, if you could take the first seat in the first

14  row of the jury box.  The next juror is number 36, 36.  If you

15  could take the second seat in the first row of the jury box.

16  The next juror is juror number 34, if you could take the third

17  seat in the first row of the jury box.

18           The next juror is number 53, if you could take the

19  fourth seat in the first row of the jury box.  The next juror

20  is number 77.  Seventy-seven, take seat number five.  The next

21  juror is number 7, if you could take the sixth seat.  The next

22  juror is number 61.  Take seat number seven, which is in the

23  second row of the jury box there.

24           The next juror is number 57.  Take the eighth seat,

25  which is in the second row of the jury box there.  The next

PROCEEDINGS                                580

1    juror is 75.  Take the ninth seat in the second row there of

2    the jury box.  The next juror is 37, take the tenth seat in

3    the jury box.

4            The next juror is number 20, take the 11th seat in

5    the jury box.  The next juror is number 40, take the 12th seat

6    in the jury box.  The next juror is 33, if you'd take the 13th

7    seat, which is in the last row of the jury box.  The last row

8    of the jury box.  You can come up this way, ma'am.

9            The next juror is 46, take seat number 14, which is

10   in the last row of the jury box.  The next juror is number 4,

11   if you could take seat number 15, which is in the last row of

12   the jury box.  The next juror is number 58, take the 16th seat

13   in the jury box.

14           The next juror is number 31, if you'd take the 17th

15   seat in the jury box.  The next juror is number 21, you can

16   take the 18th seat in the jury box.

17           THE COURT:  I think you're better off going that

18   way, sir.

19           THE CLERK:  Could the jurors in the first row there,

20   if you could find other seats.  We're going to need to seat

21   additional jurors in that first row there.  Thank you.

22           The next juror is number 22, take the 19th seat,

23   which is in the first row there.  The next juror is 62, take

24   seat number 20.  The next juror is 71, take the 21st seat.

25   The next juror is number 76, take seat number 22.  The next

PROCEEDINGS                                          581

1    juror is number 65, you can take seat number 23.  Okay, on

2    this side, if you could find other seats in the front row

3    there.  Thank you.

4           The next juror is number 42, if you could take seat

5    number 24.  The next juror is number 45, you can take seat

6    number 25.  The next juror is number 78, take seat number 26.

7    The next juror is number 16, you can take seat number 27.  The

8    next juror is number 73, you can take seat number 28.

9           THE COURT:  Thank you.  All right.  Again, good

10   morning, everybody.  And I want to raise with all of you, not

11   just the 28 who were called but with everybody else, a couple

12   of things initially.

13          During the examination of prospective jurors which

14   each of you went through, there was a young man who violated

15   my instructions.  You remember on Monday and then again

16   yesterday with the new panel, I told everybody, don't research

17   the case on the Internet.  Do you remember I made quite an

18   issue about that?

19          Well, this one fellow decided that he'd create his

20   own rules and he went and researched the case.  And

21   apparently, he may have talked to some of the other jurors

22   about what he researched.  I came close to holding this fellow

23   in contempt, I can tell you.  I didn't, but I came very close

24   to it.

25          Did any of you, if you remember, did any of you hear

1    or talk to this fellow?  He was a young Caucasian man and he

2    was a publicist I think was what he said he was.  Do any of

3    you recall anybody discussing what he found out on the

4    Internet with any of you?  If you do, just raise your hand.

5    If not, fine.  Okay, nobody's raised their hand.

6            Now, I want to take up something again that I

7    mentioned to all of you, but I want to mention it again

8    perhaps in more direct fashion.

9            In many federal cases, it is common to keep the

10   names and identities of the jurors in confidence.  Experience

11   has shown that in a case like this one, it is really wise to

12   take steps to make certain that the jurors' right to privacy

13   is respected.

14           Anonymity will assure and ensure that you are in no

15   way influenced by the public or by the media, which otherwise

16   might be interested in your identities and might seek to

17   inquire possibly into your personal affairs.  You should

18   continue to take care not to provide identifying information

19   to anybody as the trial proceeds.  Your name and other contact

20   information will not be divulged or disclosed and will be held

21   by the clerk of the court and disclosed only as I direct it.

22           Your name, your identity, your address will not

23   otherwise be available to anybody.  That includes the

24   prosecutors, the defense lawyers, the witnesses, the

25   defendant, the law enforcement officers involved in the case.

PROCEEDINGS                              583

1   And the reason for that are -- or reasons are to protect your

2   right to privacy and to assist you in discharging your

3   responsibility as jurors independently, fairly and

4   impartially.

5           And I want to repeat -- I'm going to say this

6   probably many times, because we find that, unfortunately,

7   sometimes jurors do avail themselves of the Internet.  It's

8   very important that during the course of the trial -- and the

9   trial's going to take about two or three weeks.  It will be

10  over by the end of the month.

11          The reason it's important that you abide by that

12  instruction is, as I told most of you while you were examined

13  here on the witness stand, that you're going to get your

14  information on the case from the witnesses as they testify in

15  court.  And those of you who are chosen as jurors are going to

16  be the experts in the case, and not anything on the Internet,

17  not anything on radio, television, or in the newspapers.

18          If you see anything in the paper, put the paper

19  aside or, as I suggested to a couple of you yesterday, you can

20  do what my friend, Judge Leval did, who is on the Court of

21  Appeals.  He tried a big case years ago, and he told the

22  jurors if there's something in the paper about the case and

23  ultimately you want to read it, fine, cut it out or have your

24  brother-in-law cut it out and save it, and when the case is

25  over you can read about it after you've decided the case.  All

PROCEEDINGS                                584

1   right.

2            Is there anything any of the 28 jurors whose numbers

3   were called wants to bring to my attention and to the

4   attention of the lawyers?  If there is, raise your hand.

5   Otherwise, we're going to go right ahead.  All right.  Now,

6   juror number 4, come on up to the sidebar.  Juror number 1.

7   I'm sorry, I didn't see juror number 1 raise his hand.  Okay.

8   Come up, number 1.

9            (Sidebar conference.)

10           THE PROSPECTIVE JUROR:  I didn't initially report to

11  you at the time that I was also in a mental institution in

12  1994.

13           THE COURT:  And do you think -- well, you're taking

14  medication?

15           THE PROSPECTIVE JUROR:  Yes.

16           THE COURT:  We'll excuse you.  Thank you very much.

17           MR. GOLTZER:  No objection.

18           MR. MARSHALL:  No objection.

19           (End of sidebar conference.)

20           THE COURT:  Why don't counsel stay up here, because

21  juror number 4 raised her hand.  You're excused, sir.  Thank

22  you very much.

23           Let me say this to people who are still here and as

24  number 4 approaches, the reason we excused that first lady

25  before we called any names -- or numbers, rather, was because

PROCEEDINGS                                              585

1    there was a death in her family, and it was the second death

2    in the family within this last year.  And she was quite upset,

3    so we obviously let her go.  And we're only going to be

4    excusing people for very good reasons.  Yes.

5              (Sidebar conference.)

6              THE PROSPECTIVE JUROR:  I understand that the trial

7    is going to be for three weeks.

8              THE COURT:  Two, three weeks.

9              THE CLERK:  My employer only gives me ten days.

10             THE COURT:  I'll write a letter to your employer.

11   Who is -- I don't want to know who it is, but is it a big

12   company, a small company?

13             THE PROSPECTIVE JUROR:  A small company.

14             THE COURT:  Give me the name of your employer and

15   I'll write a letter and tell them you tried to get off and we

16   refused you.  Sorry.

17             MR. BACHRACH:  Your Honor, I have a question for

18   you.  It's okay if she --

19             THE COURT:  About this?

20             MR. BACHRACH:  About what's going to happen after

21   this.

22             THE COURT:  Oh, sure.  Okay.  Take your seat.

23             (Juror leaves.)

24             MR. BACHRACH:  I just wanted to confirm, when we

25   give you our numbers, our strike numbers, do you want the

PROCEEDINGS                                              586

1  number on their badge or the number of the seat that they're

2  in now?

3           THE COURT:  Both.  That way, we'll be sure we got

4  the right one.

5           MR. BACHRACH:  Oh.

6           THE COURT:  Use both.

7           MR. MARSHALL:  That makes sense.  Thank you.

8           (End of sidebar conference.)

9           THE COURT:  Juror number 16, come on up.

10          (Sidebar conference.)

11          THE COURT:  Yes, sir.

12          THE PROSPECTIVE JUROR:  Hi.

13          THE COURT:  Yes.

14          THE PROSPECTIVE JUROR:  I would love to be on it and

15  it would be a great experience, but financially, I can't.

16          THE COURT:  Why?

17          THE PROSPECTIVE JUROR:  I have three children.  Last

18  month was really bad at work.  There was no work.  I do

19  construction, so with the cold weather and everything that

20  happened --

21          THE COURT:  Come on up.

22          THE PROSPECTIVE JUROR:  I had -- I'm struggling

23  right now paying rent, and I could even show you proof if you

24  want.  Work is starting to pick up again.  I have to support

25  my family.  My wife does work, but it takes two.

PROCEEDINGS                                    587

1          THE COURT:  Take it easy.  I'll excuse you.

2          THE PROSPECTIVE JUROR:  Okay, thank you.

3          THE COURT:  Just don't tell anybody how or why.

4          THE PROSPECTIVE JUROR:  Thank you.

5          (End of sidebar conference.)

6          THE COURT:  All right.  Juror 10.

7          (Sidebar conference.)

8          THE COURT:  Juror number 37, you were in the 10th

9    seat.

10         THE PROSPECTIVE JUROR:  So I know you said the case

11   should be over by the end of the month, but I've been wanting

12   to ask and I guess I should mention I purchased plane tickets

13   for February 17th.

14         THE COURT:  If this isn't over by February 17th,

15   none of these four people are going to be very happy, because

16   there's going to be somebody that's got to do something before

17   February 17th.

18         MR. GOLTZER:  So we won't be here either, right?

19         THE COURT:  Thank you.

20         (End of sidebar conference.)

21         THE COURT:  All right, anybody else in the jury box?

22   How about in the first row of the courtroom?  Anybody want to

23   see us?

24         MR. GOLTZER:  There's a hand up.

25         THE COURT:  Okay, that's juror number 19 -- 20, I

PROCEEDINGS                                      588

1    think you are.  Seat 20, anyhow.

2              (Sidebar conference.)

3              THE COURT:  Yes, ma'am.  Juror 62.

4              THE PROSPECTIVE JUROR:  It would be a financial

5    hardship, Judge.

6              THE COURT:  Take your time.

7              THE PROSPECTIVE JUROR:  I'm basically the sole --

8    not sole breadwinner, but major breadwinner of the house.  I

9    just don't think I could financially do two weeks.

10             THE COURT:  All right, you're excused.

11             THE PROSPECTIVE JUROR:  Thank you.

12             (End of sidebar conference.)

13             THE COURT:  All right.  Would you fill those seats,

14   Mr. Ryan.  Is there anybody else that raised their hand?

15   Anybody in the second row there?  Anybody in the first row on

16   the right side here on my side?  Okay, thank you very much.

17             (Sidebar held off the record.)

18             THE COURT:  As we call your number -- a good

19   suggestion was made by the lawyers on both sides.  If for some

20   reason you have a problem serving, when we call your number,

21   let us know and we'll bring you over to the sidebar and

22   discuss it privately with the lawyers before you take the

23   seat.  That will save a little time.  All right, fine.

24             THE CLERK:  The next juror is number 18.  You can

25   take seat number 1.  The next juror is juror number 67, if you

PROCEEDINGS                                    589

1   could take seat number 16 in the last row of the jury box.

2            The next juror is number 2.  Take seat number 20,

3   which is right here in the first row of this side.  I believe

4   he wants to speak to you.

5            THE COURT:  Did you want to come up?  Okay.

6            (Sidebar conference.)

7            THE COURT:  All right, yes.

8            THE PROSPECTIVE JUROR:  Good morning.

9            THE COURT:  Good morning.  And you're juror number?

10           THE PROSPECTIVE JUROR:  Two.  I'm a single father.

11  I don't have nobody to pick up my son, drop him off at school

12  and pick him up in the evening.

13           THE COURT:  What did you do yesterday?

14           THE PROSPECTIVE JUROR:  Doing jobs, stuff like that.

15           THE COURT:  I don't understand.

16           MR. MARSHALL:  He was doing jobs, he said.

17           THE PROSPECTIVE JUROR:  I was doing jobs.

18           MR. MARSHALL:  He was here a couple days ago.

19           THE PROSPECTIVE JUROR:  I came in Monday.  I was off

20  yesterday.

21           THE COURT:  What did you do this morning?

22           THE PROSPECTIVE JUROR:  Took my son to school.

23           THE COURT:  If you took your son to school today,

24  couldn't you take your son to school tomorrow even if you're

25  on the jury?

PROCEEDINGS                                          590

1           THE PROSPECTIVE JUROR:  I don't have nobody.

2           THE COURT:  What?

3           THE PROSPECTIVE JUROR:  I don't have anybody.  My

4    parents live in Brooklyn; I live in Queens.

5           THE COURT:  Well, who took the son to school today,

6    you did?

7           THE PROSPECTIVE JUROR:  I did.

8           THE COURT:  Can't you do that tomorrow?

9           THE PROSPECTIVE JUROR:  Not if I'm here.

10          THE COURT:  You've got me --

11          MR. GOLTZER:  May I ask a question?

12          THE COURT:  Go ahead.

13          MR. GOLTZER:  How did you get here by 10 if you took

14   your son to school?  That's what he really wants to know.

15          THE PROSPECTIVE JUROR:  Because I took the subway.

16          MR. GOLTZER:  Is that a problem during the trial?

17          THE PROSPECTIVE JUROR:  Yes.

18          MR. GOLTZER:  Why is that?

19          THE PROSPECTIVE JUROR:  Because I take the train

20   from Queens.  The trains run differently in Queens than

21   Brooklyn.

22          MR. GOLTZER:  Where does your son generally go to

23   school?

24          THE PROSPECTIVE JUROR:  In Brooklyn.

25          MR. MARSHALL:  And what about in the afternoon, in

PROCEEDINGS                                    591

1    the evening?

2              THE PROSPECTIVE JUROR:  He's with me.

3              MR. GOLTZER:  What time do you pick him up?

4              THE PROSPECTIVE JUROR:  2:30.

5              THE COURT:  Don't you work?

6              THE PROSPECTIVE JUROR:  I'm laid off.

7              THE COURT:  You're laid off?

8              THE PROSPECTIVE JUROR:  I'm doing training.

9              MR. GOLTZER:  Up to you, Judge.

10             MR. MARSHALL:  I mean, if there's no one to pick up

11   his child at 2:30, we wouldn't oppose.

12             THE COURT:  All right.  You're excused.

13             THE PROSPECTIVE JUROR:  Thank you.

14             (End of sidebar conference.)

15             THE CLERK:  The next juror is number 69.  Take seat

16   number 20.

17             THE COURT:  That's it?

18             THE CLERK:  Yes, Judge.

19             THE COURT:  Now, what is it the preacher says at the

20   wedding?  Speak now or forever hold your peace.  Can all 28 of

21   you be fair and impartial?  That's the key question, can you

22   be fair and give the defendant a fair trial, can you give the

23   government a fair trail?

24             THE PROSPECTIVE JURORS:  Yes.

25             THE COURT:  You may proceed then with the

PROCEEDINGS                                    592

1    challenges.  And I'll just wait for you and take the

2    challenges.  After we get the jury, we'll then choose the

3    alternates and then we'll take a recess.  Go ahead.

4         (Pause.)

5         THE COURT:  All right.  The following six jurors are

6    excused, with the thanks of the Court:  Juror number 57, who

7    is seated in seat 8.  So you're excused, ma'am.  Thank you.

8    Juror number 78, who is seated in seat 26.  Thank you, sir.

9    Juror number 31, who is seated in seat 17.  Thank you.  And

10   juror number 16, who is seated in seat 27.  Thank you, ma'am.

11        So, Bill, that's seats 8, 26, 17, and 27.

12        THE CLERK:  Yes, Judge.

13        THE COURT:  And that's Defense Cross Exhibit 1 of

14   today's date.

15        Juror number 21, who is seated in seat 18, you're

16   excused, sir.  And juror number 45, who is seated in seat 25,

17   you're excused, sir.  Thank you.  Thank you very much.

18        MR. GOLTZER:  May we have the number of the last two

19   people who were excused?

20        THE COURT:  Number 21, who was in seat 18; and

21   number 45, who was in seat 25.

22        MR. GOLTZER:  Thank you.

23        THE COURT:  Okay, sure.

24        (Pause.)

25        THE COURT:  The following jurors are excused with

1    the thanks of the Court:  Juror number 22, who is in seat 19,

2    you are excused.  Thank you.  Juror number 61, who is in seat

3    number 7, thank you.  Juror number 71, who is in seat 21,

4    thank you.  Juror number 42, who is in seat 24; juror number

5    18, who is in seat 1; and juror number 67, who is in seat 16.

6              All right.  Next, we have juror number 69, who is in

7    seat 20, you are excused.  Juror number 37, who is in seat

8    number 10.  Thank you.  Juror number 36, who is in seat 2.

9    Thank you, sir, you are excused.  You're 36?

10             THE PROSPECTIVE JUROR:  Yes.

11             THE COURT:  You're excused.  Thank you.  And juror

12   number 42, who is in seat 24, we've already excused from both

13   sides.  All right.

14             So now the remaining lowest 12 numbers, the lady

15   over there, you just stay there for a second.  If everybody in

16   the front row would move to your right.  And let's be sure

17   we've got the right numbers.

18             THE CLERK:  Juror number 34 is in seat 1.  Juror

19   number 53 is in seat 2.  Juror number 77 is in seat 3.  Juror

20   number 7 is in seat 4.  Juror number 75 is in seat 5.

21             THE COURT:  That's you, ma'am, right?  So if you'd

22   come up to the front and just sit next to the gentleman in the

23   front row.  Thank you.

24             THE CLERK:  Juror number 20 is in seat 6.  Juror

25   number 40 is in seat 7, at the end there.  And juror number 33

PROCEEDINGS                                               594

1   is 8.

2           THE COURT:  Just take your time and watch your step.

3   Don't trip, please.  Lots of obstacles there.

4           THE CLERK:  Juror number 46 is 9, seat 9.  Juror

5   number 4 is seat 10; juror number 76 is seat 11; and juror 65

6   is seat 12.

7           Juror number 73, if you could take the last seat in

8   the last row of the jury box.  She's eligible to be an

9   alternate juror?

10          THE COURT:  She is eligible to be an alternate.

11  Now, do you want to get me seven more?

12          THE CLERK:  The next juror is number 64, number 64.

13  That's alternate number 2, the last row of the jury box.  The

14  next juror is 19, alternate number 3.  The next juror is 82,

15  alternate number 4.  The next juror is 59.  That's alternate

16  number 5.  The next juror is 23, that's alternate number 6.

17  Take the last seat in the jury box, the last row.

18          I believe she wants to speak to you.

19          THE COURT:  All right, come on up.

20          (Sidebar conference.)

21          THE COURT:  All right.  What do you want to tell us?

22  This is juror number 23.

23          THE PROSPECTIVE JUROR:  Just I'm anticipating -- I

24  don't know what time court ends.

25          THE COURT:  4:30.

PROCEEDINGS                                                595

1          THE PROSPECTIVE JUROR:  Okay.  I'm a sabbath

2    observer, so on Fridays I need to leave at 2:00 in order to be

3    home by sundown.

4          THE COURT:  Well, we're not working next Friday.  I

5    haven't told anybody that yet, but we're not working the 17th.

6          Now, could you step back a minute.  Just wait.  I

7    mean the juror.  I didn't mean you.  I just want to talk to

8    the lawyers.  Just wait there.  That's all.

9          (Juror leaves.)

10         THE COURT:  Off the record for a second.

11         (Discussion held off the record.)

12         (Juror present.)

13         THE COURT:  No problem at all.  We'll break Fridays

14   at 1:00.

15         THE PROSPECTIVE JUROR:  I'm sorry.  One last thing

16   also.  You had said that trial would be around three weeks?

17         THE COURT:  Two to three.

18         THE PROSPECTIVE JUROR:  Because I had a letter from

19   my job, but I won't even bother you with it.

20         THE COURT:  Thank you.

21         (End of sidebar conference.)

22         THE COURT:  Juror number 14 wants to see us in seat

23   14.  Come on over.

24         (Sidebar conference.)

25         THE COURT:  Yes, ma'am.

PROCEEDINGS                                    596

1          THE PROSPECTIVE JUROR:  Hi.  I work on commission,

2    so I'm concerned about being out of the office.  And I also

3    work from home one day a week to care for my children, to get

4    them on the bus and off the bus.

5          THE COURT:  First of all, take your time a little

6    bit.  You work on commissions?  And --

7          THE PROSPECTIVE JUROR:  I'm not making any money and

8    I can't help support the family.  And I also work from home

9    one day a week to care for -- my youngest is ten years old,

10   and I -- to get her on the bus, off the bus, and be home.

11   There's nobody else.  I have somebody who does it Monday

12   through Thursday, but Fridays, I take care of her.

13         THE COURT:  Take your time.  What did you want to

14   say?

15         MR. MARSHALL:  We've been talking about having a

16   short day Friday anyway.  I don't know if that would assist.

17         THE COURT:  We'll only work till 1:00 on Fridays,

18   and next Friday, we're not working.  So you'll be able to work

19   from home on Friday practically the whole trial.  I can't let

20   you off.  Sorry.

21         (End of sidebar conference.)

22         THE CLERK:  The next juror is number 84, alternate

23   number 7, if you could come to the first row there.

24         THE COURT:  Just have a seat in the first row there

25   on your right side.  That's swell, right there.

PROCEEDINGS                                          597

1             THE CLERK:  The next juror is 15, alternate number

2    8.

3             THE COURT:  She wants to come up.

4             (Sidebar conference.)

5             THE PROSPECTIVE JUROR:  I have two concerns.  First,

6    my job.

7             THE COURT:  I don't understand you.  You have two

8    what?

9             THE PROSPECTIVE JUROR:  Concerns.  Concerns.

10            THE COURT:  Concerns.  What are they?  Take your

11   time.  Take your time.  You have two concerns for your job?

12            THE PROSPECTIVE JUROR:  First, my job, I do payroll.

13   I'm the only one that does payroll for my company of several

14   hundred employees.  If I don't submit the payroll on

15   schedule --

16            THE COURT:  We're not going to work Fridays.  What

17   day do you do the payroll?

18            THE PROSPECTIVE JUROR:  I do payroll every -- like

19   every other two weeks.

20            THE COURT:  Okay.  Well, we're not going to work

21   next Friday and we're not going to work in the afternoons any

22   Fridays.  Take it easy.  And if there's a problem at work, you

23   give me the name of whoever your supervisor is, and I'll write

24   a letter and say you wanted to get excused and we wouldn't let

25   you go.

PROCEEDINGS                                              598

1          THE PROSPECTIVE JUROR:  I have one more.  I booked a

2    trip to China in January.

3          THE COURT:  A trip to where?

4          THE PROSPECTIVE JUROR:  To China, January.

5          THE COURT:  How are they going to do the payroll

6    when you go to China?

7          THE PROSPECTIVE JUROR:  No, my supervisor is going

8    to.  I have the ticket here.

9          THE COURT:  What day are you going to China?

10          THE PROSPECTIVE JUROR:  I'm going January 31st.

11          MS. DEAN:  It shouldn't be a problem.

12          THE COURT:  Okay.  We'll be over by then.

13          MR. MARSHALL:  31st, right?

14          THE PROSPECTIVE JUROR:  January 31st.

15          THE COURT:  We'll be over by then.  Thank you.  Take

16    your seat.

17          (End of sidebar conference.)

18          THE COURT:  All right.  Now, before the lawyers

19    decide which of you will be the four alternates, let me

20    explain to you, the eight people who are eligible to be

21    alternates.  That's the lady in the first seat and the seven

22    who were just called up.

23          The reason we pick alternate jurors, particularly

24    this time of year, is because lots of people like me catch

25    colds.  Some of them get worse and you can't continue.  Or

PROCEEDINGS                                          599

1    something unforeseen might happen to somebody, and you

2    wouldn't be able to complete your service, one of the original

3    12.

4              So we have alternates.  And if for some reason one

5    of the original 12 can't finish his or her service, then we

6    take the alternates in order, one, two, three, four.

7              Alternate jurors, their function is a very important

8    function.  Human nature, as we know, is such that you think,

9    well, if I'm an alternate, I'm not going to have to decide

10   this.  Don't be so sure.  I've tried a lot of cases where

11   we've used -- and when we take as many as four alternates --

12   all four.  And I've been judging now for over 30 years.

13             So the fact is, there's a good reason we pick the

14   alternates, and alternate service is not second-rate or

15   second-class service.  It's very important.

16             Okay.  You may exercise your challenges to the

17   alternates.

18             All right, the following four jurors are excused.

19   Thank you all.  First of all, alternate juror number 1, who

20   was number 73, you are excused.  You all go back down to the

21   central jury room.  Thank you.

22             THE CLERK:  Go to the central jury room on the

23   second floor.

24             THE COURT:  Alternate juror number 5, who was juror

25   number 59.  That's you, sir, yes.  You're excused.  Thank you

PROCEEDINGS                                                    600

1    very much.

2              THE CLERK:  Report to the jury assembly room on the

3    second floor.

4              THE COURT:  Alternate juror number 2, who was number

5    64.  Thank you very much.

6              THE CLERK:  Jury assembly room, second floor.

7              THE COURT:  Alternate juror number 8, who was

8    originally number 15.  In other words, the lady there.

9              THE CLERK:  Number 15, you've been excused.  Report

10   to the jury assembly room on the second floor.  Thank you.

11             THE COURT:  Okay.  If you three in the back row

12   would move over to the right, and if the two -- yes, you move

13   over.  And if the other juror there could come over and sit in

14   the fourth row.  Now, you're the jury.

15             Mr. Ryan will swear you all in, then I'll talk to

16   you a little bit.  And the other jurors who are still here can

17   report down to central jury room.

18             THE CLERK:  There are still jurors in the courtroom.

19   You can report to the jury assembly room on the second floor.

20   Thank you.

21             THE COURT:  Thank you very much.

22             THE CLERK:  Would the jurors please rise and raise

23   your right hand.

24             (Jury sworn.)

25             THE CLERK:  Please be seated.

PROCEEDINGS                                            601

1              THE COURT:  All right.  Thank you very much.  What

2      I'm going to do now is give you some preliminary instructions

3      and directions.  First, a little housekeeping.  As soon as I

4      finish my preliminary remarks here, we're going to take a

5      recess, and Mr. Ryan will take you into the jury room.  He'll

6      show you how you get into the jury room.  And from now on, you

7      don't come in through the courtroom.  You go directly to the

8      jury room.

9              Secondly, the handsome gentleman back there behind

10     the defense table -- would you stand up, Mr. Dinnen.

11     Mr. Dinnen is a United States Marshal.  Now, he's going to go

12     in the jury room with you and explain the method of how you're

13     going to get here in the day and so forth, the means of

14     getting here before trial and each day.

15             The purpose of that is to ensure this anonymity.  I

16     don't want you wandering in individually, because that way,

17     we're assured that you will remain anonymous.  And Mr. Dinnen

18     will be in charge of that.

19             Also, you will be having lunch in the jury room most

20     days, and in the morning when you come in, just give your

21     luncheon order to Mr. Ryan, and we'll make sure you have

22     lunch.

23             Now, let me tell you about the trial days and how we

24     work.  Because of one of the jurors who we've agreed, both

25     sides and I have agreed to try to accommodate, we're going to

PROCEEDINGS                                                            602

1  break on Fridays around 1:15 to 1:30 every Friday.  In other

2  words, we're not going to work a full day on Friday.  The

3  normal trial day is 10:00 in the morning until 1:00,

4  approximately, with a break in the morning just about now,

5  11:30.  We take a break every morning around 11:30 for about

6  10 or 15 minute and then we work until 1:00.

7           We resume after lunch at 2:15 and work normally

8  until 4:30 or quarter of 5, with one break in the afternoon at

9  around 3:30, quarter to 4.  Your trial schedule, so you should

10  know it ahead of time and plan it, I said on no Friday will

11  you be required to work a full day.  That's the first thing.

12           The second thing is next Friday, that's January

13  17th, you will not be sitting at all.  Next Friday, you're not

14  sitting.  And on Monday, January 20th, which is Martin Luther

15  King Day, it's a holiday, you won't be sitting, so that you

16  know ahead of time what the schedule is.  I'm pretty sure this

17  will be over in less than three weeks.  It may take three

18  weeks, but I think it will be less than three weeks.  All

19  right?

20           Now, let me give you some preliminary instructions

21  about procedure.  I basically told you during jury selection,

22  it would be your function in the case to decide the issues of

23  fact.  Your decision on the issues of fact is to be based

24  solely on the evidence.

25           Nothing that I say -- now, remember, nothing that I

1    say or will say is evidence.  Nothing any of the lawyers on

2    either side says is evidence.  What the lawyers have to say is

3    important, but it is not evidence.  Questions by themselves

4    are not evidence.

5            Now, let me give you a silly example of that.

6    Because it's silly, you'll remember it.  In Vaudeville -- I'm

7    old enough to remember that it existed.  I never actually saw

8    it, I guess, but I know it existed.

9            In Vaudeville, one guy would always say to the other

10   guy, have you -- these were allegedly comedians -- have you

11   stopped beating your wife?  Now, what do you know from that

12   question?  Absolutely zippo, nothing.  You don't know anything

13   from the question.  You don't know whether the person that was

14   asked the question ever had a wife, and you certainly don't

15   know whether he ever beat her.

16           So it's not the question that's the evidence; it's

17   the answer to the question, in the context of the question,

18   that's the evidence in the case, concerning testimony.

19           Also, the evidence, which, as I just indicated, will

20   consist of the sworn testimony of witnesses and of any

21   exhibits which I receive into evidence for your consideration,

22   and also if the lawyers agree to something.  As always in law,

23   we have a big fancy word for it.  Instead of just saying

24   agreement, we call it a stipulation.  If the lawyers stipulate

25   to anything, that can be evidence.  And if there are

PROCEEDINGS                                                    604

1    stipulations, I'll instruct you as to the effect of the

2    stipulation and its impact on the evidence.

3            So there are three possible sources of evidence:

4    First, the testimony of the witnesses; second, the exhibits;

5    and, third, the stipulations.  Okay?

6            Now, you may ask yourselves ahead of time here,

7    particularly those of you who haven't been on jury service

8    before, how do I decide what to believe and who to believe and

9    what not to believe and who not to believe?  Well, if you

10   think about it, the answer is a relatively simple one.

11           The first thing you have to do is you have to listen

12   to the witnesses as they testify from the witness stand over

13   here.  You have to watch them.  You have to observe them.

14   Then you decide whether you believe or disbelieve them the

15   same way you decide such questions in your ordinary everyday

16   lives.

17           Did the witness seem candid, honest, open and

18   aboveboard?  Did the witness appear to be truthful?  How good

19   an opportunity did the witness have to observe or to hear what

20   the witness is testifying about?  Did the testimony make

21   sense?  Did the witness have a reason to falsify, to

22   exaggerate or to distort his or her testimony?

23           You have to use your common sense and your good

24   judgment to evaluate the testimony, based on all the

25   circumstances.  Use your common sense.  Don't leave it out on

PROCEEDINGS                                              605

1    the street.  Bring it into the jury room and into the jury

2    box.

3              Now, it's very important that you keep an open mind

4    throughout the case.  Do not form any judgments until the

5    evidence is concluded and the case is submitted to you.

6    Remember, by its very nature, the evidence has to come in step

7    by step.

8              First, a witness testifies on direct examination;

9    and when she or he has finished on direct examination, the

10   other side then has the right to cross-examine the witness.

11   First, one side presents its evidence; and then, if there is a

12   defense, the defense has an opportunity to present evidence.

13             So first, the prosecution presents evidence; and

14   then, after the prosecution case ends, then the defense, if it

15   wishes, may present evidence.

16             But remember what I told you both yesterday, those

17   of you in the second group, and what I told the other people

18   on Monday.  The defense need do nothing.  The burden is always

19   on the prosecution to prove the defendant guilty beyond a

20   reasonable doubt.  He's presumed to be innocent, and all he

21   has to do is come here.  That's all he's got to do.  And his

22   lawyers and he, you can't hold it against him if they don't do

23   anything.

24             Now, concerning this examination of witnesses, when

25   the government calls a witness, then they ask the questions.

PROCEEDINGS                                                    606

1   Either Mr. Miller or Ms. Dean will be doing the questioning.

2   They call that direct examination.  Now, there are certain

3   rules that apply to direct examination.  That's my problem,

4   not yours, okay.

5           And from time to time, you'll hear one of the

6   lawyers will object to a question, and then I have to rule on

7   the objection.  If I say overruled, that means the objection

8   is not being permitted and is not going to hold; or if I say

9   sustained, that means the objection is a good objection.

10  Okay?

11          Now, remember that there may be two or more sides to

12  any story.  So you're not going to be in a position to form

13  any judgment as to what you believe until you've heard all of

14  the evidence in the case.  Now, this is very important, what

15  I'm going to tell you now.  This is not just filler; this is

16  very important.

17          During the trial, don't discuss the case or any

18  testimony or evidence in the case amongst yourselves when

19  you're in the jury room or with any other person.  In other

20  words, when you get home at night, don't discuss the case with

21  anybody.  You will discuss it amongst yourselves only after

22  all the evidence is in and the case is given to you to discuss

23  and decide in the jury room.  Until then, keep even your

24  impressions to yourselves.

25          Now, I pointed out to all of you at one stage or

PROCEEDINGS                                             607

1    another that there probably will be something in the

2    newspapers about the case.  There may be something on

3    television about the case, there may be something on the radio

4    about the case, and there certainly will be information about

5    the case on the Internet.

6              Now, let me tell you this:  I've told everybody this

7    a couple of times, but it's so important that I'm going to

8    repeat it.  And I may repeat it even more than once during the

9    trial.  You may not use any electronic device or media, such

10   as a telephone, a cell phone, a smart phone, an iPhone, a

11   Blackberry or a computer, the Internet, any Internet service

12   or any text or instant messaging service, or any Internet chat

13   room, blog or website, such as Facebook, Myface -- Myspace,

14   excuse me, LinkedIn, YouTube or Twitter -- I think I've

15   covered pretty much everything -- to communicate to anyone any

16   information about the case or to conduct any research about

17   the case until you've rendered your verdict at the end of the

18   case.

19             After you've rendered your verdict, you can do

20   anything you want, but up until then, don't use the Internet

21   in connection with the case.  Okay?  And don't read anything

22   in the paper about the case.  And if something comes on

23   television, turn on the mute until it's over.

24             I don't believe this is going to happen, but the law

25   says I have to tell you this.  Don't allow anybody to speak to

PROCEEDINGS                                          608

1    you about the case.  If anybody -- and I'm not saying it's

2    going to happen, it's not going to happen, I'm sure, but if it

3    did, if anybody tries to talk with you about the case, you

4    have a duty to report that to me.  Not to any of the other

5    jurors, but to me.  How do you do that?  You tell Mr. Ryan or

6    Mr. Dinnen that you've got to see me, that's all, and I'll see

7    you, if somebody tries to talk to you about the case.  But

8    don't, as I say, tell any of the other jurors about it.  If

9    you want, you can write me a little note and tell me about it.

10           Now, after the recess, the first thing that's going

11   to happen is the lawyers will have an opportunity to make

12   opening statements to you.  Now, the opening statement is very

13   important, but what did I tell you about five minutes ago?

14   What the lawyers say is not evidence.  The opening statement

15   is not evidence.  It serves the purpose of giving you an idea

16   in advance of the evidence that the lawyers expect to hear and

17   expect that you will hear from the witnesses.

18           The openings are much like a table of contents to a

19   book.  I have a book here on evidence, and in the beginning of

20   the book they have contents, and it's an outline of what's in

21   the book.  And let's say that some -- this is not going to

22   arise in this case, so I'll give you an example.

23           Let's say some esoteric area of the law came up

24   about a privilege between a husband and a wife.  That's not

25   going to be in this case.  And I had to look it up, because I

PROCEEDINGS                                               609

1    wasn't sure what the law was.  I had forgotten in the many

2    years since I got out of law school and I had to look it up.

3    Well, how would I find it?  The first thing I'd look at is the

4    table of contents, because that tells me in outline form

5    what's in my evidence book.  And that's what an opening is;

6    it's an outline, as it were, of what each side expects to hear

7    from the witness.

8            So the statements or the opening statements permit

9    the lawyers to tell you what the case is all about, but the

10   only evidence, remember, comes from the witnesses, the

11   exhibits, and if there are any stipulations, the stipulations.

12           After the opening statements, then you're going to

13   hear evidence, which will include the testimony of witnesses.

14   Each witness will first give direct testimony.  Then, as I

15   pointed out, that he or she may be cross-examined by the other

16   side, and there will also be redirect testimony, usually, and

17   recross.

18           I told you this already, but I'll repeat it.  The

19   government will call its witnesses first.  After all the

20   evidence has been received, the lawyers have an opportunity to

21   sum up to you, to make their closing arguments to you.  They

22   may review the evidence and make arguments to you as to what

23   conclusions you should or should not draw from the evidence.

24   Remember that when they make their arguments, they're

25   important, but they are not evidence.  They are called

PROCEEDINGS                                                    610

1    summations.  Their arguments are not evidence.

2           After the summations, I will instruct you on the

3    law.  That will be the end of the case, basically.  Following

4    my instructions on the law, they call that the charge of the

5    law, you will go into the jury room, review the evidence as

6    you heard it from the mouths of the witnesses.  You'll review

7    any exhibits which have been received in evidence, and you

8    will discuss the evidence then amongst yourselves.

9           Based on that evidence and your discussions of it,

10   your verdict will be determined.  Remember -- I've told you

11   this, I'm going to repeat it -- the defendant is presumed to

12   be innocent.  The government has the burden of proving his

13   guilt beyond a reasonable doubt.

14          This means that the defendant and his lawyers need

15   not lift a finger in the case if they chose not to.  They

16   could sit in silence throughout all of these proceedings

17   without ever saying a word, and you could draw no inference

18   against the defendant and you would not be permitted to find

19   him guilty unless and until you unanimously -- that means all

20   12 of you who deliberate -- are convinced beyond a reasonable

21   doubt of his guilt, based on the evidence in the case.

22          We're going to take a recess until noontime, and

23   then we'll hear the opening statements.  Thank you.

24          (Sidebar conference.)

25          MR. GOLTZER:  The parties have agreed that you can

PROCEEDINGS                                                611

1    instruct the jurors that we won't be our normal charming

2    selves in the hallway, to talk to them or acknowledge them.

3              THE COURT:  The only reason I didn't do that is

4    because they're going to be anonymous and they're not going to

5    be in the hallways.  They're going to have lunch in, as I

6    explained, without going into where, because I specifically

7    told Mr. Dinnen I don't want to know where, it's none of my

8    business.

9              MR. GOLTZER:  Even when they come in in the morning,

10   they won't have a chance to see us?

11             THE COURT:  What happens is they're met somewhere.

12             MR. GOLTZER:  Oh, okay.

13             THE COURT:  And then they're all brought here.

14   There are generally two groups.

15             MR. GOLTZER:  I should have realized that.

16             THE COURT:  No, that's all right.

17             MR. GOLTZER:  Because I've had anonymous juries.

18   Thank you, Judge.

19             MR. MARSHALL:  Thank you, Judge.

20             (End of sidebar conference.)

21             (Jury exits.)

22             (Recess.)

23             (Jury enters.)

24             THE COURT:  Everybody may be seated.  Whoever is

25   making the opening statement, come on up.  All right, Ms.

PROCEEDINGS                                           612

1    Dean, you may open.

2              MS. DEAN:  Good afternoon, ladies and gentlemen.

3              THE JURORS:  Hi.

4              MS. DEAN:  This is a case about a convicted

5    fraudster who turned to murder because he refused to take

6    responsibility for his crime.  You see, for years, the

7    defendant, Joseph Romano, ruthlessly stole millions from

8    unsuspecting elderly folks, and he lived like a king off the

9    fortune he made.  But eventually, he was caught.  He was

10   caught, pled guilty to his crime, and in February of 2012 was

11   sentenced to 15 years in prison.

12             But even though he had pled guilty, the defendant

13   wasn't sorry.  No, in fact, he was furious, furious that the

14   government came between him and his money, furious that he was

15   caught, and furious about his prison sentence.

16             And so what did he do?  He turned to violence,

17   gruesome and deadly violence, because the defendant, Joseph

18   Romano, decided he was going to murder the federal judge and

19   the federal prosecutor who had the misfortune of being

20   assigned to his case, murder these public servants for simply

21   doing their jobs.

22             In September of 2012, about seven months after he

23   was sentenced, pulling the strings from inside jail, the

24   defendant hired a hitman and agreed to pay $40,000 for the

25   hitman not just to murder, but also to cut the heads off of

SB      OCR    RMR    CRR

PROCEEDINGS                                                613

1    the Assistant United States Attorney who prosecuted him, and

2    the federal judge who sentenced him.

3            Thankfully, the FBI uncovered this horrific plot

4    before anyone could be killed.  And after the defendant was

5    arrested, as you'll hear, he confessed to all of it.

6            Ladies and gentlemen, my name is Una Dean, and I am

7    an Assistant United States Attorney here in the Eastern

8    District of New York.  Sitting with me is Marshall Miller,

9    also an Assistant United States Attorney, Ja'Shayla Smith,

10   paralegal specialist, as well as Special Agent Reynaldo

11   Tariche of the Federal Bureau of Investigation.  Together, we

12   represent the United States.

13           Let me tell you a little more about the murder plot

14   the defendant hatched.  You see, from 2001 to 2008, the

15   defendant owned telemarketing companies based out on Long

16   Island that would cold call people, mostly senior citizens,

17   and convince these people to spend their savings on coins

18   worth only a fraction of what these victims paid for them.

19           The defendant and his employees did this by lying

20   about the value of the coins and lying about how much they

21   could be resold for later, and the defendant conned his

22   victims out of millions.

23           But, as you might expect, in 2008, the defendant was

24   arrested.  He was arrested and prosecuted.  He was prosecuted

25   by Assistant United States Attorney, or AUSA Lara

PROCEEDINGS                                    614

1    Treinis-Gatz.  And the judge assigned to preside over the

2    prosecution was United States District Judge Joseph Bianco.

3               Now, the defendant ended up pleading guilty in that

4    coin fraud case, and as part of his guilty plea, he agreed to

5    give up 7 million dollars in cash and property that he had

6    earned through his fraud.  And in February of 2012, he was

7    sentenced by Judge Bianco to 15 years in federal prison.

8               But even though he had stolen millions, the

9    defendant didn't think that he deserved the sentence that his

10   crime called for.  As far as he was concerned, he was above

11   the law.  And so he sat stewing in his jail cell trying to

12   think about how he was going to get revenge.  And he made up

13   his mind that he was going to kill the people he felt were

14   responsible for his sentence:  Judge Bianco, who sentenced

15   him; and AUSA Gatz, who prosecuted the case against him.

16              But he had a problem.  He was in jail.  And he knew

17   he couldn't commit the murders himself from inside the jail,

18   he needed help.  And so he turned to a jailmate of his, a

19   jailmate with a violent background.  Turned to this person,

20   told him how he wanted to torture, murder, mutilate Judge

21   Bianco and AUSA Gatz, and asked the inmate if he could send a

22   hitman his way.

23              And in late August 2012, about six months after his

24   sentencing, the defendant received a visit from this hitman in

25   the Nassau County Jail.  But the defendant knew to be careful,

PROCEEDINGS                                                  615

1    and he knew better than to order the murders at this very

2    first meeting.  He had to test the hitman first, make sure

3    that he was the real deal, someone who was ready, willing and

4    able to commit violence for money, someone who wouldn't steal

5    his money and someone who wouldn't turn him in to the police.

6             And so, instead of ordering the murders at this

7    first meeting, the defendant ordered a test run.  He gave the

8    name and address of a Long Island car mechanic to the hitman

9    and ordered the mechanic beaten.  You see, the defendant held

10   a grudge against this mechanic because the mechanic had done

11   some work on the defendant's cars, but then refused to release

12   the cars when the defendant stopped paying for the work.

13            So at his first meeting with the hitman, the

14   defendant ordered the mechanic beaten, and he offered to pay

15   $3,000 to get it done.  And he told the hitman that more

16   serious work would follow if the beating were successful; and

17   he told the hitman, as soon as we finish this one, we'll do

18   another.

19            But the defendant had another problem.  How was he

20   going to pay $3,000 to the hitman from inside the jail?  He

21   realized he needed somebody else on the outside to help him,

22   and so he decided to turn to his old friend and former

23   neighbor, a man named Dejvid Mirkovic.

24            And as it turned out, Dejvid Mirkovic was the

25   perfect candidate, because Dejvid Mirkovic had access to all

PROCEEDINGS                                    616

1    of the defendant's money.  The defendant called him his money

2    tree.

3            And Dejvid Mirkovic was also the perfect candidate

4    because he owed the defendant a debt.  You see, in 2008, when

5    the defendant was arrested for the coin fraud, his coin

6    company shut down.  But he needed to make sure the money kept

7    coming in.  He needed to make sure that he and his family

8    could keep up his lavish lifestyle.  And so he opened another

9    coin company down in Florida and used Dejvid Mirkovic, who

10   lived in Florida, as the frontman, so that no one would know

11   that it was actually the defendant's business.

12           And that Florida coin business, just like the

13   defendant's other telemarketing businesses, made the defendant

14   and Mirkovic a lot of money; according to the defendant

15   himself, 1.3 million dollars for the defendant alone in just

16   one year.  And Mirkovic, Mirkovic was grateful.  He was

17   grateful, but he was also indebted.

18           And so, in exchange for being allowed to earn money

19   from the Florida coin company, Mirkovic funneled money from

20   that company to the defendant and the defendant's family.  He

21   sent money to the defendant's wife.  He paid the Romano family

22   credit card bills, legal bills, car repair bills.  He sent

23   money, clothes, books to the defendant in jail whenever the

24   defendant asked.

25           And so, in September of 2012, when the defendant

PROCEEDINGS                                          617

1    asked Mirkovic to meet with the hitman and give the hitman a

2    downpayment for the beating of the mechanic, Mirkovic did as

3    he was told.  In mid September 2012, Mirkovic flew up to New

4    York from Florida and gave the hitman a $1,500 cash

5    downpayment for the beating of the mechanic.

6            About one week later, the hitman called Mirkovic and

7    told him, using code words, that the beating had been

8    successfully carried out.  Mirkovic then relayed that

9    information to the defendant, who ordered the defendant --

10   ordered Mirkovic to pay the remaining $1,500 balance.

11           And so three days later, on September 25th, 2012,

12   Mirkovic again flew up to New York from Florida to meet with

13   the hitman.  In preparation for that meeting, the defendant

14   called Mirkovic two times the night before and told him, it's

15   crunch time.  Make sure you go to bed early and you're on

16   point tomorrow.

17           So on September 25th, Mirkovic met with the hitman,

18   and the hitman showed Mirkovic a photograph on his phone of

19   the mechanic lying on the ground, beaten.  Satisfied, Mirkovic

20   paid the remaining $1,500 balance.  And immediately after that

21   meeting, he went straight into the Nassau County Jail to get

22   his next marching orders from the defendant.

23           And after he did, after he left that jail, he

24   immediately called the hitman and asked to meet again.  And

25   when they did, Mirkovic revealed the defendant's horrific

PROCEEDINGS                                    618

1    plan.  Mirkovic told the hitman that the defendant wanted

2    Judge Bianco and AUSA Gatz murdered.  He told the hitman that

3    the defendant wanted Judge Bianco's murder to look like an

4    accident, and he wanted AUSA Gatz's dead body stuffed into a

5    35-gallon drum and hidden so it would look like she had just

6    disappeared.

7              But the defendant wanted more than just dead bodies.

8    In a sickening twist, Mirkovic told the hitman that the

9    defendant actually wanted souvenirs, that he wanted AUSA

10   Gatz's breasts and both victims' heads cut off and preserved

11   in formaldehyde.  And he said that the defendant would pay a

12   bonus for these severed body parts of Judge Bianco and AUSA

13   Gatz.

14             During that meeting, Mirkovic agreed that he and the

15   defendant would pay $40,000 for the murder and mutilation of

16   Judge Bianco and AUSA Gatz, and he gave the hitman a $12,000

17   cash downpayment that very day.  And later that evening, in a

18   phone call with the defendant, Mirkovic confirmed that the

19   murders had been ordered.

20             One week later, Mirkovic flew up to New York from

21   Florida a third time and gave the hitman another $10,000 in

22   cash, in all, paying $22,000 up front for the murders and

23   beheadings of Judge Bianco and AUSA Gatz.  Where did he get

24   all that money?  From the defendant's Florida coin business.

25             Unfortunately for the defendant and Mirkovic, the

PROCEEDINGS                                                       619

1  person they thought was a bona fide hitman, the person they

2  had hired to kill Judge Bianco and AUSA Gatz, was actually an

3  undercover law enforcement officer.  And nearly all of their

4  meetings had been videotaped and recorded.

5        How did the FBI find out about the plot?  Because

6  back in August of 2012, the FBI had been contacted by the

7  inmate whose help the defendant sought when he was looking for

8  a hitman.  You see, the defendant's plan was so disturbing

9  that this inmate, a career criminal, the kind that the

10 defendant would seek out when he was trying to plan a murder,

11 decided he needed to report the defendant to the authorities.

12 And because of this, thankfully, the gruesome murders that the

13 defendant planned were never carried out.

14        On October 9th, 2012, one week after the payment of

15 that final downpayment, the FBI arrested the defendant and

16 Mirkovic.  In Mirkovic's home, hidden in a safe, the FBI found

17 $18,000 in cash neatly bundled and ready for hand-off.  That

18 was the balance that the defendant and Mirkovic expected to

19 pay to the hitman after Judge Bianco and AUSA Gatz were dead.

20        And after the defendant was arrested, after waiving

21 his Miranda rights, he confessed to all of it.  He confessed

22 to ordering the assault of the mechanic.  He confessed to

23 plotting to murder Judge Bianco and AUSA Gatz.  He confessed

24 that he planned their murders as revenge for AUSA Gatz's

25 prosecuting him and for Judge Bianco sentencing him to prison.

PROCEEDINGS                                              620

1          He confessed that when he and Mirkovic spoke on the

2     phone of putting a downpayment on a Dodge truck, they were

3     actually talking about ordering the murders.  And he confessed

4     to asking for Judge Bianco and AUSA Gatz's bodies to be

5     mutilated.

6          For plotting to murder Judge Bianco and AUSA Gatz,

7     the defendant has been charged with two counts of conspiring

8     to murder an employee of the United States, one count for

9     conspiring to murder Judge Bianco, one count for conspiring to

10    murder AUSA Gatz.

11         And we will prove the defendant's guilt beyond a

12    reasonable doubt through audio and video recordings, physical

13    evidence, and witness testimony.

14         First, with regard to the audio and video

15    recordings.  At this trial, you will have an opportunity to

16    hear the recorded conversation between the defendant and the

17    inmate, where the defendant asks for the inmate's help in

18    finding a hitman.  And you will have the opportunity to see

19    and hear the defendant, in his own words, describe in chilling

20    and disturbing detail his hatred for Judge Bianco and AUSA

21    Gatz, his need for revenge, and the different ways he's

22    considering having them killed, including through torture and

23    through mutilation.

24         You'll hear the defendant talk about how he's going

25    to -- and I quote -- "find out where Bianco is, go there,

PROCEEDINGS                                          621

1    boom, right in the fucking head."

2              At this trial, you'll also have the opportunity to

3    see and hear the numerous meetings between the undercover

4    officers and the defendant and Mirkovic.  You'll see and hear

5    the defendant order the assault of the mechanic and promise

6    more serious work after the assault is completed.  You'll see

7    and hear Mirkovic negotiate the murders and beheadings of

8    Judge Bianco and AUSA Gatz, all at the defendant's

9    instruction.

10             You'll also hear, during this trial, dozens of

11   lawfully recorded jail calls between the defendant and

12   Mirkovic, giving you a unique inside view of this conspiracy

13   and of the twisted and criminal relationship between the two.

14             Now, the defendant knew that these calls were being

15   recorded, and he tried to hide what he was doing from law

16   enforcement.  And so you'll learn that he actually made these

17   phone calls on the telephone accounts of other inmates so that

18   they would avoid detection.

19             You'll also learn that the defendant and Mirkovic

20   spoke in code, referring to the hitman as Mr. Softy and

21   referring to the murders as the Dodge truck.  And you'll also

22   hear the defendant tell Mirkovic over and over again not to

23   say too much on the telephone, because they're being recorded.

24             But the FBI uncovered these calls, and when you have

25   seen the evidence, you won't have trouble understanding what

PROCEEDINGS                                    622

1    they're talking about.  You'll hear the defendant and Mirkovic

2    discuss the assault of the mechanic and then the plot to

3    murder Judge Bianco and AUSA Gatz.  And you'll hear the

4    defendant giving Mirkovic detailed instructions every step of

5    the way, what to do, how to do it, when to do it.

6            You'll hear the defendant calling day after day,

7    calling all the shots and making sure Mirkovic is doing

8    exactly what he's been told to do.  And so the recordings are

9    the first category of evidence.

10           You'll also see physical evidence during the course

11   of this trial.  You'll see the photograph of the mechanic that

12   was used to prove that the assault had been successfully

13   carried out.  Only you'll learn that the assault hadn't

14   happened at all, but that the mechanic had simply posed on the

15   ground for the FBI to photograph, so that it would look like

16   he had been beaten.

17           You'll also see the money, the money that was paid

18   to the undercover officers, the $3,000 for the beating of the

19   mechanic, the $22,000 cash downpayments for the murders, and

20   the $18,000 balance seized from Mirkovic's safe.

21           Finally, you'll hear from a number of witnesses over

22   the course of this trial.  You'll have the opportunity to hear

23   from the undercover officers themselves who will describe to

24   you in detail their meetings with the defendant and with

25   Mirkovic.  You'll hear from the law enforcement officer who

PROCEEDINGS                                    623

1    arrested Mirkovic and seized the $18,000 from the safe.

2            And you'll also hear from the law enforcement

3    officer who arrested the defendant and witnessed the

4    defendant's detailed confession, in which he admitted that he

5    had ordered the murder and mutilation of Judge Bianco and AUSA

6    Gatz.

7            Ladies and gentlemen, that is just some of the

8    evidence that we will present over the course of this trial.

9    And after you have heard from all the witnesses, listened to

10   the recordings and seen the other evidence, the defendant's

11   guilt will be clear.

12           And we will ask you to return the only verdict that

13   is consistent with the evidence, and that is a verdict of

14   guilty, guilty of conspiring to murder Judge Bianco, guilty of

15   conspiring to murder AUSA Gatz, guilty on both counts.

16           Thank you.

17           THE COURT:  Thank you, Ms. Dean.  Mr. Gallis.

18           MR. GOLTZER:  Mr. Bachrach.

19           THE COURT:  Oh, Mr. Bachrach, I'm sorry.  If you

20   wish to use the lectern, you may do so.

21           MR. BACHRACH:  Thank you.

22           Let me start with something very clear.  Joseph

23   Romano is not guilty.  The evidence in this case will show, in

24   a word, that he was entrapped.  That inmate that you just

25   heard being talked about a lot, that inmate that Romano

PROCEEDINGS                                                    624

1    apparently was talking to, what you didn't hear was that

2    inmate was a government informant.  That inmate was an inmate,

3    was a career criminal who was trying to cooperate with the

4    government.  What he was doing was setting Romano up.

5           That inmate's name -- you haven't heard it once yet.

6    I'll say it now.  That inmate's name is Gerry Machacek.  This

7    case is not about Joseph Romano and Dejvid Mirkovic; this case

8    is about Joseph Romano and a government informant by the name

9    of Gerry Machacek.  And the reason for that is because this

10   case is about entrapment.

11          Entrapment has two elements:  First, was Romano

12   induced by a government agent, Gerry Machacek, to do things

13   that he never would have otherwise done.  Second, if he was

14   induced, was he predisposed, that is, was he predisposed to

15   commit murder, not some other crime, not coin fraud.  Was he

16   predisposed to commit murder prior to the time the

17   government's agent, Gerry Machacek, got his claws into Joseph

18   Romano.

19          And the date that matters is August 10th, 2012,

20   because that's the date of that recording.  You're going to

21   see the video.  That's the date that matters.  The government

22   just talked about a lot of things that happened later, but

23   let's start from the beginning.

24          Joe Romano was convicted of a coin fraud, there is

25   no question about that.  On September 28th, 2010, he entered

PROCEEDINGS                                625

1    into a plea agreement.  He pled guilty.  He accepted

2    responsibility.  He waived his right to appeal.  And on

3    February 9th, 2012, in line with his plea agreement, he

4    received a sentence from Joe Bianco, Judge Joe Bianco, of 15

5    years.

6             That plea agreement specifically said that he would

7    not appeal if he got a sentence between 151 and 188 months.

8    And 15 years is 180 months.  So the plea agreement that he

9    bargained for, he got a sentence within it.  And he agreed not

10   to appeal that sentence.  He agreed not to challenge that

11   sentence in any way.

12            Joseph Romano knew, as part of his plea agreement

13   and now as part of his sentence in February of 2012, he knew

14   that he was going to spend the next 15 years in jail.  He was

15   not getting out.  There was nothing he can do about it.  He

16   accepted responsibility for it.  As the government told you,

17   Joe Romano had been involved in coin fraud.  A collectible

18   coin fraud conspiracy.  That's not murder.

19            So let's talk about that collectible coin fraud

20   conspiracy.  Essentially, what Romano did or what Romano was

21   convicted of doing, essentially, was he and others would call

22   up unsuspecting people on the phone, and he would say, hey,

23   we've got these coins, they're worth such and such money,

24   they're really valuable.  It's a great investment.  Buy them

25   from us.  And then so he would overvalue the cost of the coins

PROCEEDINGS                                          626

1   and then he would reap the profit.

2          It's a fraud.  A lot of people lost money.  It's a

3   very serious crime, but it's a nonviolent crime.  There's no

4   murder involved, there's no threats involved.  He's

5   overvaluing the price of collectible coins, like you see on

6   TV.  That's what he's doing.  And he received a punishment for

7   that, 15 years, which he agreed not to challenge.

8          Not only did he agree not to challenge a 15-year

9   sentence, as part of his plea agreement, he agreed that he

10  would forfeit 7 million dollars, he agreed to that, 7 million

11  dollars in money and property, in exchange for being allowed

12  to plead guilty.  And he agreed that he was responsible for

13  other people losing more than 2.5 million dollars.

14         As an agreement to allow him to get this 15-year

15  plea, he agreed to these things.  It's all in the plea

16  agreement.  And nothing he could ever do once he pled guilty

17  and once he was sentenced, nothing could ever change what he

18  agreed to.  Nothing he said or did was going to get him out of

19  jail before that 15-year sentence was up.  Fifteen years in

20  prison.

21         He was locked in, both into the jail and into his

22  agreement, and he knew it.  He swore to it.  He acknowledged

23  it.  The lawyer -- during his plea agreement, he was asked

24  whether he was satisfied with his lawyer's work, and Romano

25  said, yes, I'm satisfied with my lawyer's work, knowing full

PROCEEDINGS                                        627

1    well that 15 years was the sentence he could get and then did

2    get.

3              Joe Romano has a wife and three kids.  He served in

4    the Navy.  He became a pilot.  The evidence will show that he

5    served his country for four years and he supported his family.

6              But there's no question that there are two Joe

7    Romanos in this case.  You're going to hear tapes that show,

8    or you can hear two different Joe Romanos.  There was the man

9    he was, and then there was the man he pretended to be in order

10   to survive being in jail.  Both were crass.  Both swore.  You

11   were warned about bad language.  There's bad language in this

12   case.  Both spoke dirty.  But neither ever hurt anyone.  Both

13   talked a big game, but neither ever intended to kill anyone.

14             In prison, Romano is a man who needs to act a little

15   bit crazy, a little bit nuts, in order to survive, because

16   being convicted of coin fraud, the evidence will show that's

17   not going to instill fear in murderers, drug dealers, armed

18   robbers or the gangbangers that are in prison with him.

19             Collectible coin fraud.  And prison is a scary

20   place.  No one wants to be in prison, no one.  Being confined

21   24 hours a day.  Even when you're allowed recreation time,

22   you're trapped.  You're either within walls or you're within

23   fences with barbed wire and armed guards.  You're never

24   allowed to go home.

25             Romano was serving federal time, so there's no

PROCEEDINGS                                             628

1    conjugal visits.  That means for the next 15 years, he can't

2    be intimate with a woman, not his wife or any other woman, not

3    for 15 years.  This is not fun.  Being trapped inside a

4    building with drug dealers, murderers, gangbangers.

5           To survive, Joseph Romano had to talk a big game.

6    He acted tough.  And the evidence will show he did everything

7    he possibly could, everything he possibly could, to make

8    himself sound to the other inmates like a big man, sound to

9    the inmates he's recorded speaking to, sound to the inmates

10   he's not recorded speaking to.  He's trying to sound tough.

11          So yes, he talked about how he was wronged by the

12   judge and the prosecutor, how the criminal justice system, in

13   his opinion, was corrupt.  He talked about that.  Because he

14   received this 15-year sentence for fraud.  He didn't tell the

15   inmates, he's not complaining to the inmates I got 15 years,

16   but I agreed to 15 years, that was part of my plea agreement.

17   No.  He's saying, I was wronged.  Pardon the language.  They

18   all screwed me.  You can't trust any of them.  I want them all

19   dead.  He acted like he was still fighting his case, and he

20   acted like a tough man.

21          So what did he do?  To each and every single person

22   that would listen to him, either at the top of his voice or

23   whispering -- in at least one of these tapes you're going to

24   hear him whispering -- he said some pretty awful stuff.  To

25   act tough, he says to Gerry Machacek, to the cooperating

PROCEEDINGS                                        629

1    informant, to the agent, he does say, I want to cut her tits

2    off.  He does say, I want to cut his balls off.  He does say,

3    I want their heads decapitated and preserved in jars of

4    formaldehyde.  You'll even hear -- I think you'll even hear a

5    witness say as souvenirs.

6              He really was angry.  But he was desperate.  He was

7    scared.  He thought he would die in prison, so he had to act

8    tough.  He had to say things like cutting off people's heads,

9    even though he didn't intend to do it.  And the evidence will

10   show he didn't intend to do it.  He had to say these things

11   because he had to say these things, he had to say these things

12   to survive.

13             Then along came Gerry Machacek.  Now, right about

14   the time that Romano is pleading guilty in February 2012 to

15   his coin fraud case, just a few weeks earlier than that, in

16   January, Gerry Machacek is in his own bit of trouble.  Gerry

17   has just been charged in Federal Court with robbery, money

18   laundering and guns.  Gerry, Gerry is facing a potential life

19   sentence in jail.  He's facing 20 years on the money

20   laundering, 20 years on the robbery, and possible life

21   sentence on the gun.

22             And Gerry had a criminal history to deserve a life

23   sentence.  You're going to hear all about his record, a record

24   that goes back to when he was 16 years old.  This is a man who

25   jumped bail time after time again, a man who used aliases to

PROCEEDINGS                                          630

1    evade being arrested.  He was dangerous.

2           He knew that there was -- through all his

3    experience, he knew that with a record like his, his only

4    chance of getting out of jail was to cooperate, was to become

5    a government snitch, was to convince the government to write a

6    letter to the judge asking the judge to give Gerry leniency.

7    Otherwise, that's it for him, he's done, he's in jail the rest

8    of his life.

9           On January 4th, 2012 -- this is, again, just about a

10   month before Romano gets sentenced.  On January 4th, 2012,

11   Gerry pleads initially not guilty in his case.  However,

12   within days, he was begging to meet the government, wanting

13   desperately to become a snitch and to cooperate.

14          Gerry knew how difficult it was going to be to

15   defend his case, and he knew his best chance of getting out of

16   jail was to become a cooperator.  He was already previously

17   convicted of robbery, gun charges, kidnapping.  Gerry had been

18   convicted of kidnapping.  That's what kind of a guy Gerry is,

19   the government's eventual informant.

20          This is a man who knew all about lying, all about

21   deception, all about the importance of striking a deal.  So on

22   January 26, 2012, still slightly before Romano's been

23   sentenced, on January 26, 2012, Gerry goes in to meet with the

24   government for the very first time, begging to cooperate,

25   begging to become an informant, begging to become a government

PROCEEDINGS                                          631

1   snitch.  He knew his only chance of getting out of jail was to

2   cooperate, so that's what he was going to do.

3            On January 26, 2012, then again on April 10th, 2012,

4   now after Romano's been sentenced, and again on July 17th,

5   2012, Gerry goes in begging and pleading with prosecutors to

6   become a cooperating witness, to become an informant, against

7   anyone.  He's not talking about Romano yet.  He just wants to

8   be a snitch, because that's the way he was going to get out of

9   jail.

10           But each time, on January 26, on April 10th, on July

11  17th, the government wasn't having it.  The government wasn't

12  interested.  The information he was providing them wasn't good

13  enough.  It wasn't something that they found useful or

14  something they needed.  It wasn't something that they were

15  going to give him a get out of jail free card.  They weren't

16  going to -- on the information he had at that point, at that

17  point, he couldn't become part of Team America.  He couldn't

18  get his get out of jail free card.

19           MS. DEAN:  I'm going to object at this time, Your

20  Honor.

21           THE COURT:  Overruled.

22           MR. BACHRACH:  But then, after months and months of

23  trying, along came our client, Joe Romano, boasting to the

24  world that he was a tough guy.  Don't mess with me.  I want my

25  prosecutor and judge dead.

PROCEEDINGS                                       632

1          Romano's coin fraud case was dragging along.  This

2    is now about July or August 2012.  He had already been

3    sentenced to 15 years' imprisonment, the amount he agreed not

4    to appeal, but there were some matters still dragging in his

5    case.  He had something called a restitution hearing that was

6    still going on.

7          A restitution hearing is just simply where the court

8    and the prosecutors and the judges determine how much money

9    the defendant has to pay back to the victims for the losses

10   they lost, the money they lost as a result of the crimes.

11   That's all a restitution hearing is, but it does require

12   witnesses and evidence.

13         So Romano was still in jail, but he hasn't been sent

14   out to some far-off prison.  He's still nearby in a nearby

15   facility.  And he's still living, already living with that

16   15-year sentence.  But since he's still here, he's still in

17   jail, he needs to continue to tell people what an unjust world

18   this is, still venting to each and every person that would

19   listen how corrupt he was -- excuse me, how corrupt the

20   criminal justice system was.

21         In a sense, actually, he does talk about how corrupt

22   he was, because he talks about his coin fraud.  He doesn't

23   hide the coin fraud.  He just tried to make himself tough on

24   top of that, because he always admitted to that coin fraud.

25         He hated everyone involved in his case, the judge,

PROCEEDINGS                          633

1    the prosecutors, the defense attorneys.  He even hated a guy

2    named Giblin, who's a probation officer, whose sole job was to

3    write a report to the judge recommending a potential sentence.

4    That was the guy's sole job, talking about his background, the

5    good things in his background as well as the bad.  He hated

6    him, too.  He wanted him dead, too.  That's what he said.

7    Everyone had wronged him, and he was going to spend the next

8    15 years complaining about it.

9            He was venting.  He's now been in jail for six

10   months and he's still talking the tough talk.  Still scared

11   for his own life in prison, still desperate.  And you'll hear

12   on tapes that he still wanted to kill himself.  He wanted to

13   kill himself, he was so scared.  But he couldn't show fear to

14   anyone.  He's living in a cage with violent criminals.  You

15   don't show fear to them.  You don't show fear to murderers or

16   gangbangers or armed robbers like Gerry.

17           But you know what didn't happen during those six

18   months, the six months between when he was sentenced in

19   February and July and August when Gerry starts overhearing

20   him?  No one got hurt.  No one was killed.  He was angry.  He

21   was telling the world he was angry.  But he hadn't done

22   anything about it, either.  He was just complaining.

23           And then along comes Gerry, the career criminal

24   desperate to cooperate with the government, desperate to get

25   his get out of jail free card.  And he stumbles upon his

PROCEEDINGS                                    634

1   golden goose, Joseph Romano.  He overhears Romano venting to

2   the world some awful things, venting to the world how he wants

3   to have the judge killed and the prosecutor killed.  And Gerry

4   realizes, if he milks this enough, he can finally become a

5   cooperator.  That's much better information than anything he

6   had before.

7           So Gerry sends a letter to his lawyer on August 7,

8   2012.  Remember, Gerry's a convicted violent criminal,

9   kidnapping, armed robbery, armed robbery with guns.  He's a

10  liar and he's a thief.  You'll hear all about Gerry's criminal

11  record during this trial.  Yet he sends a letter to his lawyer

12  telling him, quote --

13          MS. DEAN:  Objection, Your Honor.

14          THE COURT:  You can't go into what he said to his

15  lawyer unless he specifically waives it.  It violates the

16  confidential privilege.  Sustained.

17          MR. BACHRACH:  After sending a letter to his lawyer,

18  after sending a letter to his lawyer, his lawyer sets up a

19  meeting with the government and shows the government the

20  letter, shows the government the letter so the government can

21  read how upset Gerry has supposedly just become.

22          He says, I'm upset about something and I don't know

23  what to do.  I was in the law library the other day with this

24  other criminal, this federal inmate who was sentenced to 16

25  years.  He's nuts.  Gerry goes on to claim that Joe corrupted

PROCEEDINGS                                      635

1   most of the corrections staff and inmates in the jail.  You're

2   not going to hear a single witness come on to the stand and

3   tell you that most of the corrections staff and inmates have

4   been corrupted by Romano.  No corrections officer is going to

5   tell you that.

6           Gerry goes on to tell -- they have a letter that's

7   now sent to the government -- goes on to tell them that Romano

8   wants the judge killed, he wants the prosecutor killed.  He

9   puts every crazy rant he's heard into this information to get

10  it to the prosecutors.  First to his lawyer, knowing it would

11  be given to his prosecutor -- or to the prosecutors, which is

12  what happened.

13          The prosecutors get a hold of this letter.  They

14  look at this letter.  They see every crazy rant that Romano

15  said and every crazy additional thing that Gerry threw in

16  there for good measure, regardless whether or not Romano said

17  it.  He throws it in.  He's going to milk this.  This is his

18  chance.  This is possibly his last chance to turn snitch, so

19  he puts it in there.

20          To this point, Gerry -- excuse me, to this point,

21  Romano has never actually taken any steps to turn his venting

22  into reality.  Not yet.  This is August, August 7th.  He

23  hasn't done anything.  He hasn't done anything to show

24  predisposition or intent to do it.  But Gerry milked Romano's

25  rants, the evidence will show, for all he could get.

PROCEEDINGS                                    636

1        On or about August 8th, 2012, the government finally

2   agrees to give Gerry his chance.  They interviewed him to take

3   down his story.  And on August 10th, a couple days later, they

4   wire him up.  They put a microphone under his prison gear and

5   they turn him into their agent.  And they instruct him, go

6   into his cell and record Romano.  We're going to turn on the

7   recording when you're in there.

8        And they actually place him in a holding cell.  They

9   make arrangements, that is, so that he is placed in a holding

10  cell with Romano with his hidden microphone.  He's now acting

11  as a government agent.

12       And you're actually going to hear that tape.  You're

13  going to see that video of Gerry and Romano talking.  You're

14  going to see that video that Gerry's acting as an agent,

15  milking Romano for as much information as he can.

16       And Gerry, the evidence will show Gerry was very

17  good at his job.  Acting as the government's agent and intent

18  on getting his only get out of jail free card, Gerry tried his

19  best to get Romano to vent about how upset he was.  And

20  Romano, mister tough talker, boy, does he vent.

21       At Gerry's constant prodding, Romano repeats every

22  single comment about Judge Bianco and Lara Gatz.  Every nasty

23  thing he said before, he starts venting it again, because

24  Gerry's prodding him to say it.  And the more Gerry prodded,

25  the more nasty and outlandish it would get.

PROCEEDINGS                                637

1          But when you listen to the recording and when you

2    watch the video, you'll see that Romano may have wanted

3    certain people harmed, certain people.  He definitely wanted

4    certain people investigated.  But the evidence won't show that

5    he really wanted anyone killed, that that was his actual

6    intent.  He was just boasting.

7          But here's something -- here's an example of

8    something Romano says on that video that you will see.  He

9    says -- and, again, excuse the bad language -- "you don't even

10   have to kill them.  Just fucking hurt them.  Hurt them real

11   bad."  There's a big difference between killing and hurting

12   someone.  It's a completely different thing.  Gerry -- I'm

13   going to try to -- this is how it's going to sound.  Gerry:

14   "You want it broke?"  Romano:  "Yeah."  Gerry:  "Broken bad?"

15   Romano:  "Yeah."

16         Gerry's prodding him and Romano's feeding right into

17   it.  But then Romano explains, yeah, I've got this one guy in

18   Delaware.  He's a musician.  I want to have his hands broken

19   into a million pieces so that he can never play guitar again.

20   It's not the judge, it's not the prosecutor.

21         Quite frankly, you'll hear him also talking about

22   crime novels.  It's messed up, but it's not murder.  It's not

23   even clear from the evidence that it's serious or that he's

24   just trying to act tough.

25         You will see that it is Gerry, the government's

SB      OCR    RMR    CRR

PROCEEDINGS                                        638

1    informant, the government's agent, who keeps bringing up the

2    judge and the prosecutor in the conversation, who keeps trying

3    to pull the judge and prosecutor back into what Romano's

4    talking about.  Romano starts to talk about something else,

5    Gerry brings them back in.

6         Here's one thing Romano says about the judge and

7    prosecutor.  He says:  "Will this investigator you're talking

8    about," the investigator that actually turns out later on to

9    be an undercover agent, "will this investigator get me

10   information on this judge?"  Get me information on this judge.

11   Gerry:  "Of course."  Romano:  "And what about Lara Gatz?"

12   "Of course."

13        Romano's talking about information, because he has a

14   restitution hearing coming up and he needs to know everything

15   he can.  Romano at this point is acting pro se.  That means he

16   doesn't have a lawyer in August of 2012 in his coin fraud

17   case.  He's representing himself.  So he needs to get as much

18   information as he can to defend himself in the upcoming

19   restitution hearing.

20        Romano says:  "I want to get this investigator guy

21   and get him to investigate a couple of people.  I want to know

22   everything about them, and I want him to do some work on this

23   case.  I need it done immediately."  Immediately, because he's

24   got a restitution hearing potentially coming up.

25        Gerry:  "So you want him to investigate Bianco and

PROCEEDINGS                                          639

1   Gatz?"  Romano:  "Well, I want him to investigate -- I want to

2   investigate these coin people, these coin people that are

3   going to testify against me in the courtroom."  He says on the

4   tape the people who are going to testify against him in the

5   courtroom.  He's talking about an upcoming proceeding.  He's

6   talking about the restitution hearing.

7        Romano talks about information, gathering

8   information, but Gerry keeps changing the subject back into

9   murder, because that's what's going to help him.  Gathering

10  information is not illegal, killing someone is, so that's what

11  he has to have Romano say on the tape.  That's what he had an

12  information -- that's what Gerry needs to get recorded.

13       And in his new role as a government informant, Gerry

14  will then later induce Romano to meet a pretend hitman.  The

15  government talks about him being a hitman.  No, he was a

16  pretend hitman.  He was another government agent.  He was an

17  undercover law enforcement officer.

18       He went by the name Bobby when he introduces himself

19  to Mr. -- when he introduces himself to Romano.  He's

20  pretending to be a hitman, but he's an undercover agent.  And

21  meeting a hitman is not something Romano would have ever done

22  had Gerry not induced him to do it.  Prior to meeting Gerry,

23  Romano had never killed anyone or conspired to kill anyone.

24  Thus far, he had been all talk.

25       And everything that happens after Gerry enters the

PROCEEDINGS                                    640

1   scene, which is what the government discusses, everything that

2   happens after Gerry enters the scene, all of Romano's later

3   conversations with the pretend hitman, the government law

4   enforcement officer, Bobby, everything that Romano tells to

5   his buddy, Dejvid Mirkovic, someone he's known for years,

6   everything Romano -- everything that comes after Gerry induces

7   Romano and entraps him, that's what you're hearing on the

8   government's side of the case, what happens after he's been

9   induced as Gerry, trying to get his plea agreement, entraps

10  Romano.

11          Now, remember, even with Gerry involved, these

12  aren't actually real murders.  Everything Gerry did was to

13  further the government's prosecution of Romano and to earn his

14  own freedom, that is, Gerry's own freedom.

15          Judge Bianco and AUSA Gatz, Lara Gatz, are never in

16  any real danger, because the hitman that Gerry introduces

17  Romano to, a guy named Bobby, as I said, he's an undercover

18  cop.  He's recording everything.  And everything he says is

19  then being brought to the prosecution.

20          And by the way, you don't need to take my word for

21  this and you don't need to take my co-counsel George Goltzer's

22  word for it.  Romano wasn't in any danger, and you're going to

23  hear that from Special Agent Tariche, this man sitting right

24  here.

25          He is going to get on the stand and he is going to

PROCEEDINGS                                    641

1    say that he wrote a report analyzing the situation at the

2    time, and he concluded that Romano was no imminent threat.

3    Excuse me, he concluded that there was no imminent threat.

4    Special Agent Tariche of the FBI will testify to that.

5           If Special Agent Tariche concluded there was no

6    imminent threat, and you're not going to hear that from us,

7    you're going to hear that from him, then you know the

8    government knew the judge wasn't in danger, you know the

9    government knew the prosecutor wasn't in danger, because the

10   special agent of the FBI thought he wasn't in danger.

11          But Gerry knew.  Gerry knew that he needed to set

12   Romano up to get his deal.  He needed to get Romano to go as

13   far as he possibly could to get his deal and get it on tape.

14   So you're going to watch that one video from August 10, 2012

15   of Gerry's effort to induce Romano to join the conspiracy.

16   There were other conversations as well that were not recorded.

17          So if the government calls Gerry to the stand, we

18   will cross-examine him vigorously about those other

19   conversations too, the ones you don't get to see on the video.

20          And if the government doesn't call Gerry to the

21   stand, if the government does not, we'll call him.  He will be

22   our witness.  And we'll get him to tell all of you about all

23   the times he met with Romano and all of his efforts to induce

24   and entrap Joseph Romano.

25          Now, Romano was scared.  The evidence will show he

PROCEEDINGS                                    642

1    was desperate.  He thought 15 years was a death sentence.  So

2    think about it.  If you're scared of being in jail for 15

3    years, killing a judge and prosecutor is not going to get him

4    out of jail.  The evidence will show it's just going to keep

5    him in jail longer.  You know what will get you out of jail?

6    Cooperation.  Gerry knew it.  Romano knew it, too.

7            Now, Romano gets arrested on this case, the one

8    we're here for today, when he's in jail on the coin fraud

9    case, in jail beginning his sentence of 15 years on the coin

10   fraud case.

11           Law enforcement officers come into the jail,

12   handcuff him, drag him out of the jail, place him in a

13   patrol -- in an unmarked car, drive him to an FBI field office

14   in Long Island and then they start questioning him.

15           During the drive and once he gets there, again at

16   the FBI office, the government lets Romano know under no

17   uncertain terms, they were clear, it's in his best interest to

18   cooperate.  They tell him that.  It is in his best interest to

19   cooperate.

20           And Romano understands that he could cooperate,

21   because they're telling him he can cooperate.  And if he

22   cooperates, maybe he can get out of jail.  Maybe he can reduce

23   that 15-year sentence.  He may have agreed to it, but he

24   doesn't want to serve it.

25           So Romano tries his best to cooperate; and he tells

1    these law enforcement officers, he tells them what they want

2    to hear.  He signs a written statement which talks about the

3    murder conspiracy, but it also talks about other people, and

4    it talks about his willingness to cooperate against those

5    other people.

6              The government, an FBI agent or law enforcement

7    officer is the one who writes the statement up, writes it up

8    in hand, by hand, and then hands it to Romano to sign.  And

9    this is what Romano reads.  After hearing at the beginning of

10   the conversation that it's in your best interest to cooperate,

11   here's what the statement says that Romano then signs.

12             One:  "My name is Joseph Romano."

13             Two:  "I've signed an advice of rights form, which

14   is attached to this statement, incorporated by reference."

15   That's the Miranda warnings that you hear about on TV:  Right

16   to an attorney, right to remain silent.  He signs a form.  In

17   his statement here, he acknowledges that he's waived those

18   rights.

19             Three, direct quote:  "I have agreed to cooperate

20   with the FBI and provide statements about crimes I know about

21   and crimes in which I was personally involved."

22             Four, and he talks about this case:  "I and at least

23   one other person, including, but not limited, to Dejvid

24   Mirkovic, conspired to murder Federal District Court Judge

25   Bianco and United States Attorney Lara Gatz."

PROCEEDINGS                                    644

1          Five:  "I am willing to provide information I

2    acquired while incarcerated regarding a separate double

3    homicide in Freeport, New York."  You'll hear that's a cold

4    case, a case that the police could never solve that happened

5    on Long Island.

6          Six:  "I am willing to provide information about

7    other prisoners who approached me and offered to perpetrate

8    violent acts on my behalf."  Gerry.  "I am willing to provide

9    information about individuals who may be connected to

10   organized crime."  That's not Romano; it's other inmates.

11          And then he signed it.  He initialed every line and

12   he signed it.  The government claims this statement is a

13   confession.  The evidence will show it's a cooperation

14   agreement.  It's not formally typed up like you may see with

15   respect to Gerry Machacek's cooperation agreement, because

16   it's done on the fly.  It's written up on the fly by the FBI,

17   not prepared in advance.  They didn't know what he was going

18   to agree to say.  But it is nonetheless a cooperation

19   agreement.

20          But you know what, even if it's both a cooperation

21   agreement and a confession, or even if it's just a confession,

22   it really doesn't matter, because the fact of the matter is he

23   was entrapped.  And if he's entrapped by a government agent,

24   he is not guilty, no matter whether -- it doesn't matter if he

25   confesses later on.  He doesn't know he's entrapped when he

PROCEEDINGS                                                645

1    confesses.  If he's entrapped, he's not guilty.

2            Another thing the government is going to use to try

3    to make their case is Romano's desire to escape.  Absolutely.

4    Not going to deny this.  Absolutely agree there is no question

5    Joseph Romano wanted to escape prison.  He's serving a 15-year

6    sentence in a scary place.  Who wouldn't?  Prison is scary, so

7    he doesn't want to be there.  You're not going to hear a

8    single witness come into this case and say that prison is fun.

9    If prison was fun, it wouldn't be punishment.

10           And you're going to hear about the security that

11   Romano faced, the cement walls, the shackling of inmates as

12   they're being transferred.  You're going to see on that video

13   the metal balls.  Romano talks about a plastic key that he

14   once made.  A plastic key is fantasy.  That's not going to

15   break you out of jail.  Only on TV, not in real life.

16           Would he have tried to escape if he could?

17   Absolutely.  So would have Gerry.  But that doesn't make

18   Romano a murderer.  It doesn't mean that he ever intended to

19   kill anyone just because he tried to escape.

20           All this talk of escape proves two things, it proves

21   he was scared and it proves he was going to spend the rest of

22   his life, 15 years, in jail, but it doesn't prove that he

23   intended to kill anyone.

24           The evidence will show that almost all of the

25   government's case, everything that happens after he's

SB        OCR    RMR    CRR

PROCEEDINGS                                             646

1    entrapped, it's all just for show.  It's not going to matter.

2    All that matters is does Gerry entrap him?  Is he a government

3    agent entrapping Romano?

4              There are really two issues, in our view, that you

5    need to focus in on this case.  First, did Romano ever

6    actually intend to kill anyone or intend to kill a federal

7    judge and prosecutor?  Did he ever actually intend to do that

8    or was he just venting?  Was he just all talk, just trying to

9    talk a tough game?

10             If he was just talk and never intended to actually

11   carry out his threats, then Judge Keenan will instruct you at

12   the end of this case that you must find Romano not guilty of

13   murder conspiracy, because he didn't intend to commit murder.

14             He could be the angriest person in the world, but

15   the government has to prove beyond a reasonable doubt that he

16   actually intended to kill Judge Bianco and AUSA Lara Gatz.  If

17   the government doesn't prove actual intent, you must find

18   Romano not guilty.

19             Second, even if the government is able to convince

20   you that Romano really intended to get the judge and

21   prosecutor killed, the second question you have to determine

22   is whether he would have actually conspired to do it, even

23   without Gerry and the government's involvement.

24             If you determine that Romano was not going to

25   actually kill anyone and that he only entered into the

PROCEEDINGS                                        647

1   conspiracy because he was induced by Gerry to do so and the

2   pretend hitman, the undercover agent Bobby, with one

3   exception, you must find Romano not guilty.  The one exception

4   is if you believe that Romano is pre --

5            MS. DEAN:  Objection, Your Honor.

6            THE COURT:  Would you leave a little bit of the law

7   to me at the end of the case, please.  That will be something

8   for me to do.

9            MR. BACHRACH:  Absolutely.

10           THE COURT:  Tell the jury what you're going to prove

11  or disprove.

12           MR. BACHRACH:  We're going to prove, ladies and

13  gentlemen, that he was not predisposed to commit murder, that

14  he wouldn't have committed the murders, he wouldn't have

15  conspired to commit the murders if the government's agent,

16  Gerry Machacek, hadn't induced him and entrapped him.

17           Committing collectible coin fraud does not show that

18  Romano is capable of murder.  Trying to escape prison is not

19  predisposition to kill.  It's predisposition to survive.

20  Tough talk is just that.  The government must prove that

21  Romano was predisposed to carry that tough talk out, and the

22  evidence simply will not show that.

23           When listening to the evidence come in during this

24  case, we also want you to keep in mind that the burden is

25  always on the government and solely the government to prove

PROCEEDINGS                                           648

1  that Romano was guilty of conspiracy to commit murder,

2  conspiracy to commit murder of a federal judge and a

3  prosecutor.  The burden is never on the defendant to prove his

4  innocence.  The burden remains at all times on the government

5  to prove his guilt, Romano's guilt beyond a reasonable doubt.

6          At the end of this trial, as Judge Keenan just

7  mentioned, he will instruct you on the law.  He will tell you

8  what conspiracy is, and in doing so, he will explain to you

9  what conspiracy is not.

10         We just ask that you keep an open mind to the

11  evidence as it comes in, the recordings, what was said, but

12  also what wasn't said.  The actions of Gerry Machacek, the

13  government's informant, their agent, and Bobby the hitman, the

14  government's undercover law enforcement officer.

15         Pay careful attention to what is disputed in this

16  case, but pay just as much attention to what is not disputed

17  in this case.  We submit if you evaluate all of the evidence,

18  if you pay close attention to everything that is said and

19  everything that is not said, what's not in dispute as well,

20  and you follow Judge Keenan's instructions at the end of this

21  case, each and every one of you will be doing your jobs as

22  jurors.

23         And after you have deliberated and you have listened

24  to the evidence, what's in evidence and what's not in

25  evidence, what's disputed and what's not disputed, you're

PROCEEDINGS                                          649

1   going to come back to this courtroom, you're going to come

2   right back here, and you're going to say, Joseph Romano,

3   you're not guilty.

4          Thank you.

5          THE COURT:  Thank you.  All right, ladies and

6   gentlemen, you may have your lunch now.  We'll resume at 2:25.

7          (Jury exits.)

8          MR. MARSHALL:  We would request an instruction from

9   Your Honor to the jury that, to the extent that lawyers talked

10  about principles of law, that those should be ignored, because

11  we dispute the description of the law that Mr. Bachrach gave,

12  and we don't think it appropriate at this time for Your Honor

13  to instruct them on the law.

14         THE COURT:  I plan to do that anyway.

15         MR. MARSHALL:  Thank you.

16         MR. BACHRACH:  Your Honor, just briefly --

17         THE COURT:  No.  Look, I'm going to let you say

18  anything you want.

19         MR. BACHRACH:  Fair enough.

20         THE COURT:  Have a seat.  Everybody have a seat.

21  Now, first of all, go over there and address me from the

22  lectern.

23         Secondly, I would have stopped you before they did

24  about the law.  I give the law, not the lawyers, and that's

25  the rule.  Now, what did you want to say?

PROCEEDINGS                                          650

1          MR. BACHRACH:  I was only going to say, Your Honor,

2     that I believe the jury had already been instructed on that.

3     But if you'd like to instruct them --

4          THE COURT:  On what?

5          MR. BACHRACH:  That the law was going to come from

6     you.

7          THE COURT:  But you were doing it, and I don't want

8     you to do it and I direct you not to do it.  That's pretty

9     clear, isn't it?

10          MR. BACHRACH:  Fair enough.

11          THE COURT:  Thank you.

12          (Luncheon recess.)

13          (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

WILLIAM HESSLE-DIRECT-DEAN                           651

1                    AFTERNOON SESSION

2              THE CLERK:  All rise.

3              (Jury enters.)

4              THE COURT:  All right.  Good afternoon, everybody.

5              JURORS:  Good afternoon.

6              THE COURT:  You all may be seated.

7              Your first witness?

8              MS. DEAN:  Your Honor, the government calls William

9     Hessle.

10             THE COURT:  All right.  Before we start, let me just

11    tell you one thing that I have told you, but I just want to

12    make sure you understand it clearly.

13             On the law, I'll tell you what the law is.  What the

14    lawyers have to tell you about the law is maybe interesting,

15    but it's not the law.  I'll tell you what the law is.  So take

16    the law from me, not the lawyers, please.  Thanks.

17             You can bring the witness up.

18             (Witness takes the stand.)

19             THE COURT:  Good afternoon, sir.

20             THE WITNESS:  Good afternoon, Your Honor.

21             (Witness sworn.)

22             THE WITNESS:  I do.

23             THE CLERK:  Please be seated.  State your full name

24    and spell your last name for the record.

25             THE WITNESS:  William Hessle, H-E-S-S-L-E.

WILLIAM HESSLE–DIRECT–DEAN                          652

1           THE COURT:  You may proceed.

2           MS. DEAN:  Thank you.

3                    DIRECT EXAMINATION

4    BY MS. DEAN:

5    Q    Tell can you tell the jury who you work for?

6    A    Yes.  I'm a contractor with the Department of Justice.

7    Q    Where within the Department of Justice?

8    A    (No response.)

9    Q    Where within the Department of Justice?

10          MS. DEAN:  I'll try to speak up.

11   BY MS. DEAN:

12   Q    Mr. Hessle, you said you work within the Department of

13   Justice.  Where within the Department of Justice?

14   A    I work in the U. S. Attorney's Office in Central Islip,

15   New York, Long Island.

16   Q    That's within the Eastern District of New York?

17   A    Yes, it is.

18   Q    And could you just explain briefly what your duties and

19   responsibilities are as a contractor?

20   A    Yes.  I conduct investigations.  I also assist others in

21   other investigations, and I also serve as a financial analyst.

22   Q    Now, you said you have been a contractor since -- I'm

23   sorry.  Maybe you haven't said.  How long have you been a

24   contractor with the U. S. Attorney's Office?

25   A    Since August of 2009.

WILLIAM HESSLE-DIRECT-DEAN                653

1    Q    And you said that you were assigned to the Central islip

2    Office.  Can you explain how many offices there are of the

3    U. S. Attorney's office in the Eastern District of New York?

4    A    Yes.  Within the Eastern District of New York, there are

5    two offices, one located in Brooklyn and the second located on

6    Long Island.

7    Q    And prior to joining the U. S. Attorney's Office, where

8    were you?

9    A    I was a U.  S.  Postal inspector.

10   Q    Can you explain what types of cases you investigated as a

11   postal inspector?

12   A    Yes.  Essentially, during the course of my career, I've

13   had three assignments.  The first involved the financial audit

14   of post offices, looking for embezzlements.

15        My second assignment involved what is known as

16   prohibitive mailings.  Prohibited mailings essentially

17   involves when the use of the mail is used to transport drugs,

18   guns, bombs or the proceeds of crimes.

19        And for the past eight years of my career, I did

20   white collar crime investigations.

21   Q    Are you familiar with an individual named Joseph Romano?

22   A    I am.

23   Q    Do you see him sitting in the courtroom today?

24   A    I do.

25   Q    Can you identify him by an article of clothing he's

WILLIAM HESSLE–DIRECT–DEAN                    654

1    wearing?

2    A    I guess it looks like he's wearing a blue sweater.

3            THE COURT:  Indicating the defendant.

4    BY MS. DEAN:

5    Q    Now, I'm putting up on the Elmo what's been marked for

6    identification as Government Exhibit 1.  Do you recognize that

7    individual?

8    A    I do.

9    Q    Who is it?

10   A    That's Joseph Romano.

11           MS. DEAN:  Your Honor, the government offers

12   Government Exhibit 1.

13           MR. GOLTZER:  No objection.

14           THE COURT:  Received.

15           MS. DEAN:  May we publish briefly?

16           (Exhibit published to the jury.)

17           MS. DEAN:  Your Honor, also each juror's seat has a

18   screen.  I don't know if they have been instructed that they

19   can view --

20           THE COURT:  You can look at the screen.  That's

21   fine.  Let's hope these work.  All right.  They seem to, from

22   what I can see over here.  Okay.  Fine.

23   BY MS. DEAN:

24   Q    Mr. Hessle, how are you familiar with the defendant,

25   Joseph Romano.

WILLIAM HESSLE-DIRECT-DEAN                    655

1    A    I'm sorry.  I didn't hear.

2    Q    How are you familiar with the defendant?

3    A    I conducted a mail fraud investigation into his

4    activities.

5    Q    What activities are you referring to specifically?

6    A    The defendant was the owner of three businesses, each

7    engaged in the business of telemarketing supposed investable

8    grade coins from -- I began the investigation into his

9    activities in 2007.

10   Q    Were you the lead agent or the case agent on that

11   investigation?

12   A    I was.

13   Q    And just so it's clear in the timing, when the

14   investigation began, were you working as a postal inspector?

15   A    No, I had just retired after 24 years.

16   Q    In 2000 and -- what year?

17   A    I'm sorry.  Repeat the question, please?

18   Q    When the investigation first began, were you a postal

19   inspector?

20   A    Yes, I was.

21   Q    And when you became a contractor with the U. S.

22   Attorney's Office, did you continue the investigation?

23   A    I did.

24   Q    And what specifically were you investigating the

25   defendant's companies?

WILLIAM HESSLE-DIRECT-DEAN                    656

1   A    For violations of mail fraud and money laundering.

2   Q    Where were these companies located?

3   A    On Long Island.

4   Q    What were the names of the companies you were

5   investigating?

6   A    The first company was Last Quarter Coin, the second was

7   American Coin, and the third was All American Coin.

8   Q    And just to be clear, did these companies all exist at

9   the same time or at different points in time?

10  A    No.  One folded into the other and they -- two may have

11  been in existence collectively, but only for a very short

12  period of time.

13  Q    And what was the defendant's position with these

14  companies?

15  A    He was the owner.

16  Q    Were charges brought as a result of your investigation?

17  A    Yes, they were.

18  Q    When were charges brought?

19  A    In November of 2008.

20  Q    Were charges brought against the defendant?

21  A    They were.

22  Q    Anybody else?

23  A    Yes.  There were nine co-defendants that were also

24  charged.

25  Q    And were these nine others employed at the defendant's

LISA SCHMID, CCR, RMR

WILLIAM HESSLE-DIRECT-DEAN                    657

1   coin company?

2   A    Yes, they were.

3   Q    Are you familiar with the indictment that was filed

4   against the defendant?

5   A    I am.

6           MS. DEAN:  One moment, Your Honor.  This is the

7   one --

8           MR. GOLTZER:  We have no objection to the

9   introduction, if she'd like to.

10          MS. DEAN:  The government offers Government Exhibit

11  50.

12          THE COURT:  Received.  No objection.

13          MS. DEAN:  May I publish to the jury?

14          THE COURT:  You may.

15          (Exhibit published to the jury.)

16  BY MS. DEAN:

17  Q    Mr. Hessle, what is that document?

18  A    This is the superseding indictment against the defendant,

19  Joseph Romano, and the other defendants.

20  Q    In when you say "superseding indictment," does that mean

21  it wasn't the first of the indictments filed?

22  A    That's correct.

23  Q    And turning your attention to page eight of this

24  document, what did Counts 1 charge the defendant with?

25  A    Conspiracy to commit mail and wire fraud.

WILLIAM HESSLE—DIRECT—DEAN                    658

1   Q    And turning your attention to page nine of this document,

2   what did Count 2 charge the defendant with?

3   A    Money laundering conspiracy.

4   Q    Who was the prosecutor assigned to the case?

5   A    Assistant U. S. Attorney Lara Treinis-Gatz.

6         MS. DEAN:  For identification, only.

7   BY MS. DEAN:

8   Q    I'm putting up on the Elmo what's been marked for

9   identification as Government Exhibit 3.  Do you recognize that

10  individual?

11  A    Yes.  That's AUSA Gatz.

12        MS. DEAN:  Your Honor, the government offers

13  Government Exhibit 3.

14        MR. GOLTZER:  No objection.

15        THE COURT:  Received.

16        MS. DEAN:  May we publish?

17        THE COURT:  Yes.

18        (Exhibit published to the jury.)

19  BY MS. DEAN:

20  Q    Where is Ms. Gatz a prosecutor?

21  A    She's a prosecutor in office of the Eastern District of

22  New York, at the Central Islip office.

23  Q    And who was the Judge assigned to the case?

24  A    It was U. S. District Court Judge Joseph Bianco.

25        MS. DEAN:  For identification only.

WILLIAM HESSLE–DIRECT–DEAN                                    659

1    BY MS. DEAN:

2    Q    Now, I'm showing you what's been marked for

3    identification as Government Exhibit 4.  Do you recognize that

4    individual?

5    A    I do.

6    Q    Who is it?

7    A    That's Judge Joseph Bianco.

8              MS. DEAN:  Your Honor, the government offers

9    Government Exhibit 4.

10             MR. GOLTZER:  Likewise, no objection.

11             THE COURT:  Received.

12             MS. DEAN:  May we publish?

13             THE COURT:  You may.

14             (Exhibit published to the jury.)

15   BY MS. DEAN:

16   Q    Where is Judge Bianco a judge?

17   A    He's a judge in Central islip, New York.

18   Q    And can you explain to the jury how many federal

19   courthouses there are within the Eastern District of New York?

20   A    Yes.  Within the Eastern District of New York, there are

21   two courthouses, the one that we're in and the one in Central

22   Islip.

23             MS. DEAN:  Your Honor, at this time, I would like to

24   read a stipulation.

25             THE COURT:  All right.  Is this a stipulation of

WILLIAM HESSLE-DIRECT-DEAN                    660

1    fact or of testimony.

2            MS. DEAN:  Of fact, Your Honor.

3            THE COURT:  All right.  So this is going to be

4    evidence in the case.  Now, this is the same as testimony,

5    exhibit that were received.  This is evidence in the case.

6            You may read it.  Go ahead.

7            MS. DEAN:  Marked as Government Exhibit 9:  "It is

8    hereby stipulated and agreed between the United States of

9    America and the defendant, Joseph Romano, by his attorney,

10   that November 2001 through the present, Lara Treinis-Gatz has

11   served as an Assistant United States Attorney, AUSA, and

12   employed by the United States Attorney's Office for the

13   Eastern District of New York of the United States Department

14   of Justice.

15           From January 2006 through the present, Judge Joseph

16   F. Bianco has served as a United States District Judge for the

17   Eastern District of New York.

18           As part of her official duties beginning before 2012

19   and continuing through October 2012, AUSA Lara Treinis-Gatz

20   was assigned to lead the coin fraud prosecution of Joseph

21   Romano in United States versus Joseph Romano, 09 CR 170(JFB).

22           United States District Judge Joseph F. Bianco was

23   assigned by random lottery to preside over the criminal case

24   of United States versus Joseph Romano.  09 CR170(JFB).

25           As part of his official duties, Judge Bianco

1  presided over that case, beginning before 2012 and continuing

2  through October 2012.

3          This stipulation, marked Government Exhibit 9, is

4  admissible in evidence."

5  BY MS. DEAN:

6  Q    Mr. Hessle, did the defendant plead guilty to any charges

7  against him?

8  A    Yes, he did.

9  Q    When?

10 A    He pled guilty in September of 2010.

11 Q    And when was the defendant scheduled to go to trial?

12 A    In September of 2010.

13 Q    And so, had trial started when the defendant pled guilty?

14 A    We were in the middle of jury selection when the

15 defendant pled guilty.

16 Q    Did he plead guilty pursuant to a plea agreement with the

17 government?

18 A    Yes, he did.

19 Q    And did you have an opportunity to review the plea

20 agreement prior to the defendant signing it?

21 A    I did.

22 Q    Did you have an opportunity to review it after the

23 defendant signed it?

24 A    I did.

25 Q    Showing you what's been marked for identification as

WILLIAM HESSLE–DIRECT–DEAN                    662

1    Government Exhibit 51.  Do you recognize that document?

2    A    I do.

3    Q    What is it?

4    A    That's the plea agreement with the defendant's plea.

5    Q    And --

6              MS. DEAN:  Your Honor, at this time, the government

7    offers Government Exhibit 51.

8              MR. GOLTZER:  No objection.

9              THE COURT:  Received.

10             MS. DEAN:  May we publish?

11             THE COURT:  You may.

12             (Exhibit published to the jury.)

13   BY MS. DEAN:

14   Q    Now, turning to the last page of this document, whose

15   signature is that above the word "defendant"?

16   A    The defendant's Joseph Romano.

17   Q    And whose signature is that above the words "counsel to

18   defendant"?

19   A    Charles Carnesi.

20   Q    Charles Carnesi was the defendant's attorney at the time?

21   A    That's correct.

22   Q    And who signed the plea agreement on behalf of the

23   government?

24   A    Assistant United States Attorney Lara Treinis-Gatz.

25   Q    And now turning your attention to paragraph one of the

WILLIAM HESSLE–DIRECT–DEAN                    663

1    plea agreement, what count of the indictment did the defendant

2    plead guilty to?

3    A     He pled guilty to Count 1.

4    Q     So then turning back to what's been admitted as

5    Government Exhibit 50, what did that count charge the

6    defendant with?

7    A     Conspiracy to commit mail and wire fraud.

8    Q     Now, it says here in the indictment at paragraph 24, "The

9    allegations contained in paragraphs one through 23 are

10   alleged and incorporated as fully set forth in this

11   paragraph."

12          So if you could turn to some of those paragraphs.

13   Starting with paragraph 18, can you read starting from

14   photograph 18?

15   A     Yes.  "As part of this scheme and artifice to defraud,

16   the defendants either personally telephoned potential coin

17   purchasers or instructed employees under their supervision to

18   telephone potential customers and offer coins for sale during

19   sales pitches.  During those sales pitches, the defendants and

20   those acting at their direction offered for sale and sold

21   rolls of Benjamin Franklin half dollars, typically starting at

22   $390, while each subsequent roll was sold at an increased

23   price.  For instance, the second roll was typically sold for

24   $780, and the third roll was typically sold for $1180.  In

25   each case, the defendants or those acting at their direction,

WILLIAM HESSLE–DIRECT–DEAN                    664

1   falsely informed the customers that substantial profits would

2   be realized by investing in those coins."

3   Q    Can you keep reading?

4   A    "The defendants induced the customers to continue to

5   purchase coins by falsely promising the customers that the

6   subject companies had investors waiting to purchase the coins

7   from the customers once the customers had purchased the

8   complete roll sets.  The defendants or those acting at their

9   direction also falsely told the customers that the Benjamin

10  Franklin half dollars being offered for sale were MS-64 plus

11  or better, and that the proof Benjamin Franklin half dollars

12  being offered for sale were MS-68."

13  Q    If you could keep reading?

14  A    Paragraph 20:  "The defendants regularly instructed the

15  customers to pay for the coins by sending the subject

16  companies a check via Federal Express, DHL or U. S. Mail.  The

17  coins were then sent to the customers via Federal Express, DHL

18  or U. S. Mail.  After the customers purchased the complete

19  roll set and contacted the defendants to arrange to sell their

20  coins to the promised investors, the defendants falsely told

21  the customers that the investors required that the customers

22  purchase additional coins before they would purchase the

23  collections from the customers.  After the customers purchased

24  the additional coins at inflated prices, the customers

25  realized that the investors had backed out the deal."

1      Paragraph 21:  "The defendants further induced

2  customers to purchase additional coins by falsely informing

3  them that new investors were interested in purchasing their

4  coin collections, but that the new investors wanted the

5  customers to purchase additional coins before they would

6  purchase the collections from the customers.  None of the

7  complete roll sets purchased by the customers of the subject

8  companies were subsequently purchased by investors arranged

9  via the subject companies, as promised by the defendants."

10      Paragraph 22:  "The defendants also falsely

11  misrepresented the grade of the coins sold to the customers.

12  The defendants falsely informed the customers that the

13  Benjamin Franklin half dollars they purchased were graded MS

14  64 –– were graded MS-64 plus or higher, when in fact, they

15  were not.  Similarly, the defendants falsely informed the

16  customers that the proof Benjamin Franklin half dollars they

17  purchased were graded MS-68 or higher, when in fact they were

18  not.  As a result, the customers purchased coins worth

19  approximately ten to 20 percent of the purchase price."

20  Q    If you could just read through 23A.

21  A    Paragraph 23:  "Between August 11th, 2002 and

22  November 30, 2008, the defendants or those acting at their

23  direction deposited more than $40 million into the bank

24  accounts of the subject companies.  Between December 6th, 2002

25  and November 30th, 2008 payments from the bank accounts of the

WILLIAM HESSLE—DIRECT—DEAN                     666

1   subject companies were made as follows:  Letter A, $3,818,000

2   to the defendant, Joseph Romano, between December 6, 2002 and

3   November 30, 2008."

4   Q    Thank you.

5         Now, just to be clear, Count 1 incorporated those

6   allegations?

7   A    Yes.

8   Q    And the defendant pleaded guilty to Count 1?

9   A    He did.

10  Q    Now, turning back to the plea agreement, Government

11  Exhibit 51, what was the maximum term of imprisonment allowed

12  by statute for the defendant's crime?

13  A    Twenty years.

14  Q    And was there any required minimum?

15  A    No.

16  Q    Can you explain -- do you know what a sentencing

17  Guidelines range is?

18  A    Yes, I do.

19  Q    Can you explain what a sentencing Guidelines range is?

20  A    It's a recommendation to a judge as to what a sentence

21  should be.

22  Q    And that's calculated using a formula?

23  A    That's correct.

24  Q    What's the purpose of calculating a range for a

25  sentencing Guidelines range?

WILLIAM HESSLE–DIRECT–DEAN                    667

1    A    To serve the Court with what a reasonable sentence should

2    be for the defendant.

3    Q    Did the government come up with its own calculation for

4    the sentencing Guidelines range for the defendant's crime?

5    A    It did.

6    Q    And is that reflected in paragraph two of this plea

7    agreement?

8    A    Yes, it is.

9    Q    Now, turning to the end of paragraph two of Government

10   Exhibit 51, what was the government's estimate for the

11   sentencing Guidelines range for the defendant?

12   A    151 months to 188 months.

13   Q    How many -- can you tell us what that is in terms of

14   years?

15   A    That's about 12 and-a-half to 15 and-a-half years.

16   Q    Now, turning to paragraph five of this document, can you

17   just read that first sentence?

18   A    Yes.  "The defendant agrees to forfeit to the United

19   States all of his right, title and interest in $7 million

20   (seven million dollars) the forfeiture money judgment.  The

21   defendant shall partially satisfy the forfeiture money

22   judgment through the immediate forfeiture of the following

23   assets."

24   Q    I'll just stop you there.  And there are a number of bank

25   accounts and property listed there, is that right?

WILLIAM HESSLE—DIRECT—DEAN                    668

1   A    That's correct.

2   Q    Now, can you explain to the jury what forfeiture is in

3   the context of criminal cases?

4   A    Forfeiture is a penalty for having done the crime.  It's

5   also part of the sentence.

6   Q    And what is the $7 million represent with respect to

7   monies earned by the defendant?

8   A    That represents a portion of the proceeds that were

9   realized by the defendant as a result of the operations.

10  Q    Now, where is it says here, "That the defendant shall

11  partially satisfy the forfeiture money judgment for the

12  immediate forfeiture of the following assets," and then it

13  goes on to list a number of bank accounts and assets.  Had the

14  government seized those bank accounts --

15  A    Yes.

16  Q    -- and those other assets?

17  A    Yes, the assets, as well.

18  Q    There these were derived from the defendant's fraud?

19  A    Yes.

20  Q    Now, there are six pieces of property listed here in

21  paragraph five, going onto the next page --

22  A    Yes.

23  Q    -- end of paragraph five.  Do you see that?

24  A    I do.

25  Q    Did these six pieces of property reflect all the property

WILLIAM HESSLE–DIRECT–DEAN                                        669

1  owned by the defendant?

2  A    No, they did not.

3  Q    How many other pieces of property does he own that you're

4  aware of?

5  A    At least three.

6            MR. GOLTZER:  It's irrelevant.

7            THE COURT:  I'm sorry?

8            MR. GOLTZER:  It's irrelevant.

9            THE COURT:  What is the relevance?

10           MS. DEAN:  The scale of the fraud, Your Honor.

11           THE COURT:  But you're proving it.  I mean, I don't

12 want to try the coin fraud case here.  I want to try the

13 conspiracies that is charged in Count 1.

14           MS. DEAN:  I can move on, Your Honor.

15           THE COURT:  We've got the indictment in.  We've got

16 the plea agreement in.  Let's move along.

17           MS. DEAN:  Okay.

18 BY MS. DEAN:

19 Q    Now, were you present when the defendant pled guilty?

20 A    I was.

21 Q    Showing you what's been marked for identification as

22 Government Exhibit 52.  Do you recognize this document?

23 A    I do.  That's the transcript of the plea on

24 September 28th, 2010, that the defendant made.

25 Q    And did you have an opportunity to review this transcript

WILLIAM HESSLE-DIRECT-DEAN                    670

1   prior to you testifying today?

2   A    I did.

3   Q    Is this a fair and accurate transcription of the

4   defendant's guilty plea proceeding?

5   A    Yes, it is.

6            MS. DEAN:  Your Honor, the government offers

7   Government Exhibit 52, and will note that it's been redacted

8   to reflect the defendant's statements, as well as any

9   statements required for context.

10           MR. GOLTZER:  No objection.

11           THE COURT:  Received.

12           MS. DEAN:  May we publish, Your Honor?

13           THE COURT:  Yes.

14           (Exhibit published to the jury.)

15  BY MS. DEAN:

16  Q    Turning your attention to page 241, line 14.  Can you

17  read what the defendant said about the coin fraud when he pled

18  guilty?

19  A    Yes.  "From 2001 through 2008, I conspired with others to

20  commit wire fraud by using a telephone to contact potential

21  customers and induce them into purchasing coins through false

22  representations as to the value of the coins and the existence

23  of an investor willing to repurchase the coins at a profit.

24  These representations were made from the Eastern District of

25  New York."

1

2    Q     Thank you.

3          Did you identify different victims of the

4    defendant's fraud?

5    A     I did.

6    Q     Approximately how many victims did you identify over what

7    period of time?

8    A     They were in excess of 1500 victims, and the time frame

9    ranged from 2001 to 2008.

10   Q     Were these victims located in New York?

11   A     They were very few located in New York.  Most of them

12   were scattered throughout the United States.

13   Q     What was the average age of the victims?

14   A     Seventy-four.

15   Q     Did you interview some of the victims?

16   A     I did.

17   Q     Approximately how many?

18   A     At least two to 300.

19   Q     Were there any victims you tried to interview, but

20   couldn't?

21          MR. GOLTZER:  Objection; 403.

22          THE COURT:  What's the relevance of this?

23          MS. DEAN:  Strictly demographics, Your Honor.

24          THE COURT:  You've established how many victims

25   there were and how many he's interviewed.  You have

WILLIAM HESSLE-DIRECT-DEAN                          672

1    established that he pleaded guilty.  I said and I'll repeat

2    myself, I don't want to try the fraud case.

3            MS. DEAN:  Understood, Your Honor.  May I have a

4    moment?

5            THE COURT:  Yes.

6            MS. DEAN:  (Confers with Mr. Miller.)

7    BY MS. DEAN:

8    Q    Now, after the defendant was charged in the coin fraud

9    case, did retain an attorney?

10   A    He did.

11   Q    And was Charles Carnesi his attorney?

12   A    That's correct.

13   Q    Was Charles Carnesi the only attorney the defendant had

14   during the pendency of the prosecution?

15   A    No, he was not.

16   Q    How many others were there?

17   A    At least two others.

18   Q    When did Charles Carnesi stop being the defendant's

19   attorney?

20   A    Two months after the defendant pled guilty, November of

21   2010.

22   Q    And who replaced Charles Carnesi?

23   A    Vincent Ansanelli, A-N-S-A-N-E-L-L-I.

24   Q    And and how long was Vincent Ansanelli the defendant's

25   attorney?

WILLIAM HESSLE-DIRECT-DEAN                          673

1   A    He represented the defendant 'til I think the -- at least

2   the summer of 2011.  I think it was August.

3   Q    And he was then replaced by whom?

4   A    By Mark Goidell, G-O-I-D-E-L-L.

5   Q    And how long did Mark Goidell continue in his

6   representation of the defendant?

7   A    Until the month after he was sentenced, in March of 2012.

8   Q    And after Mark Goidell, who represented the defendant?

9   A    The defendant represented himself.

10  Q    Now, the defendant pled guilty.  Was he sentenced?

11  A    Yes, he was.

12  Q    And you said he was sentenced when?

13  A    In February of 2012.

14  Q    Are you familiar with an individual named Greg Giblin?

15  A    I am.

16  Q    Who is Greg Giblin?

17  A    Greg Giblin is the probation officer who generated the

18  pre-sentence report for the defendant.

19        THE COURT:  When you say "generated," do you mean he

20  is the one who wrote it?

21        THE WITNESS:  He wrote it.

22        THE COURT:  Okay.  Go ahead.

23  BY MS. DEAN:

24  Q    Can you explain what a pre-sentence report is?

25  A    Yes.  It's an investigative report by the Probation

LISA SCHMID, CCR, RMR

WILLIAM HESSLE–DIRECT–DEAN                    674

1  Department, essentially outlining the crimes in question, the

2  personal history and background of the defendant, and a

3  Guidelines range.

4  Q    Now, in preparing the PSR, does the probation officer

5  meet with the defendant --

6  A    Yes.

7  Q    -- for an interview?

8  A    Yes.

9  Q    The defendant -- who sentenced the defendant in

10  February 2012?

11  A    Judge Joseph Bianco.

12  Q    Were you present for the sentencing?

13  A    I was.

14  Q    Showing you what's been marked for identification as

15  Government Exhibit 53.  Do you recognize this document?

16  A    I do.

17  Q    Did you review this document prior to today?

18  A    I did.

19  Q    Is it a fair and accurate transcript of the sentencing

20  proceeding that took place on February 9th, 2012?

21  A    Yes, it is.

22        MS. DEAN:  Your Honor, at this time, the government

23  offers Government Exhibit 53, and will note that it had

24  similarly been redacted to reflect the defendant's statements

25  and any statements required for context.

WILLIAM HESSLE-DIRECT-DEAN                    675

1          MR. GOLTZER:  No objection.

2          THE COURT:  Received.

3          MS. DEAN:  May we publish?

4          THE COURT:  Yes, you may.

5          (Exhibit published to the jury.)

6     BY MS. DEAN:

7     Q    Now, turning your attention to page 29, line 17, can you

8     read the first paragraph of the defendant's statements in

9     court that day, up to line 24?

10    A    Yes.  "Your Honor, I'm here before you and I'm guilty of

11    fraud.  I owned and operated coin companies with overgraded

12    coins and charged exorbitant prices and misrepresented the

13    value of the coins.  I defrauded and I collected the profits.

14    I witnessed salesmen making promises stating that customers

15    would see returns on their money when they resold their coins

16    to other investors."

17    Q    Now, following the sentencing in February 2012, was the

18    case against the defendant completely resolved?

19    A    No, it was not.

20    Q    After -- stepping back.  What sentence did the defendant

21    receive that day?

22    A    The defendant was sentenced to 15 years incarceration.

23    Q    Now, you said that following his sentencing, the

24    defendant's case was not completely resolved.  What do you

25    mean by that?

WILLIAM HESSLE–DIRECT–DEAN                    676

1   A     There is an outstanding issue involving restitution to

2   the victims.

3   Q     And can you explain what restitution is?

4   A     Restitution is the payment to the -- is the payment to

5   the victims of the crime that they lost, in dollars that they

6   lost as a result of the fraud.

7   Q     Now, you mentioned earlier that the defendant forfeited

8   $7 million for his crime.  Is the payment of restitution

9   separate and apart from the $7 million the defendant agreed to

10  forfeit?

11  A     Yes, it is.

12  Q     Now, with regard to the restitution issues that were

13  still pending, were there any hearings scheduled in the months

14  of September -- I'm sorry.  In the months of August through

15  September -- through October 2012 to address restitution?

16  A     Yes, there were.

17  Q     Were any of these hearings canceled and rescheduled?

18  A     Yes, they were.  It was rescheduled to October.

19  Q     When you say "it," what are you referring to?

20  A     It was one -- there was a restitution issue to be

21  addressed on September 11th.  That was postponed and it was

22  rescheduled for October.

23  Q     And does the government have its own estimate of how much

24  money is owed to the victims in restitution?

25  A     Yes.

WILLIAM HESSLE-DIRECT-DEAN                          677

1    Q     What is that estimate?

2    A     $19.1 million.

3    Q     Over what period of time?

4    A     2001 through 2008.

5    Q     And to be clear, that restitution issue is still ongoing?

6    A     That's correct.

7    Q     Is Judge Bianco still overseeing that case?

8    A     No, he is not.

9    Q     Who is?

10   A     When additional charges were brought against the

11   defendant, the case was moved to Judge Sterling Johnson.

12          MS. DEAN:  Your Honor, at this time, I would like to

13   read a stipulation.

14          THE COURT:  Of fact?

15          MS. DEAN:  Yes, Your Honor.

16          THE COURT:  All right.  This is also evidence, what

17   is about to be read.

18          MS. DEAN:  The stipulation is marked Government

19   Exhibit 80:  "It is hereby stipulated and agreed by and

20   between the United States of America and the defendant, Joseph

21   Romano, by his attorneys, that Government Exhibit 81 is a true

22   and accurate copy of Regions Bank records for account number

23   95248250, in the name of Collectible Coins, Incorporated,

24   Dejvid Mirkovic, spelled, D-E-J-V-I-D, for the period from

25   February 26th, 2009 through November 30th, 2010, when the

WILLIAM HESSLE–DIRECT–DEAN                  678

1   account was closed.

2           Government Exhibit 82 is a true and accurate copy of

3   Bank of America records for account number 8980325128746, in

4   the name of Collectible Coins, Incorporated, for the period of

5   August 3, 2009, through May 31st, 2010.

6           And Government's Exhibit 83 is a true and accurate

7   copy of American Express records for account number ending in

8   9-13003, in the name of Joseph Romano, Last Quarter,

9   Incorporated, for the period from January 2009 to May 2013.

10          Government Exhibit 81, 82, 83, and this stipulation

11  marked Government Exhibit 80 are admissible in evidence at

12  trial."

13          Your Honor, at this time, the government offers 80

14  through 83.

15          MR. GOLTZER:  No objection.

16          THE COURT:  Received.

17  BY MS. DEAN:

18  Q    Now, when the defendant was charged with a coin fraud

19  back in November of 2008, where was he living?

20  A    In Florida.

21  Q    How did he operate his coin companies in New York when he

22  lived in Florida?

23  A    He flew back frequently between West Palm Beach and New

24  York to visit his companies, and he also installed a security

25  system inside the business, consisting of audio and video

WILLIAM HESSLE-DIRECT-DEAN                   679

1    cameras and sensors, which allowed the defendant to monitor

2    the activities of the business from his house.

3    Q    Did the defendant also have a home on Long Island?

4    A    He did.

5    Q    Where was that?

6    A    That was 22 Lilac Lane, in Levittown, New York.

7    Q    Now, after the defendant was charged in November of 2008,

8    what happened with the coin company in Long Island that he was

9    running at that time?

10   A    It went out of business.

11   Q    Did the defendant cease operating the coin companies

12   entirely at that point?

13   A    No, he did not.

14   Q    What did you mean by that?

15   A    He opened up another coin business in Florida.

16   Q    What was that company called?

17   A    Collectable Coins, Incorporated, also known as CCI.

18   Q    When did the defendant open that company?

19   A    In February of 2009.

20   Q    Did you begin investigating this company, Collectable

21   Coins, Incorporated?

22   A    I did.

23   Q    Approximately when?

24   A    In January of 2009.

25   Q    Now, showing you what's been marked for identification as

WILLIAM HESSLE–DIRECT–DEAN                        680

1   Government Exhibit 57, do you recognize this document?

2   A    I do.

3   Q    What is it?

4   A    That's a snapshot of the web page for Collectible Coins.

5   Q    And where did you obtain that snapshot?

6   A    From the website of Collectible Coins.

7   Q    You printed it up yourself?

8   A    I did.

9        MS. DEAN:  Your Honor, at this time, the Government

10  offers Government Exhibit 57.

11       MR. GOLTZER:  No objection.

12       THE COURT:  Received.

13       MS. DEAN:  May we publish?

14       THE COURT:  You may.

15       (Exhibit published to the jury.)

16  BY MS. DEAN:

17  Q    Now, the company, Collectible Coins, Incorporated, did

18  that company eventually change its name?

19  A    Yes, it did.

20  Q    When was that?

21  A    In November of 2010, it became Universal Coin

22  collections.

23  Q    What was the address of the company known as Collectible

24  Coins or Universal Coin?

25  A    It was 1300 Northwest 17th Avenue, Suite 218, in Delray

WILLIAM HESSLE–DIRECT–DEAN                    681

1   Beach, Florida.

2   Q    Now, when you were investigating Collectable Coins, did

3   you review public documents about the company?

4   A    I did.

5   Q    Did you also review documents referring to CCI?

6   A    Yes, I did.

7   Q    Now, showing what's been marked for identification as

8   Government Exhibit -- actually, I'll withdraw that.

9          Showing you what's been admitted into evidence as

10  Government Exhibit 81, this page number 1378, and this has

11  already been admitted in evidence.

12  A    I keep getting the same page.  It's not --

13          THE CLERK:  We need a five-minute break, Judge.

14          THE COURT:  We have to recess for five minutes.  The

15  electronic equipment is jammed.  Okay?  Don't discuss the

16  case.  Remember, I've been telling you don't discuss the case.

17  Go back to the jury room.

18          (To the witness)  You can step down.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  Could I go off the record?  There is no.

21  0need to 32.

22  Q    Clutter the record.

23          (Recess.)

24          THE CLERK:  Okay.  We're ready to proceed.  Counsel,

25  everyone is here.  I'm going to bring the jury out now.

WILLIAM HESSLE-DIRECT-DEAN                    682

1            (Jury enters.)

2            THE COURT:  Okay.  Be seated, please.  No harm, no

3    foul.  That's our afternoon recess.

4            Go ahead.  All right.

5            MS. DEAN:  May I inquire, Your Honor.

6            THE COURT:  We were showing an exhibit to the

7    witness, and then the electronics broke down.

8            So go ahead.  Where are we?

9            MS. DEAN:  Thank you.

10           THE CLERK:  For identification?

11           MS. DEAN:  This is for publication.

12           THE CLERK:  Publication.

13           THE COURT:  All right.  We are publishing the -- the

14   electronic -- articles of incorporation for Collectable Coins,

15   Incorporated.  Fine.  What's the Exhibit Number?

16           MS. DEAN:  This is Government Exhibit 81, Your

17   Honor.

18           THE COURT:  Eighty-one.

19           MS. DEAN:  Page 1378.

20           THE COURT:  It is in evidence now?

21           MS. DEAN:  Yes, Your Honor.

22           THE COURT:  All right.  Fine.  Your question?

23   BY MS. DEAN:

24   Q    Mr. Hessle, what is this document?

25   A    This is a copy of the electronic articles of

WILLIAM HESSLE–DIRECT–DEAN                         683

1   incorporation for Collectible Coins, Incorporated.

2   Q    Now, turning your attention to the bottom part of the

3   page.  Who does it list as the registered agent for

4   Collectible Coins, Incorporated?

5   A    Dejvid Mirkovic.  1300 Northwest 17th Avenue, Suite 218,

6   Delray Beach Florida.

7   Q    Now, turning your attention to the next page, which has

8   been Bates numbered 1379, who is listed here as the initial

9   officer or director of the corporation?

10  A    Dejvid Mirkovic, 1300, Northwest 17th Avenue, Suite 218,

11  Delray Beach, Florida.

12  Q    When did you first review the articles of incorporation

13  for Collectible Coins.

14  A    When the bank records were subpoenaed for the company,

15  the articles of incorporation were contained within the

16  documents supplied.

17  Q    So approximately when was that?

18  A    That would be in early 2009.

19  Q    Now, at the time when you saw -- received these articles

20  of incorporation, did you know who Dejvid Mirkovic was?

21  A    No, I did not.

22  Q    Did you later become familiar with who Dejvid Mirkovic

23  is?

24  A    I did.

25       MS. DEAN:  Your Honor, I don't believe there's an

WILLIAM HESSLE-DIRECT-DEAN                    684

1   objection to -- the government would offer Government Exhibit

2   2 at this time, so we don't have to --

3                THE COURT:  That's correct.

4                MS. DEAN:  -- play with --

5                THE COURT:  No objection.  Number 2 is received.

6   BY MS. DEAN:

7   Q    Mr. Hessle, showing you Government Exhibit 2, do you

8   recognize this individual?

9   A    I do.

10  Q    Who is its?

11  A    That's Dejvid Mirkovic.

12  Q    Now, based on your investigation, had Dejvid Mirkovic

13  been employed at the defendant's prior coin companies?

14  A    No, he had not.  He was a car salesman.

15  Q    Now, where did Dejvid Mirkovic -- Dejvid Mirkovic live at

16  the time?

17  A    In Florida.

18  Q    Where?

19  A    At 7090 Leonardo, in Lake Worth, Florida.

20  Q    Is that Via Leonardo?

21  A    I'm sorry?

22  Q    7090 Via Leonardo?

23  A    Yes.  I'm sorry.  Via, V-I-A, Leonardo.

24  Q    Did the defendant have any property on Via Leonardo?

25  A    Yes, he did.

WILLIAM HESSLE–DIRECT–DEAN                    685

1    Q      Where?

2    A      At 7084 Via Leonardo.

3    Q      Where are those two properties with respect to one

4    another?

5    A      Next door.

6    Q      And did the defendant have any other homes in Florida?

7    A      Yes, he did.

8    Q      Where was his primary residence in Florida?

9    A      At 6011 North Ocean Avenue, in Ocean Ridge, Florida.

10   Q      Now, in addition to reviewing bank records and public

11   records for CCI, did you also interview employees?

12   A      I did.

13   Q      Did you interview customers?

14   A      Yes, I did.

15   Q      Did you review lease records?

16   A      Yes, I did.

17   Q      And did you investigate whether there was any connection

18   between CCI and the defendant?

19   A      I did.

20   Q      And what did you find out?

21   A      That CCI was the defendant's company.

22   Q      Now --

23          MS. DEAN:  Your Honor, at this time, the government

24   would like to read and offer a stipulation.

25          THE COURT:  This is also a stipulation of fact?

WILLIAM HESSLE-DIRECT-DEAN                    686

1          MS. DEAN:  Yes, Your Honor.

2          THE COURT:  All right.  This is evidence in the

3   case, then.

4          MR. GOLTZER:  Exhibit Number?

5          MS. DEAN:  Fifty-five.

6          MR. GOLTZER:  Thank you.

7          MS. DEAN:  "It is hereby stipulated and agreed by

8   and between the United States of America and the defendant,

9   Joseph Romano, by his attorneys, that Government Exhibit 56A

10  is a true and accurate copy of a lease for 1300 Northwest 17th

11  Avenue, Suite 218, Delray Beach, Florida, for the period from

12  February 1, 2009 to July 31, 2009.

13         From February 1, 2009 to July 31, 2009, Joseph

14  Romano was the lessee of 1300 Northwest 17th Avenue, Suite

15  218, Delray Beach, Florida.

16         Government Exhibit 56B is a true and accurate copy

17  of a lease for 1300 Northwest 17th Avenue, Suite 218, Delray

18  Beach, Florida, for the period August 1st, 2009 to July 31st,

19  2012.  From August 1st, 2009 to July 31st, 2012, Collectible

20  Coins was the tenant at 1300 Northwest 17th Avenue, Suite 218,

21  Delray Beach, Florida, and Joseph Romano was the guarantor for

22  that lease."

23         And Your Honor, at this time, the government would

24  offer Government Exhibit 56A and 56B, as well.

25         MR. GOLTZER:  No objection.

WILLIAM HESSLE–DIRECT–DEAN                    687

1          THE COURT:  Received.

2    BY MS. DEAN:

3    Q    Now, if you could just review one of these leases.  I'm

4    showing what's been admitted as Government Exhibit 56A.

5    (Publishing exhibit.)

6          Who is listed as the tenant for this property?

7    A    Joseph Romano.

8    Q    And what's the start date of the lease?

9    A    January 16th, 2009.

10   Q    Now, there are initials on the bottom corner of the page

11   of this document.  Do you see that?

12   A    I do.

13   Q    What initials are those?

14   A    J. R.

15         MS. DEAN:  Your Honor, at this time, the government

16   would offer Government Exhibit 15, which is also another fact

17   stipulation.

18         THE COURT:  Received.  It's now evidence in the

19   case, as soon as you have read it.

20         MS. DEAN:  "It is hereby stipulated and agreed by

21   and between the United States of America and the defendant,

22   Joseph Romano, by his attorneys, that Government Exhibits 16A,

23   16B, 16C and 16D are photographs of Joseph Romano and Dejvid

24   Mirkovic taken on February 2nd of 2010, at 1300 Northwest 17th

25   Avenue, Delray Beach, Florida."

WILLIAM HESSLE-DIRECT-DEAN                    688

1          Your Honor, at this time, the government would offer

2    16A, B, C and D, as well.

3          MR. GOLTZER:  No objection.

4          THE COURT:  Received, and they may be displayed.

5          MS. DEAN:   Your Honor, may we publish?

6          THE COURT:  That's why I said displayed.

7          MS. DEAN:  Okay.  I'm sorry.  I couldn't --

8          THE COURT:  Sometimes the jury thinks it's a book if

9    we say published.

10         Published means -- it's the same thing as displayed,

11   in other words, shown to you.

12         So yes, it can be published.  Go ahead.

13         (Exhibit published to the jury.)

14         MS. DEAN:  I think have a better version of this.

15   It's too shiny.

16   BY MS. DEAN:

17   Q    Mr. Hessle, who is the individual in the green shirt on

18   the left?

19   A    That's the defendant, Joseph Romano.

20   Q    And who is next to him?

21   A    Dejvid Mirkovic.

22   Q    And I'm displaying Government Exhibit 16B, 16C, as well

23   as 16D.

24         Now, did you or the United States Attorney's Office

25   ever contact Dejvid Mirkovic?

WILLIAM HESSLE–DIRECT–DEAN                      689

1    A    Yes.

2    Q    Did the government contemplate bringing charges against

3    Dejvid Mirkovic for his operation of CCI?

4    A    Yes.

5    Q    What was the outcome of the government' investigation of

6    Dejvid Mirkovic?

7    A    Dejvid Mirkovic was offered a non-prosecution agreement,

8    essentially, in exchange for his cooperation and testimony

9    against the defendant.

10   Q    Can you explain what a non-prosecution agreement is?

11   A    Yes.  In exchange for cooperation with the government,

12   the individual who is signing the nonpros agreement will not

13   be prosecuted.

14   Q    Did Dejvid Mirkovic, in fact, testify against the

15   defendant?

16   A    No, he did not.

17   Q    Why not?

18   A    The defendant pled guilty at jury selection.

19   Q    Are you familiar with an individual named Russell Barnes?

20   A    I am.

21   Q    Did Russell Barnes have a nickname?

22   A    Yes, he was also known as Rusty.

23   Q    And what was Russell or Rusty Barnes' relationship with

24   the defendant?

25   A    They had been in the navy together in the late 1980s, and

WILLIAM HESSLE-DIRECT-DEAN                          690

1   Rusty worked for the defendant at the coin companies, as a

2   salesman.

3           MS. DEAN:  Your Honor, at this time, the government

4   would offer Government Exhibit 5, which is a photograph.

5           MR. GOLTZER:  No objection.

6           THE COURT:  No objection?

7           MS. DEAN:  May we display it to the jury?

8           THE COURT:  You may.  Received.

9           (Exhibit published to the jury.)

10  BY MS. DEAN:

11  Q    Was Rusty Barnes also indicted for his roll in the

12  telemarketing companies?

13  A    Yes, he was.

14  Q    Did he also agree to cooperate?

15  A    He did.

16  Q    Did he agree to testify against the defendant?

17  A    He did.

18          THE COURT:  I don't want to try your case, but let

19  me have him identify him.

20          MS. DEAN:  I'm sorry, Your Honor?

21          THE COURT:  Shouldn't you have the witness identify

22  Barnes?  He didn't do it yet.

23          MS. DEAN:  Oh, I'm sorry.

24          THE COURT:  As I say, I don't want to try your case.

25  You've got his name up there.

WILLIAM HESSLE–DIRECT–DEAN                     691

1              MS. DEAN:  I apologize, Your Honor.

2    BY MS. DEAN:

3    Q    In Government Exhibit 5, do you recognize this

4    individual?

5    A    That's Rusty, also known as Russell Barnes.

6              MS. DEAN:  Thank you, Your Honor.

7              THE COURT:  Okay.

8              MS. DEAN:  I jumped ahead.

9    BY MS. DEAN:

10   Q    Now, when was Rusty Barnes arrested?

11   A    In November of 2008.

12   Q    And when did he agree initially to cooperate with the

13   government's investigation?

14   A    In December of 2008, he was proffered.

15   Q    Can you explain what a proffer is?

16   A    Yes.  Essentially, the individual comes in and tells us

17   what he knows about the subjects that the government is

18   interested in.

19   Q    Now, did his cooperation continue throughout the

20   prosecution of the defendant?

21   A    No, it did not.

22   Q    Can you explain what you mean by that?

23              MR. GOLTZER:  Objection to relevance.  May we

24   approach?

25              THE COURT:  What is the relevance of this?

WILLIAM HESSLE–DIRECT–DEAN                    692

1          MS. DEAN:  May we approach, Your Honor?

2          THE COURT:  All right.  Yes.  I'll let you approach.

3          (Continued on the next page.)

SIDEBAR CONFERENCE                     693

1          (Sidebar conference.)

2          MS. DEAN:  Your Honor, there is a portion of the

3    videotape --

4          MR. GOLTZER:  I think they can hear you.

5          THE WITNESS:  All right.  Go ahead.

6          MS. DEAN:  Your Honor, there is a portion of the

7    video recording between Gerry Machacek and the defendant.

8          THE COURT:  And they mentioned Barnes.  Yes, I know

9    that.

10         MS. DEAN:  Where he talks about how Mr. Barnes began

11   cooperating against him until he threatened him with a knife

12   to the throat.  And we would like to -- and it's relevant for

13   that purpose, from the government's perspective that

14   Mr. Barnes started cooperating, and that he ceased cooperating

15   and that he began cooperating again.  It's a little confusing

16   otherwise, without this sort of context.

17         MR. GOLTZER:  Of course, we raised the entrapment.

18   The defense has no problem with the government bringing out

19   the mere fact that he did cooperate, didn't cooperate and then

20   did cooperate.

21         But what I don't want to get into are the hearsay

22   reports from Mr. Barnes, because he's deceased, unavailable

23   and it's clearly testimonial.

24         THE COURT:  I didn't know he was deceased.

25         MS. DEAN:  We don't intend that.

SIDEBAR CONFERENCE                        694

1           MR. GOLTZER:  I thought that's where he was going to

2   go.

3           THE WITNESS:  Okay.  There's no objection.

4           MR. GOLTZER:  To that question, no.

5           THE COURT:  Go ahead.

6           MR. GOLTZER:  To that answer.

7           (End of sidebar conference.)

8           (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WILLIAM HESSLE-DIRECT-DEAN                      695

1              (In open court.)

2              THE COURT:  Could you read the pendant question to

3      the witness?

4              (Record read.)

5              THE COURT:  The objection is withdrawn.

6              Go ahead.

7      A    In early 2009, the -- at the time, AUSA Treinis-Gatz was

8      advised that Mr. Barnes was no longer cooperating with the

9      government.

10     BY MS. DEAN:

11     Q    Now, you began investigating CCI early 2009?

12     A    Yes, I did.

13     Q    Did Rusty Barnes play any roll in CCI?

14     A    Yes, he became an employee of CCI, as a salesman.

15             THE COURT:  He was the guy that was in Navy with the

16     defendant?

17             THE WITNESS:  Yes, Your Honor?

18             THE COURT:  Okay.  Go ahead.

19     BY MS. DEAN:

20     Q    And when did you first discover that Rusty Barnes was

21     working at CCI?

22     A    In early 2009.

23     Q    Now, was that when charges were still pending against Mr.

24     Barnes?

25     A    Yes, they were.

WILLIAM HESSLE-DIRECT-DEAN                          696

1    Q    When Mr. Barnes was initially released on bail -- when he

2    was initially arrested, was he released on bail?

3    A    Yes, he was.

4    Q    And when you discovered that he was working again

5    telemarketing coins, what did the government do?

6    A    We moved -- we moved to revoke his bail.

7    Q    Was his bail, in fact, revoked?

8    A    Yes.

9    Q    When was that?

10   A    In March of 2009.

11   Q    And when you say that his bail was revoked, does that

12   mean he went to jail?

13   A    Yes, he did.

14   Q    Did he make any effort to cooperate again after his bail

15   was revoked and he was sent to jail?

16   A    I'm sorry.  Could you repeat that.

17   Q    Did Mr. Barnes make any effort to cooperate again after

18   his bail was revoked and he was sent to jail?

19   A    Yes, he did.

20   Q    Can you explain what you mean by that?

21          MR. GOLTZER:  Objection.

22          THE COURT:  I think it speaks for itself.  He sought

23   to cooperate.  Fine.  Next question?

24          THE WITNESS:  His bail was revoked in 2010, not

25   2009.

WILLIAM HESSLE-DIRECT-DEAN                         697

1           MS. DEAN:  Thank you.

2   BY MS. DEAN:

3   Q    Was Mr. Barnes --

4           THE COURT:  He again sought to cooperate after he

5   was put back in, is that it?

6           THE WITNESS:  Yes, Your Honor.

7           THE COURT:  Go ahead.

8   BY MS. DEAN:

9   Q    Was Mr. Barnes ever convicted and sentenced?

10  A    No, he was not.

11  Q    Why not?

12  A    Because he died in jail, in June of 2010.

13  Q    Now, when the defendant was first arrested in November of

14  2008, was he also released on bail?

15  A    Yes, he was.

16  Q    Now, you said Mr. Barnes had violated his bail conditions

17  by engaging in telemarketing.  As a condition of the

18  defendant's bail, was he also not allowed to engage in

19  telemarketing?

20  A    That's correct.

21  Q    And did the government move to revoke the defendant's

22  bail, as well?

23  A    Yes, it did.

24  Q    When was that?

25  A    In March of 2010.

WILLIAM HESSLE-DIRECT-DEAN                    698

1    Q    And can you explain what happened after the government

2    moved to revoke the defendant's bail?

3    A    Yes.  The defendant was arrested in Florida.  He was

4    transported to New York.  And in May of 2010, there was a

5    detention hearing held in the Eastern District of New York.

6    Q    And what was the result that detention hearing?

7    A    He was order remanded.

8              THE COURT:  Go ahead.  I don't want to try your

9    case.  Go ahead.  Forget it.

10   BY MS. DEAN:

11   Q    When you say he was ordered remanded, does that mean he

12   was --

13   A    There was a permanent order of detention on him.

14   Q    Which means he went to jail?

15   A    He went to jail, yes.

16   Q    What jail was the defendant placed in at that point?

17   A    The -- I'm sorry.  One second.  He was placed in the

18   Nassau County Correctional -- Nassau County Jail.  He spent

19   the first couple of days when he got here in April, in MDC and

20   then he was -- the Metropolitan Detention Center in Brooklyn,

21   and then he was moved shortly thereafter to the Nassau County

22   Jail.

23   Q    When you say when he first got here, does that mean he

24   was arrested outside of New York?

25   A    Yes, he was arrested in Florida and he was brought up by

WILLIAM HESSLE-DIRECT-DEAN                    699

1   the Marshal Service, and then when he got to New York, he was

2   placed in MDC, and then shortly thereafter, he was moved to

3   the Nassau County Jail.

4   Q    Now, you said that MDC is in Brooklyn.  Where exactly is

5   the Nassau County Jail?

6   A    It's in East Meadow, New York, on Long Island.

7   Q    Now, when the defendant was arrested initially for the --

8   in connection with the coin fraud prosecution in November of

9   2008, was he allowed to self-surrender or was he arrested by

10  authorities going to where he was?

11  A    He is self-surrendered to the postal inspectors with

12  counsel.

13  Q    What about when he was arrested for violation of the

14  conditions of his bail?

15  A    He was -- had to be arrested by the Marshals.

16  Q    Now, just so the time line is clear, is it correct that

17  he was out on bail from November 2008 to March of 2010?

18  A    Yes.  That's correct.

19  Q    And after that, he was in Nassau jail?

20  A    Yes.

21          THE COURT:  Don't lead, please.

22          MS. DEAN:  Yes, Your Honor.

23  BY MS. DEAN:

24  Q    Now turning your attention to page one of what's already

25  been admitted as Government Exhibit 81, do you recognize this

WILLIAM HESSLE-DIRECT-DEAN                    700

1   document?

2   A    I do.

3   Q    What is it?

4   A    It is the signature card for the business account of

5   Collectable Coins, issued by Regions Bank.

6   Q    And -- is this focused on people's screens?

7          Who is listed -- who is listed as the signatory of

8   the account?

9   A    Dejvid Mirkovic, president.

10  Q    Now, showing what's been already admitted as Government

11  Exhibit 82, showing you page one of this exhibit.  Do you

12  recognize --

13  A    I've lost my screen.  Now it's back.

14          MS. DEAN:  May we display page one of Government

15  Exhibit 82, Your Honor?

16          THE COURT:  Yes.

17          (Exhibit published to the jury.)

18  BY MS. DEAN:

19  Q    Do you recognize this document?

20  A    I do.

21  Q    What is it?

22  A    This is the signatory card for the business account of

23  Collectable Coins, as issued by the Bank of America.

24  Q    And who is the signatory of this Bank of America account?

25  A    Dejvid Mirkovic, president.

WILLIAM HESSLE-DIRECT-DEAN                    701

1          MS. DEAN:  Your Honor, at this time, I would like to

2   display for the jury Government Exhibit 82, Bates numbers 519

3   through 522.  It's already in evidence.

4          THE COURT:  Since it's in evidence, you can.

5   BY MS. DEAN:

6   Q    Now, showing you Government Exhibit 82, pages 519 through

7   522.  Do you recognize these documents?

8   A    I do.

9   Q    And did you have an opportunity to review them prior to

10  today?

11  A    I did.

12  Q    What are these?

13  A    These are checks drawn on the accounts of Collectable

14  Coins, Incorporated, made payable to "cash."

15  Q    Now, if I turn this, this way.

16          It's been endorsed on the back side.  Do you

17  recognize that signature?

18  A    I do.

19  Q    How do you recognize that signature?

20  A    Through the review of many bank accounts involving this

21  particular person.

22  Q    And whose signature is that?

23  A    Karen Romano, the defendant's wife.

24  Q    So this first one, June 9th, 2009, is page 519.  And what

25  is the -- how much is this check made out for?

WILLIAM HESSLE-DIRECT-DEAN                          702

1   A     One thousand dollars.

2   Q     And the next one, page 520?

3   A     One thousand dollars.

4   Q     And that's also endorsed by Karen Romano?

5   A     Yes.

6   Q     And this next one, 521?

7   A     One thousand dollars.

8   Q     Who that is endorsed by?

9   A     Karen Romano.

10  Q     And page 522?

11  A     The same, one thousand dollars, and endorsed by Karen --

12  appears to be Karen Romano.

13  Q     And all of these were drawn on the Collectable Coins,

14  Incorporated account?

15  A     Yes.

16        MS. DEAN:  Your Honor, at this time, I would like to

17  display for the jury what's been admitted as Government's

18  Exhibit 81, page 520 -- I'll withdraw that, Your Honor.

19        I would like at this time to display for the jury

20  pages from Government Exhibit 81, which has been admitted into

21  evidence.  And these page have been marked Government Exhibits

22  81A, B, C, D and E.

23        THE COURT:  All right.  You can show those pages.

24        MS. DEAN:  As well has Government's Exhibit 82, a

25  page from that exhibit, which is marked Government's Exhibit

WILLIAM HESSLE-DIRECT-DEAN                    703

1   82B.

2          THE COURT:  You can show those, please.

3          (Exhibits published to the jury.)

4   BY MS. DEAN:

5   Q    Mr. Hessle, do you recognize this document?

6   A    I do.

7   Q    Exhibit 81A?

8   A    I do.

9   Q    What is it?

10  A    It's a check drawn on the Regions Bank account of

11  Collectable Coins, payable to Charles Carnesi, in the amount

12  of five thousand dollars.

13  Q    And can you remind the jury who Charles Carnesi is?

14  A    It's the defendant's first attorney.

15  Q    And what about Government Exhibit 81B?

16  A    It's another check payable to Charles Carnesi in the

17  amount of five thousand dollars, drawn on Collectible Coins

18  account.

19  Q    And 81C?

20  A    The same.

21  Q    In the amount of five thousand dollars?

22  A    In the amount of five thousand dollars, payable to

23  Charles Carnesi.

24  Q    And 81D?

25  A    Also drawn for five thousand, payable to Charles Carnesi.

WILLIAM HESSLE–DIRECT–DEAN                                704

1    Q    And 81E?

2    A    Payable to Charles Carnesi, in the amount of five

3    thousand dollars, on Collectible Coins account.

4    Q    And what about 82B?

5    A    Yes, also payable to Charles Carnesi in the amount of

6    five thousand dollars, drawn on the Collectable Coins account.

7    Q    Which Collectable Coins account?

8    A    The Bank of America account.

9    Q    Now, these checks range from November of 2009 to January

10   of 2010.

11   A    Yes.

12   Q    Over this approximately two-month period, how much money

13   went from the Collectable Coins accounts to the defendant's

14   attorney?

15   A    That appears to be $30,000.

16        MS. DEAN:  Your Honor, at this time, I would like to

17   display for the jury pages from Government Exhibit 81 and 82,

18   which are in evidence and these page have been marked

19   Government Exhibits 81F through J and 82C through F.

20        THE COURT:  All right.  It's in evidence.  You can

21   show it.  Go ahead.

22        (Exhibits published to the jury.)

23   BY MS. DEAN:

24   Q    Mr. Hessle, do you recognize this document, 81F?

25   A    I do.

WILLIAM HESSLE–DIRECT–DEAN                          705

1    Q    What is it?

2    A    It's a check payable to Millenium, in the amount of two

3    thousand dollars, drawn on the Regions Bank account of

4    Collectable Coins.

5    Q    And are you familiar with a company called Milennium

6    associated with the defendant?

7    A    Yes, I am.

8    Q    What company?

9    A    It's a –– Milennium is a custom auto shop located in Deer

10   Park, New York.

11   Q    And whose cars were being restored at Milennium Custom

12   Auto?

13   A    The defendant's.

14   Q    Now, showing you also 81G, what is that document?

15   A    It's a check payable to Milennium in the amount of three

16   thousands, $3,000, drawn on the Regions account of Collectable

17   Coins.

18   Q    And 81H?

19   A    A check in the amount of $1,500, drawn on the Regions

20   account of Collectable Coins, payable to Millenium Custom

21   Auto.

22   Q    81J?

23   A    A check in the amount of $2,000, drawn on the account of

24   Regions –– Regions account of Collectible Coins, payable to

25   Millenium Custom Auto.

WILLIAM HESSLE-DIRECT-DEAN                    706

1           MS. DEAN:  May I have a moment, Your Honor?

2           THE COURT:  Yes.

3           MS. DEAN:  (Confers with Mr. Miller.)

4    BY MS. DEAN:

5    Q    Mr. Hessle, are you aware of any dispute between the

6    defendant and Milennium Custom Auto?

7    A    I am.

8    Q    Can you explain what that dispute is about?

9           MR. GOLTZER:  Objection; hearsay.

10          THE COURT:  Sustained, probably, but I mean, until I

11   hear it, it's going to be hard to rule.  It sounds like it's

12   going to be hearsay, yes.  Is it going to be hearsay?

13          MS. DEAN:  I can work around the hearsay Your Honor.

14          THE COURT:  All right.  If you can work around the

15   hearsay, let's see you do it.  But if it gets to the hearsay,

16   I'm going to sustain the objection.

17   BY MS. DEAN:

18   Q    Did you review any of the defendant's calls from jail?

19   A    I did.

20   Q    And did the defendant speak of Milennium Custom Auto in

21   any of these telephone calls?

22   A    Yes, he did.

23   Q    And did the defendant speak of any dispute with Milennium

24   Custom Auto?

25   A    Yes, he did.

WILLIAM HESSLE–DIRECT–DEAN                    707

1    Q    And what did he say about Milennium Custom Auto?

2    A    That they had stolen his cars.

3    Q    Showing you Government Exhibit 81I, do you recognize this

4    document?

5    A    I do.

6    Q    What is it?

7    A    It's a check payable to Milennium Custom Auto, in the

8    amount of $1,500, drawn on the Regions account of Collectable

9    Coins.

10   Q    And 82C?

11   A    Also a check payable to Milennium Custom Auto, in the

12   amount of $660.87, drawn on the Bank of America account of

13   Collectible Coins.

14   Q    82D?

15   A    It's payable to -- check in the amount of $2,000, payable

16   to Milennium Custom Auto, drawn on the Bank of America account

17   of Collectible Coins.

18   Q    And 82E?

19   A    Check in the amount of $2,000, payable to Milennium

20   Custom Auto, drawn on the Bank of America account of

21   Collectible Coins.

22   Q    And finally, 82F?

23   A    A check in the amount of one thousand dollars, payable to

24   Milennium Custom Auto, drawn on the Bank of America account of

25   Collectible Coins.

WILLIAM HESSLE–DIRECT–DEAN                          708

1   Q     Now, these checks range from October of 2009 to

2   January 2010?

3           THE COURT:  Nobody's objecting, but please don't

4   lead.  All you have to do is ask what is the time period of

5   the checks.  Don't get in the habit of leading, will you,

6   please?

7   BY MS. DEAN:

8   Q     Mr. Hessle, what is date range of these checks?

9   A     The date of the first check appears to be October 17th,

10  2009, and the last date is January 28th, 2010.

11  Q     And how much money was paid to Milennium Custom Auto from

12  the accounts of Collectible Coins, Incorporated?

13  A     Could you just -- I'll add them up if you'd show them

14  once again.

15          MS. DEAN:  Your Honor, may I approach the witness

16  with these documents?  It's faster.

17          THE COURT:  You may.

18          MR. GOLTZER:  If there is a number they have, we

19  won't dispute it.

20          THE COURT:  All right.  Go ahead.  Go ahead.

21          MS. DEAN:  May I lead the defendant, Your Honor --

22  may I lead the witness?

23          THE COURT:  Yes.

24  BY MS. DEAN:

25  Q     Is that slightly over $15,000 --

WILLIAM HESSLE–DIRECT–DEAN                     709

1  A    Yes.

2  Q    -- during that time period?

3  A    Yes.

4         MS. DEAN:  Your Honor, may I display to the jury

5  page one of Government Exhibit 83, which is already in

6  evidence?

7         THE COURT:  Yes.

8  BY MS. DEAN:

9  Q    Mr. Hessle, do you recognize this document?

10  A    I do.

11  Q    What is it?

12  A    It's an American Express invoice, dated 1-25-09, on the

13  account of Joseph Romano, Last Quarter Coin, Inc.

14  Q    And what is Last Quarter, Inc.?

15  A    That was the defendant's first coin company.

16  Q    And did you review American Express records for Joseph

17  Romano, Last Quarter, Inc.

18  A    I did.

19         MS. DEAN:  Your Honor, at this time, I would like to

20  display for the jury what's been marked Government Exhibits

21  83A through D, which are pages from what's Government Exhibit

22  83.

23         THE COURT:  It's in evidence.  You may do so.

24  BY MS. DEAN:

25  Q    Mr. Hessle, do you recognize this document, 83A?

LISA SCHMID, CCR, RMR

WILLIAM HESSLE–DIRECT–DEAN                710

1   A    I do.

2   Q    What is it?

3   A    It's a check drawn on the Regions Bank account of

4   Collectible Coins, payable to American Express in the amount

5   of $3,500.

6   Q    And just to be clear, this is the American Express

7   account for who?

8   A    I'm sorry?

9   Q    Which American Express account is this?

10  A    That's the account of Last Quarter Coin.

11  Q    And 83B?

12  A    It's a check in the amount of $2,000, payable to Amex,

13  drawn on the Bank of American account of Collectible Coins.

14  Q    83C?

15  A    Check in the amount of $3,000, payable to Amex, drawn on

16  the Regions account of Collectible Coins, Inc.

17  Q    83D?

18  A    Check in the amount of 3500, drawn on the Bank of America

19  account of Collectible Coins, payable to Amex.

20  Q    Now, what time span do those checks cover?

21  A    The first check was drawn -- appears to be on

22  September 30th, 2009, and the last one, January 4th, 2010.

23  Q    Now, over this approximately three-month period, how much

24  was paid by CCI to the American Express account belonging to

25  the defendant?

WILLIAM HESSLE-DIRECT-DEAN                711

1    A    It looks like $12,000.

2    Q    Now, you said that after the defendant was arrested for

3    having violated his bail conditions, he was placed in the

4    Nassau County Jail.  During what period of time was the

5    defendant housed there?

6    A    From April of 2010 until September of 2012.

7    Q    And do you recall exactly when in September he was moved

8    out of the Nassau County Jail?

9    A    I believe it was the 28th of September.

10   Q    And where did he move to?

11   A    He moved to the Queens private detention facility,

12   located by Kennedy Airport in Queens.

13          MS. DEAN:  Your Honor, at this time, the government

14   would like to offer and read a rather lengthy stipulation,

15   marked Government Exhibit 60.

16          THE COURT:  All right.

17          MS. DEAN:  "It is hereby stipulated and agreed by

18   and between the United States of America and the defendant,

19   Joseph Romano, by his attorneys, that Government Exhibit 298

20   is a list of telephone calls made from the Nassau County

21   Correctional Center, or NCCC, to telephone number

22   516-749-6662, a telephone number subscribed to by Dejvid

23   Mirkovic, for the period August 1, 2012 to September 28th,

24   2012."

25          THE COURT:  That's now evidence in the case.

WILLIAM HESSLE-DIRECT-DEAN                    712

1           Go ahead.

2           MS. DEAN:  Thank you, Your Honor.  The stipulation,

3    however, goes on for two more pages.

4           THE COURT:  All right.  The stipulation -- are you

5    offering the whole stipulation right now or only offering that

6    page?

7           MS. DEAN:  I was going to read the whole thing and

8    offer all of the exhibits, Your Honor.

9           THE COURT:  All right.  It's received.  It's now

10   evidence.

11          MS. DEAN:  Does Your Honor want me to continue

12   reading or --

13          THE COURT:  No, you can -- I said earlier, I don't

14   want to try your case.  You try your case.

15          MR. GOLTZER:  We have no objection to the

16   stipulation being entered into evidence, as well as the

17   exhibits, if she would like to, just to --

18          THE COURT:  If you wish.  If you wish to do that,

19   you may do so.

20          MS. DEAN:  At this time then, the government would

21   offer Government Exhibits 61A through D, 62A and B, 63, 64A

22   through D, 65, 66, 150 through 152, 201B, 202B, 298 through

23   330, and the stipulation, which is Government Exhibit 60.

24          THE COURT:  All received.

25   BY MS. DEAN:

WILLIAM HESSLE-DIRECT-DEAN                    713

1    Q    I'm showing you what's been admitted now as Government

2    Exhibit 300.

3              MS. DEAN:  Your Honor, may we display Government

4    Exhibit 300?

5              THE COURT:  Yes.

6              (Exhibit published to the jury.)

7    BY MS. DEAN:

8    Q    Do you recognize this chart?

9    A    I do.

10   Q    What is this chart?

11   A    This chart is depiction of the calls placed from the

12   Nassau County Correctional Center to Dejvid Mirkovic, and

13   the -- on page one, and I don't know how many page there are.

14   Q    (Indicating.)

15   A    Ending on September 25th, 2012 and beginning on

16   August 8th, 2012.

17   Q    Now, turning your attention to this first entry, which

18   references Government Exhibit 301.  What is the date and time

19   of this particular telephone call?

20   A    It's August 8th, 2012, and the time is 2:29 p.m.

21   Q    Did you review this call prior to today?

22   A    I did.

23             MS. DEAN:  Your Honor, at this time, we'll be

24   playing a series of recordings, and we have transcript binders

25   prepared for the jurors.  It may be appropriate to take a

WILLIAM HESSLE–DIRECT–DEAN                    714

1   break.

2          THE COURT:  All right.  You can play the recording,

3   but before you do, I think we ought to explain what the chart

4   means.  It's in front of the jury.  Because all we know is

5   this is Exhibit 301.  It was on August 8th, 2012 at 2:29, and

6   it's to Mr. Mirkovic at that phone number, 516-749-6662.  We

7   don't know what the other things on the exhibit are that's

8   before the jury, and I think before we play the recordings, we

9   ought to know what the exhibit is.

10         MS. DEAN:  Yes, Your Honor.  It might be appropriate

11  to read that paragraph in the stipulation now.  May I, Your

12  Honor?

13         THE COURT:  Yes.

14         MS. DEAN:  This is paragraph two of Government

15  Exhibit 60:  "Government Exhibits 300, 301 through 325 are

16  true and accurate recordings of calls made by Joseph Romano

17  from the NCCC, made on the dates and times to the telephone

18  numbers, and using the PINs of the NCCC inmates listed in

19  Government Exhibit 300."

20         THE COURT:  And I take it PIN stands for Personal

21  Identification Number, is that correct?

22         MS. DEAN:  Yes, Your Honor.  And I --

23         THE COURT:  Does anyone -- can you explain that to

24  the -- I don't know.  Maybe the jury understands all that.  I

25  do, because I have --

WILLIAM HESSLE–DIRECT–DEAN                      715

1    BY MS. DEAN:

2    Q    Mr. Hessle, are you familiar --

3            THE COURT:  That's only because it's not the first

4    case I've tried.  I don't know whether the jury understands

5    what a Personal Identification Number is.

6    BY MS. DEAN:

7    Q    Mr. Hessle, are you familiar with what a PIN is, P-I-N?

8    A    I am.

9    Q    What is it?

10   A    It's a Personal Identification Number assigned to each

11   inmate that needs to be used whenever a call is placed by an

12   inmate.

13   Q    Why does each inmate have his or her own Personal

14   Identification Number?

15   A    So that there could be some sort of tracking done on the

16   calls that are being made from jail.

17   Q    Now, the fact that the defendant made telephone calls to

18   Dejvid Mirkovic using PIN numbers of other inmates --

19   A    I'm sorry?

20   Q    Now, turning your attention to Government Exhibit 300.

21   This, for example, referencing the first entry, Government

22   Exhibit 301, whose PIN number did the defendant use to make

23   this call?

24   A    An inmate by the name John Cabrejal.

25           MS. DEAN:  Your Honor, at this time, is it

LISA SCHMID, CCR, RMR

WILLIAM HESSLE–DIRECT–DEAN                          716

1    appropriate to take a break to pass out the binders?

2                THE COURT:  Go ahead.  Do what you want.  It's late,

3    but you can do it, yes.  You want to play the tapes now?

4                MS. DEAN:  Yes, Your Honor, but we have some

5    binders.

6                THE COURT:  You can pass out the transcripts if you

7    have transcripts.

8                All right, now, the transcripts that you're going to

9    be supplied are what the government believes is what is said

10   on this tape.  You're going to hear the tape.  You can look at

11   the transcript as an aid to listening to the tape, but it's

12   the tape that you hear that is the evidence, not the

13   transcript.

14               Let me repeat that.  The transcript is being given

15   to you as only as an aid for you to hear the tape, and to

16   listen to the tape.  The tape what you hear is the evidence,

17   not the transcripts.  Don't read, in other words, page --

18   there's five pages to the transcript, and they're playing what

19   the government thinks is on the first page, don't read the

20   fourth page or the fifth page while they're playing the first

21   page.  Just listen to the tape.

22               And if you decide you don't want to use the

23   transcript, nobody is going to be mad at you.  You don't have

24   to use the transcript if you don't want to.  It's an aid for

25   you.  Strictly up to you.

WILLIAM HESSLE–DIRECT–DEAN                    717

1          (Discussion off the record.)

2          THE CLERK:  Is there a copy for the Court?

3          THE COURT:  Now, if I understand, you want to play

4   301, is that right?

5          MS. DEAN:  Yes, Your Honor.

6          THE COURT:  Okay.

7          MS. DEAN:  Your Honor, may I show the witness

8   Government Exhibit --

9          THE COURT:  I can't hear you.

10         MS. DEAN:  May I show the witness Government Exhibit

11  301T, the transcripts which he initialed?

12         THE COURT:  What do you want to do now?

13         MS. DEAN:  Show the witness Government Exhibit 301T.

14         THE COURT:  Yes, you can show him.

15         MS. DEAN:  Okay.

16  BY MS. DEAN:

17  Q    Now, Mr. Hessle, I'm showing you what's been marked

18  Government Exhibit 301T.  Do you recognize this document?

19  A    It's not on my screen.

20         THE CLERK:  Is it on now?

21         THE WITNESS:  Now it is.

22  BY MS. DEAN:

23  Q    Do you recognize this document?

24  A    I do.

25  Q    What is it?

WILLIAM HESSLE–DIRECT–DEAN                         718

1   A    It's a transcript of the recording placed on August 8th,

2   2012 at 2:29 p.m., depicting a conversation between the

3   defendant and Dejvid Mirkovic.

4   Q    And when you say a conversation, is that reflected on

5   Government Exhibit 301.

6   A    (No response.)

7   Q    The call that you're referring to, is that Government

8   Exhibit 301?

9   A    Yes, on the chart that you have.

10  Q    Is it a fair and accurate transcript of Government

11  Exhibit 301?

12  A    Yes.

13  Q    Okay.  And on this lower right hand corner, whose

14  initials are those?

15  A    Those are my initials and the date.

16  Q    And did you review this transcript prior to today?

17  A    I did.

18          MS. DEAN:  Your Honor, may we play 301?

19          THE COURT:  Yes.

20          MS. DEAN:  Okay.  And Your Honor --

21          THE COURT:  It's hard to hear with the earphones on.

22  I thought you were going to play the tape.

23          MS. DEAN:  I believe the sound is going to come from

24  overhead, but everyone is welcome to use headphones, as well.

25  You just have to turn on the switch on the side.

WILLIAM HESSLE–DIRECT–DEAN                           719

1          THE COURT:  Whatever you want to do.  Show them how

2   they do it.

3          MS. DEAN:  There is an on-off switch on the side.

4          MR. MILLER:  (Demonstrating.)

5          THE COURT:  All right.  You may play the tape.

6          MS. DEAN:  Thank you, Your Honor.

7          (Audio played in open court.)

8          MS. DEAN:  May we change to the Elmo?

9          THE CLERK:  Public?

10         MS. DEAN:  Yes.

11   BY MS. DEAN:

12   Q    Now, turning your attention -- are you able to see the

13   screen, Mr. Hessle?  Can you see?

14   A    Yes, I can see.

15   Q    Can you clear the screen of the red marks?

16   A    I don't know how to do that.

17   Q    On the corner --

18         THE CLERK:  It should be done on your podium.

19         MS. DEAN:  I think it's fine.  We'll just leave it

20   there.

21   BY MS. DEAN:

22   Q    Turning your attention to page two of this transcript,

23   Government Exhibit 301T, line 13, there's a mention of someone

24   here, K.  Did you identify who K is?

25   A    Yeah, I did.

WILLIAM HESSLE–DIRECT–DEAN                    720

1    Q      How did you identify who K is?

2    A      Identified K through conversations in which K, the letter

3    "K" or the name "Kay" is interchanged with Karen, the

4    defendant's wife.

5                  MS. DEAN:  Your Honor, may I have a quick moment?

6                  THE COURT:  Yes.

7                  MS. DEAN:  (Confers with Mr. Miller.)

8                  (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WILLIAM HESSLE–DIRECT–DEAN                    721

1              THE COURT:  I don't think this has been established.

2    On the transcript, where it reads "DM," is that Dejvid

3    Mirkovic?

4    A    Yes, Your Honor.

5              THE COURT:  "JR," Joseph Romano?

6    A    Yes, Your Honor.

7              THE COURT:  Thank you.

8    Q    I'm sorry.  Can you repeat your answer as to how you

9    identified who K is?

10   A    Yes.  In prior -- there were other conversations in which

11   the conversation -- or during the conversation, the letter K

12   or the name Kay was used interchangeably with Karen, the

13   defendant's wife.

14             MS. DEAN:  Your Honor, at this time, the government

15   would like to play another call, Government Exhibit 302.

16             THE COURT:  302.

17   BY MS. DEAN:

18   Q    Mr. Hessle, I'm putting up on the screen what has been

19   marked Government Exhibit 302T.  Do you recognize this

20   document?  You don't have it?

21   A    I don't have it on my screen.

22   Q    We can give you a binder if that might make it easier.

23   A    Thank you.

24   Q    Actually, before I do that, turning your attention to

25   Government Exhibit 300, which is in evidence, and referencing

WILLIAM HESSLE-DIRECT-DEAN                722

1   the second entry with reference to Government Exhibit 302, can

2   you explain what call Government Exhibit 302 is?

3           THE COURT:  Could you get that up?

4   A    I -- it's not on my screen, so I can't really read it.

5           THE COURT:  It's not on my screen, either.

6           MS. DEAN:  May I approach, Your Honor?  We can

7   circumvent the ELMO.

8           THE COURT:  Yes, you can approach.

9   Thank you.

10  Q    The second entry referencing Government Exhibit 302, what

11  call is Government Exhibit 302?

12  A    It's a call that was placed on August 15th, 2012 at 10:08

13  a.m.  It was placed on the PIN number of John Cabrejal.  The

14  call was placed to Dejvid Mirkovic.

15  Q    By whom?

16  A    By the defendants.

17  Q    Now, if you can turn to, in your binder, Government

18  Exhibit 302T, what is that document?

19          THE COURT:  All right.  Now, if we play -- I'm

20  interrupting you so the jury can understand what's happening.

21  If we play 302T -- or we play the tape 302, the jury may look

22  at the transcript, 302T, which, again, is not the evidence.

23  The evidence is what you hear on 302, which is played.  Go

24  ahead.  And don't read it, just listen to the tape.

25  Q    Mr. Hessle, what is Government Exhibit 302T?

WILLIAM HESSLE—DIRECT—DEAN                         723

1   A    302T is a transcript of the conversation made on August

2   15, 2012 at 10:08 a.m.

3   Q    A transcript of Government Exhibit 302?

4   A    Yes, that is correct.

5   Q    And did you have an opportunity to review this transcript

6   prior to today?

7   A    I did.

8   Q    Is it a fair and accurate transcript of Government

9   Exhibit 302?

10  A    Yes, it is.

11        MS. DEAN:  Your Honor, the government would offer

12  Government Exhibit 302T as an aid for the jury.

13        THE COURT:  Accept it as an aid for the jury.

14        MS. DEAN:  Your Honor, at this time, the government

15  would also request an instruction regarding redactions,

16  because this call is redacted.

17        THE COURT:  There are certain things in the call

18  that are not being exhibited or played, and the reason for

19  that is they're not relevant to the case.  Go ahead.  Relevant

20  means that they don't pertain to the case.  Go ahead.

21        THE CLERK:  From your computer, we're not getting a

22  signal.

23        MS. DEAN:  Your Honor, it appears we're having some

24  technology problems.  Again, I can skip ahead for now.

25        THE COURT:  If you want to skip ahead, go ahead.

WILLIAM HESSLE-DIRECT-DEAN                          724

1           (Tape-recording played.)

2           THE COURT:  All right, that completes the playing of

3    302, because the last thing that is in the court record with

4    the stenographer is that you said you wanted to move on to

5    other things, and then suddenly the record started to play,

6    the recording started to play, and we just heard it.  So the

7    record is clear.  All right.  What's next?  Go ahead.

8           MS. DEAN:  Thank you, Your Honor.

9    Q    Now, there was a reference in the call to a scumbag

10   judge.  Who sentenced the defendant to 15 years?

11   A    Judge Joseph Bianco.

12   Q    Now, in the course of your investigations of the

13   connection between CCI and the defendant, did you review jail

14   records as well?

15   A    I did.

16   Q    Did you review commissary account records?

17   A    I did.

18   Q    Can you explain what commissary account records are?

19   A    Yes.  At jails, each inmate has what's called a

20   commissary account, and it's sort of like a debit account,

21   where when you purchase goods or candy or items from them,

22   it's deducted from your account.

23   Q    Did you review the commissary account records of inmates

24   other than the defendant?

25   A    I did.

WILLIAM HESSLE-DIRECT-DEAN                725

1  Q    Why did you review those records?

2  A    Because during the review of the defendant's

3  conversations, I began to realize that there were references

4  being made to phone calls and conversations over the jail

5  calls that I had never heard, and it happened on an increasing

6  basis.

7          So what I did was I had the jail, via subpoena, do

8  what's called a reverse search.  And with the --

9  Q    I'm sorry.  I think you may have misunderstood the

10 question.  The question was why you reviewed commissary

11 account records for inmates other than --

12 A    I'm sorry, I'm sorry.  Because there was references being

13 made in conversations between the defendant and Mr. Mirkovic

14 concerning the placing of dollar amounts on the commissary

15 accounts of other inmates.

16         MS. DEAN:  Your Honor, at this time we'd like to

17 display for the jury what's about been admitted as Government

18 Exhibit 61A, B, C and D.

19         THE COURT:  We'll do that, and then when you

20 finish -- how long is it going to take to handle those

21 exhibits?

22         MS. DEAN:  Five minutes, Your Honor.

23         THE COURT:  All right.  Let's finish with those.

24 Yes, you may display it.  Let's finish with that, and then

25 we'll recess for the day.

WILLIAM HESSLE-DIRECT-DEAN                               726

1    Q    Showing you what's been admitted as Government 61A.  Do

2    you recognize this document?

3    A    I do.

4    Q    What is it?

5    A    This is the commissary account of an inmate named Rasoul

6    Johnson at the Nassau County Correctional Center.

7    Q    Now, turning your attention towards the bottom of the

8    page, an entry beginning 6/19/12, what does that entry

9    reflect?

10   A    It reflects that a deposit in the amount of $50 was made

11   into the account of Mr. Johnson by a K. Romano.

12   Q    Do you know anyone associated with the defendant with the

13   first initial K, last name Romano?

14   A    Yes, the defendant's wife's name begins with K.

15   Q    Which is what?

16   A    Karen.

17   Q    Now, turning your attention to the next page, there's an

18   entry here May 3rd, 2012.  What does that entry reflect?

19   A    That reflects a deposit in the amount of $100 that was

20   made by M. Hasan, H-a-s-a-n.

21   Q    Into the account of --

22   A    Into the account of Rasoul Johnson.

23   Q    Now, do you know anyone associated with the defendant

24   with the first initial M, last name Hasan?

25   A    I do.

WILLIAM HESSLE-DIRECT-DEAN                                727

1   Q    Who?

2   A    Melissa Hasan.

3   Q    Who is Melissa Hasan?

4   A    She was a former employee of CCI and a current employee

5   of Universal Coin Collections in Florida.

6              THE COURT:  When you say current, do you mean at the

7   time of the deposit, or do you mean today, January 9th, 2014?

8   You said current.

9   A    Today.  She's a current employee.

10             THE COURT:  She's current.  Okay.

11  Q    Now, showing you what's been marked Government Exhibit

12  61B, do you recognize this document?

13  A    Yes.  That's the commissary account of the Nassau County

14  Correctional Center inmate by the name of Jose Estrella.

15  Q    And turning your attention to the third page of this

16  document, there's an entry here beginning March 13th, 2012.

17  What does that entry reflect?

18  A    It reflects a deposit in the amount of $100 made by

19  Melissa Hasan.

20  Q    And there's another entry January 25th, 2012.  What does

21  that entry reflect?

22  A    That reflects a deposit into Mr. Estrella's account in

23  the amount of $30 -- I'm sorry, in the amount of $50 by M.

24  Hasan.

25  Q    Now, turning your attention to the next page, there's an

WILLIAM HESSLE-DIRECT-DEAN                728

1    entry December 8, 2011.  What does that reflect?

2    A    It reflects a deposit into the account of Mr. Estrella,

3    in the amount of $200, made by M. Hasan.

4    Q    And the entry November 22nd, 2011?

5    A    Yes.  That reflects a deposit in the amount of $150 into

6    the account of Jose Estrella, with the remarks Melissa Hasan.

7    Q    And what about the entry October 27th, 2011?

8    A    That reflects a deposit into the account of Mr. Estrella

9    in the amount of $150, with the remarks Melissa Hasan.

10   Q    Now, in Government Exhibit 300 --

11            THE COURT:  Are we going back to the phone calls

12   now?

13            MS. DEAN:  No, Your Honor.

14            THE COURT:  All right, go ahead.

15   Q    In Government Exhibit 300, you explained that Government

16   Exhibit 301, that telephone call was made on the -- using the

17   PIN of John Cabrejal?

18   A    Yes, that is correct.

19   Q    Were there any telephone calls made by the defendant

20   using the PIN of Rasoul Johnson?

21   A    Yes, there were.

22   Q    Now, showing you what's been admitted as Government

23   Exhibit 61C, whose records are these?

24   A    This is the commissary account of an inmate at the Nassau

25   County Correctional Center whose name is Eric Tassiello.

WILLIAM HESSLE-DIRECT-DEAN                    729

1   Q     And turning to page 2, just looking at an entry August

2   29, 2012, what does that entry reflect?

3   A     It reflects a deposit in the amount of $100 made into

4   Mr. Tassiello's account, with the remarks D. M-i-r-k.

5   Q     Now, we also reviewed commissary account records for

6   inmate Jose Estrella.  Were any calls made by the defendant

7   from the Nassau County Correctional Center made using the PIN

8   for Jose Estrella?

9   A     Yes, there were.

10          MS. DEAN:  Your Honor, at this time, it might be a

11  good time to break.

12          THE COURT:  All right.  We'll recess for the day,

13  ladies and gentlemen.  And remember, because we're

14  accommodating one of the jurors, we're only going to be

15  working tomorrow until about 1:15.  Thank you very much.

16          You can leave the books right on the table.

17          (Jury exits.)

18          (Continued on following page.)

19

20

21

22

23

24

25

PROCEEDINGS                                     730

1          THE COURT:  I have one suggestion which I'd like to

2   put on the record, and that is to try, if you can, before

3   10:00 to make sure the electronic equipment is working,

4   because it saves time if the electronic equipment works.

5          MS. DEAN:  Yes, Your Honor.  We tested it.  I'm not

6   sure what happened.

7          THE COURT:  I'm not blaming you.  It's the machines.

8   That's why I do everything by hand.  Thank you very much.

9          MS. DEAN:  Thank you, Your Honor.

10         MR. MARSHALL:  Thank you, Your Honor.

11         MR. BACHRACH:  Thank you.

12         MR. GOLTZER:  Thank you.

13         (Matter adjourned until January 10, 2014 at 10:00

14   a.m.)

15

16

17

18

19

20

21

22

23

24

25

731

```
1                         I N D E X

2                          WITNESS

3    FOR GOVERNMENT                              DIRECT

4    William Hessle
          By Ms. Dean:                           652
5
                           EXHIBIT
6    EXHIBIT NUMBER                               PAGE

7    Defense Cross Exhibit 1                      592

8    Government Exhibit 1                         654

9    Government Exhibit 50                        657

10   Government Exhibit 3                         658

11   Government Exhibit 4                         659

12   Government Exhibit 51                        662

13   Government Exhibit 52                        670

14   Government Exhibit 53                        675

15   Government Exhibits 80, 81, 82, 83          678

16   Government Exhibit 57                        680

17   Government Exhibit 2                         684

18   Government Exhibit 56A and 56B              686

19   Government Exhibit 15                        687

20   Government Exhibit 16A, B, C and D          688

21   Government Exhibit 5                         690

22   Government Exhibits 60, 61A through D,      712
     62A and B, 63, 64A through D, 65, 66,
23   150 through 152, 201B, 202B,
     298 through 330
24

25
```