1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,   :   12-CR-691 (JFK)
                            :
                            :
                            :
      -against-             :   United States Courthouse
                            :   Brooklyn, New York
                            :
                            :
                            :
JOSEPH ROMANO,              :   Monday, April 14, 2014
                            :   10:30 a.m.
            Defendant.      :
                            :
- - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE JOHN F. KEENAN
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:   LORETTA E. LYNCH, ESQ.
                      United States Attorney
                      BY: **MARSHALL L. MILLER**, **ESQ.**
                          **UNA A. DEAN**, **ESQ.**
                          Assistant United States Attorneys

For the Defendant:    BY: **GEORGE R. GOLTZER**, **ESQ.**
                          **MICHAEL K. BACHRACH**, **ESQ.**

                      UNITED STATES PROBATION DEPARTMENT
                      BY: **MICHAEL DORRA**, **USPO**
Also Present:             **REYNALDO TARICHE**,
                          FBI Special Agent


Courtroom Deputy: William Ryan

Court Reporter:   Mary Agnes Drury, RPR
                  Official Court Reporter
                  Telephone: (718) 613-2615
                  E-mail:  Mad78910@yahoo.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

PROCEEDINGS                                        2

(In open court.)

(Defendant present in open court.)

COURTROOM DEPUTY:  All rise, the United States District Court for the Eastern District of New York is now in session, the Honorable John F. Keenan is now presiding.

(Honorable John F. Keenan takes the bench.)

THE COURT:  All right, everybody may be seated. This is the matter of United States against Joseph Romano 12-CR-691 for sentence.

Before we get to the issue of sentence, the record should reflect that I received a letter on April 8th from Mr. Romano dated April 3rd.  I arranged to have copies of the letter sent to counsel on both sides.  The letter primarily refers to property that allegedly belonged to the defendant's wife.  And the letter refers and enclosed with it, minutes of a proceeding before me on May 21st, 2013, as well as a copy of a letter from Mrs. Romano, and a copy of the letter from United States Attorney's office to Ms. Romano relating to forfeiture.

Could you -- however, it is a fact, as Mr. Romano says in his letter, that when we took this up back in May, there was basically an indication that if property belonged to the wife and was not subject to forfeiture, it should be returned.

What do you know about it, Mr. Miller?

Mary Agnes Drury, RPR
Official Court Reporter

PROCEEDINGS                                3

MR. MILLER:  Your Honor, two computers have been returned to Mrs. Romano.  And all of the remaining materials, other than that that had been forfeited, were retained pending the end of the trial.  They're now ready to be returned; copies having been kept, of course, and the agents have those materials here in court.  We can provide them to Mr. Romano's counsel or we can make arrangements --

THE COURT:  After this procedure is over today, please return them to Mr. Goltzer and Mr. Bachrach.

MR. MILLER:  Yes, your Honor.

THE COURT:  The letter also tells me that he wants to hold you in contempt.  I decline to hold you in contempt because of the fact that, first of all, some of these things have been turned over, and you've explained that you're going to return the rest over when these proceedings are over.

And the letter also tells me something that I cannot believe that Mr. Bachrach allegedly said to Mr. Romano.  The letter says that if Mr. Bachrach told Mr. Romano about the property, this is in quotes in the letter, I'm not just quoting from the letter, I'm pointing out that in the letter it reads, quote, if you press the issue -- this is Mr. Bachrach to Mr. Romano, allegedly, Mr. Marshall will indict your wife, closed quote.

I doubt very much that Mr. Bachrach said that.

PROCEEDINGS                                    4

That letter can be marked Court's Exhibit 1 of today's date.

Thank you very much.  All right.  That takes care of the

letter.

          (Court Exhibit 1 was admitted into evidence.)

          THE COURT:  Now --

          MR. MILLER:  Your Honor, may I put one more thing

on the record?  I want to be sure the record is clear; the

two items that have been forfeited, were forfeited pursuant

to a final order of forfeiture signed by your Honor on

August 1st, 2013, and those are the Honda Accord and $9,000

in currency that were seized on October 9th, 2012.

          I just wanted to be clear, those two items are not

going to be returned, all the rest of the materials are

going to be returned.

          THE COURT:  Thank you.  All right.  As I

understand it now, all the time requirements or temporal

requirements of all of Federal Rule of Criminal Procedure 32

have been complied with.  And the probation officer,

Mr. Dorra has interviewed the defendant and noted the

defendant's comments.

          Defense counsel had previously filed objections

both on March 14th and March 27th, and what I want to do now

is go through the defendant's first objections or

observations, I'll take them as objections as though the

defendant were objecting, and then I'll also go through the

PROCEEDINGS                                    5

formal objections by the defense counsel and by the government's counsel.  I believe the government also objected.

All right.  Paragraph six, which is objected to by both counsel, it remains as it is, that's not going to be changed.  Paragraph seven stays in the report the way it is.  Paragraph eight stays in the report the way it is.  Paragraph nine stays in the report the way it is.  Paragraph ten stays in the report the way it is.  Paragraph 11 stays in the report the way it is.  Paragraph 12 stays in the report the way it is.  Paragraph 13 stays in the report the way it is.

I'm only referring to those paragraphs to which the defendant made objections.  Paragraph 15 stays in the report the way it is.  Paragraph 17 stays in the report the way it is.  Paragraph 18 stays in the report the way it is.  Paragraph 19 stays in the report the way it is.  It is true, relating to paragraph 20, that Forrestal did not testify at the trial, that's absolutely correct.  It is also true as to paragraph 21 that Cohen did not testify at the trial.  It's also true as to paragraph 22 that Brown did not testify at the trial.  But other than the fact that the three people named in 20, 21 and 22 did not testify at paragraphs are fine.

Paragraph 23 was objected to both by counsel and

PROCEEDINGS                                    6

by the defendant himself, and the government appropriately agrees to amend paragraph 23.  Paragraph 23 will now read, as the government suggests, Romano directed Mirkovic with respect to the significant aspects of the offenses, including instructing Mirkovic as to A, when to place calls to the undercover officer who was posing as a hit man and what to say; B, scheduling meetings with both undercover officers to make payments to the test assault of John Joe and John Doe and the murders; C, ordering the murders of the Judge and prosecutor, including the manner in which each should be killed and D, offering the undercover officer a payment of a bonus for preserving the severed heads of the judge and prosecutor.

Paragraph 24, the defendant pointed out to me in one of his communications to me that he wasn't complaining about me and his language was not directed at me, and I accept that, I accept what he says.  Thank you.

Paragraph 27 is overruled against the objection by the defendant personally.  Paragraph 30 is overruled, the objection is by the defendant.

As for paragraph 70, defense counsel, who was wrong, the defendant is right apparently, because the defendant certainly would know, and that should read the defendant's father now at age 82, 83 requires a pacemaker. He has not passed away, as was suggested by defense counsel,

PROCEEDINGS                                          7

it was the father-in-law who passed away.  So the report in paragraph 70, when I say "the report" I mean the actual presentence report should read that it was the father-in-law who has passed away.

The age of the mother and Mr. Romano's brothers should also be changed, Mr. Romano's version I'm sure is more accurate, he would know how old his siblings are.

Paragraph 72 is fine, the defendant notes, and if this is the fact, fine, that he continues to share close and good relationships with his family; there is no problem with that.

The defendant, in paragraph 74, or relating to it, tells us that his wife is now in good health and she owns a boutique that sells women's apparel, that's a fact, that's fine, there is no reason why it shouldn't be in the report if he wants it in the report.

As to paragraph 75, it does appear that the children, the sons at least, have suffered and do suffer from attention deficit disorder, and there is a whole explanation about that in the defense counsel's submission; and that's also applies to paragraph 76.

The issue in paragraph 88 about the defendant writes and tells me that he occasionally suffers from heart palpitations.  That, I didn't know about, which cause him chest pains.  It says -- he says he has not been prescribed

medication for that condition and that he doesn't want to ingest any medications. I would advise him that if he needs medication, and his doctors's prescribe it for him, he ought to take it.

As to paragraph 112 concerning Pittas and Mr. Kilada, Mr. Romano's first lawyer, I'm not getting into that. Whatever action legally he wishes to take concerning other people, it is not my concern. And if he wishes to take legal action against Mr. Kilada that's his business.

All right. Addressing defense counsel, who is going to speak, Mr. Bachrach or Mr. Goltzer?

MR. GOLTZER: I am, your Honor.

THE COURT: All right, fine, Mr. Goltzer. The answer to my first question is quite obvious, have you read the presentence report?

MR. GOLTZER: Of course.

THE COURT: And other than objections that I've noted, do you have any other objections to the report?

MR. GOLTZER: No, sir.

THE COURT: All right. Have you gone over the report with the defendant?

MR. GOLTZER: Mr. Bachrach has gone over it with him and I've discussed it with him, yes.

THE COURT: Obviously it's been read to him and he read it, this is clear; is that correct?

PROCEEDINGS                                    9

MR. GOLTZER:  Yes.

THE COURT:  All right.  Are you ready for sentence?

MR. GOLTZER:  We are.

THE COURT:  All right.  I'll hear you.

MR. GOLTZER:  Thank you very much, your Honor.

Having appeared before your Honor over a number of years, I'm very much aware that your Honor takes these grave matters quite seriously, and you've had an opportunity to go over all the party's submissions, so I'm not going to repeat what is in there today.

The real question from perspective and no doubt from Mr. Romano's perspective, is whether by your Honor's judgment today he will be relegated to dying in a cage or will, at some point, close to the end of his life, have an opportunity to come out of incarceration and live for some brief period of time as a free man.

As I look at this very strange case and I observe the probation department's recommendation of 70 years and the government's recommendation of life, which we vehemently oppose, Judge, I am thoughtful of those cases that I've represented over the year as a member of the Capital Panel in both this and the Southern District, where people who have actually killed multiple individuals out of greed or for any number of reasons, in furtherance of racketeering

enterprises, were sentenced to life in prison.  People who have never done a good deed in their life, people who were sociopaths, people who never served their country.  And both Mr. Bachrach and I find it and recommend it to be inappropriate to impose that sort of a sentence who, when this defendant in this particular case, in view of the fact that, number one, thankfully, nobody was injured.  Number two, while the jury has spoken and your Honor has denied our motion to seat aside the jury's verdict, on both legal and factual grounds, it is apparent to defense counsel, both of us, that had not the government provided the opportunity, this never would have occurred.

Had Mr. Mirkovic, for reasons that nobody can explain not done what he did and simply said to other persons, "what?  Are you crazy?", we would never be in court today.

THE DEFENDANT:  Excuse me, your Honor, can I say something?

THE COURT:  I'm going to let you speak last.  You can say anything you want later on, I'm going to give you an opportunity fully to be heard.

THE DEFENDANT:  I understand, your Honor, the only problem is that I don't like the idea of speaking, whether that's what a counsel is supposed to do or not, speaking as if I actually told someone to do that, because I have not

had a chance in this courtroom to tell my version of the story.  And to speak of it just because Mr. Marshall proved his case to a jury whose unknowing about a real lot of things, I have a problem with my defense counsel saying well, he would never had told Mirkovic.  If I'm not to be -- if the government is not to be challenged in their case when the trial is going on, then there's no way that I can have my defense counsel --

THE COURT:  All right.  Now, you listen to me.

THE DEFENDANT:  Yes, your Honor, I will.

THE COURT:  I'm going to let you speak.

THE DEFENDANT:  Okay.

THE COURT:  You can disagree with your lawyer, one of them or both of them, and you can express that when I let you speak.

Now, just wait.  Make notes if you want of whatever you want to say, but wait until Mr. Goltzer is finished.

Mr. Goltzer, you may continue.

MR. GOLTZER:  Thank you, Judge.

Let me be very clear in deference to Mr. Romano. Mr. Romano has never admitted that he actually committed the crime.  Mr. Romano has made that clear over the past many, many months.  Mr. Romano made that clear in his second probation interview after his interview in connection with

the coin fraud case.

Nothing that I say here should be taken as my -- as my admission on behalf of Mr. Romano that he was ever guilty of this offense.  We, as lawyers, asserted, as Mr. Romano had a right to have us do, even in the wake of a denial, an entrapment defense, because there was a good faith basis to raise both issues of entrapment having to do with inducement and the lack of predisposition.

My sentencing remarks obviously have to be made in the context of a jury having rejected that defense; with a right or wrong, is not for me to say, and your Honor having rejected our vehement attack on the jury's verdict, those issues are closed.

Now that we are here for sentence, it would be naive of me, at best, to argue innocence.  I'm going to argue for mitigation, and I hope Mr. Romano understands that, in the context of a jury verdict of guilt and a court denial of our motion to set aside the verdict.  With that kind of argument, I should let Mr. Romano know, as he already does, there goes certain assumptions for the purposes of the argument.

I stand by what I said to you, Judge.  Number one, by way of mitigation, there was no injury to anybody. Number two, Mr. Mirkovic was at least, if not more, culpable for reasons that nobody can understand; be it his lawyer or

PROCEEDINGS                                    13

even Mr. Mirkovic himself.  Number three, and I stand by what I said before, he was in custody for over a year, according to his very own confession, which he no doubt will tell you about.

He said to the government agents when he was admitting what he did, according to them, it was a hair brained scheme, other people wanted me to do it, I didn't do it.

According to Mr. Romano, there were two or three people a year earlier who offered him an opportunity to hurt a judge, to hurt a prosecutor, and it never happened.  That's in the record, it's not contradicted.  And it's for that reason that I say to your Honor with a very straight face and in all sincerity, that had not the government provided the opportunity, whatever happened never would have happened.

And most respectfully, as serious as the conviction is, the law does not require a life sentence, as it does under, for example, 18 United States Code 1959.

As a further part of the calculus, I ask the Court to consider the possible disparity in sentences that would occur between Mr. Mirkovic and Mr. Romano.  Certainly, that's something that Congress has addressed in you 18 US Code --

THE COURT:  Wait just one second, Mr. Goltzer.

PROCEEDINGS                            14

Anything relevant to the case would be before any appellate tribunal; the record should reflect that Mirkovic pleaded guilty.

MR. GOLTZER:  There is no question.  Not only did Mirkovic plead guilty, but in fairness to the record, he also expressed very significant remorse, and I didn't mean to imply that that wasn't the case.

I also take the position, which I'm sure the Court agrees with, that people are not to be punished for asserting their right to trial.

THE COURT:  Absolutely not.

MR. GOLTZER:  And I know the Court wouldn't do that.

To the extent that there is a guideline, an advisory having to do with either the acceptance of responsibility or extraordinary remorse, no one is suggesting that Mr. Romano should be entitled to that, because, quite frankly, he denies that he did anything illegal.  So, I understand the difference.

Our position is that the sentences ought to be the same.  And our position is that the sentence that Mr. Romano receives ought to be concurrent to the sentence that he's serving, because the guidelines are no longer mandatory. Mr. Romano is 51 years of age.

THE COURT:  I'm not so sure you're right

PROCEEDINGS                                          15

concerning the concurrent aspect under Section 5G1.3(a) of the sentencing guidelines.  I thought there was a requirement that the sentence --

MR. GOLTZER:  Under the text of the guidelines, there is such a requirement.

THE COURT:  Oh, okay.  All right.

MR. GOLTZER:  But the guidelines as a whole were found to be unconstitutional if they were mandatory.

THE COURT:  The scope of the guidelines is not mandatory; but in any event, the question is, at the very least, at the very least, discretionary.

MR. GOLTZER:  That's what I was trying say.

THE COURT:  Go ahead.  Fine.

MR. GOLTZER:  Your Honor has the right, if he wishes, under his broad discretion not to impose a concurrent sentence.  Not withstanding what the guideline says, and that in Joker, *Apprendi* and all the others.

THE COURT:  Okay.  Go ahead.

MR. GOLTZER:  And Mr. Bachrach in his very same memorandum addressed that question.

THE COURT:  He does indeed.

MR. GOLTZER:  In addition and as part of the calculus, I don't think one can ignore Mr. Romano's conceded dedication to his family; his loyalty to his wife, his extraordinary efforts to raise and do right by his children,

his charitable works in connection with children who suffered from birth defects and debilitations, his four years of honorable service to the United States and the military, his work history, other than the coin business, of course. So there is a lot to be said for Mr. Romano on the side of the ledger that speaks well of him.

In the prior sentencing there were many, many letters that we submitted as an exhibit.

THE COURT: Which I read all of them.

MR. GOLTZER: Mr. Romano asked us in this proceeding specifically not to, as he put it, barter my children or my wife or my friends or my family for me. I respect that and I think the Court should respect that. Mr. Romano --

THE COURT: I respect his wishes. I did read the letters, they were before Judge Bianco when you supplied them to me, and I read them.

MR. GOLTZER: That's appropriate, but I'm not going to argue them at length, because he's asked me not to. But as his lawyer, I would be remiss if I didn't ask your Honor to consider both sides of the coin, if you will, and there is a lot of good to be said of Mr. Romano and the life that he led before he found himself in these extraordinary difficulties.

So all things being equal, the Government's

PROCEEDINGS                              17

reccomendation of a life sentence ought to be rejected.

Probation's recommendation of a 70 year sentence ought to be

rejected.  And the at some point in his life, Mr. Romano

should have an opportunity to once again be with his family.

Thank you, Judge.  If your Honor has any

questions, I'm happy to address them.

THE COURT:  All right.  Mr. Marshall.

MR. MILLER:  Thank you, your Honor.  A couple of

factual points.

THE COURT:  Well, let me just -- I'm sorry.  I

want to refer to the second letter that Mr. Romano sent me

on April 4th that I got on April 8th, which I pointed out

that he wanted me to know that the language in paragraph 24

was not directed at me.  And I said I accepted that, by I

want to mark that as Court Exhibit 2 of today's date.

Yes, Mr. Marshall.

(Court Exhibit 2 was admitted into evidence.)

MR. MILLER:  Thank you, your Honor.

Just a couple of factual points, before I get to

the heart of the matter.  It was just posited that

Mr. Romano had not or had fought with these charges, and of

course, that is true.  I would note that he did, in his post

arrest statement as the Court is aware from the trial, admit

his involvement in these crimes both orally and in writing

upon his arrest, and admitted his guilt unequivocally at

PROCEEDINGS                    18

that time.  And I put that out there just to remind the Court of that fact.

The second point that I wanted to make that was in response to Mr. Goltzer was the idea that there was no injury here, and that no effort to injury would have taken place absent the government's involvement, and I think the evidence at the trial proved otherwise.  The evidence at the trial, in fact, proved, I submit, that the defendant approached multiple inmates at the Nassau County Correctional Center about committing violent acts, that he repeatedly attempted to order the attempted assault of Nick Pittas, that was a precursor to the murder plot.  And that the reason no injury occurred was because of the good work of law enforcement in intercepting Mr. Romano's efforts and ensuring that they did not, in fact, result in assault and indeed murders, as the Court was well aware from the trial.

In fact, when Mr. Romano met someone he understood to be a hit man, he, in fact, did order the assault and multiple murders, directed the payment of substantial sums of money in order to accomplish his violent goals.

With respect to disparity, I think there is a significant difference beyond just the pleading of guilty between Mr. Romano and Mr. Mirkovic vis-a-vis sentencing.

First, not only did Mr. Mirkovic accept responsibility rather than obstructing justice, as

PROCEEDINGS                    19

Mr. Romano has done, but he also engaged in a lesser role in the offense, as your Honor upheld the probation department's PSR determination.

Mr. Romano was designated to have played an aggravating role.  He directed Mr. Mirkovic with respect to all significant aspects of the offense.  And indeed, he also had a much more significant criminal history than Mr. Mirkovic.  As a result, the fact that they face different sentences under the guidelines is not the result of some unwarranted disparity; but rather, the guidelines' appropriate designation of a higher sentence for the individual that was more culpable and had a more significant criminal history and obstructed justice.

Your Honor, Mr. Romano's crime that he was convicted of here, I submit, is as serious as any conspiracy crime in the United States Code.  Not only did Mr. Romano mastermind a plot to murder two innocent individuals, and not only did he plot to do the unthinkable; that is, dismember the prosecutor, cut off the heads of the prosecutor and the judge, and preserve them as mementos, but he did so in an effort to strike at the heart of the criminal justice system, to retaliate with disturbing violence against public servants who are just doing their jobs.

The murders he endeavored to commit would, of

course, have devastated the family and the friends of the intended victims, but they also would have sent shock waves to the foundation of our civil society.

The evidence here at trial proved beyond a shadow of the doubt that Mr. Romano was the driving force behind the murder plot; he picked the targets, he trolled the Nassau County Correctional Center to find a hit man, he financed the plot with the tens of thousands of dollars that he earned from the coin fraud. He tested the hit man with the Nick Pittas assault, he told Mirkovic when to pay the hit man and how. He decided, Mr. Romano decided when the murders would be ordered, the exact methods of murder, the torture and the dismemberment. He directed Mr. Mirkovic as to every significant step in the plot. And we all heard the recordings at the trial; telephone call after telephone call where he told Mirkovic what to do, when he yelled at Mirkovic when Mirkovic got things wrong, and when he praised Mirkovic when Mirkovic followed orders. And we heard the recordings between Mirkovic and the undercover officer, where Mirkovic said time and time again when a new issue came up, I've got to go check with Big Joe, with Mr. Romano.

So this was the defendant's plot, he ran the show from day one until the day of his arrest.

And I think it's important to note that this wasn't some grim task for the defendant, something he felt

he had to do.  He enjoyed every minute of it.  He enjoyed pulling the strings, he enjoyed the anticipation of revenge; we heard it on the tapes, and we saw it on the videos.

And when he found a hit man who he thought could do the job, he was so happy, he couldn't contain himself. And at the end of the first meeting that we saw, he hugged the hit man after the hit man said he would execute the test assault.

And I think it's also important to note, as is in the PSR, that he told Machacek and the undercover officer that he had a whole list of people to assault and murder; the Judge, the prosecutor, yes, but also his lawyers, the probation officer, Investigator Hessle, the cooperating witnesses and many more.

And then when Mr. Mirkovic reported that the murder plot was a go, that he hired the undercover officer to torture and dismember and murder the judge and the prosecutor, how did the defendant react?  We heard it on the tapes, he told Mirkovic that he was dancing around his cell, singing and laughing.

As a result, I submit to your Honor that the nature and the circumstances of the offense clearly call for a life sentence, the guideline sentence.  Indeed, the guidelines identified this offense so significant, so repugnant, that the guidelines are literally off the chart

PROCEEDINGS                                    22

in the book, they are six levels above the top line listed in the sentencing guidelines offense level chart; six levels above the offense that calls for a life sentence no matter what the defendant's criminal history.

THE COURT:  The top of the guidelines being 43 and the level is 49, you're correct.

MR. MILLER:  Yes.  Thank you, your Honor.  I think it's important to note that while the guidelines are that high, because some of the aspects of the offense drive them that high; such as the focus of the murder on public officials, such as the obstruction of justice.  There are a whole lot of aspects of this plot that aren't even registered in the guidelines.  The stunning lack of remorse, the ruthlessness of the plot, the intended dismemberment; none of that is even reflected in the guidelines, so it is six levels above the highest guidelines available without even those factors being a part of that calculation.

With respect to the defendant's history and characteristics, I submit those also call for a life sentence.  There is the decade-long financial crimes, the coin fraud both in New York and Florida that I think are relevant to the defendant's history and characteristics, the way that the defendant engaged in a fraud that fleeced elderly victims of their life savings, and did so day in and day out for over a decade.

PROCEEDINGS                    23

There were the other crimes of violence; the Pittas assault, the other individuals that the defendant and Mirkovic intended to hire the undercover officer to attack, such as the defendant's lawyers and other members of the criminal justice system.

But there was also the description that the defendant gave of his effort to obstruct justice by holding a knife to the throat of one of the witnesses who might have testified against him at the coin fraud, his erstwhile friend Rusty Barnes. There was the attempts to escape. There was the obstruction in the form of the false affidavit.

All of those history and characteristics also call for a life sentence, the guidelines sentence. I submit, your Honor, that a life sentence would also reflect the seriousness of the offense, promote respect for the law and provide just punishment, and would have the appropriate deterrent effect, both in a general manner and in a specific manner; a general manner in sending the message that attempting to murder those engaged in the criminal justice system on one case warrant is the most significant punishment available, the punishment called for by the guidelines. Similarly, with respect to specific deterrence that a life sentence for Mr. Romano would also protect the public from future crimes.

PROCEEDINGS                                    24

In sum, your Honor, the defendant conspired to strike a blow at the heart of our nation's criminal justice system, he attempted to use violence to undermine the rules of law, the foundation of this country.  He conspired to murder two hard-working public officials for doing their jobs, and he conspired to torture, dismember and decapitate the victims all to satisfy some twisted desire for revenge.

I respectfully submit that only one sentence is proportional and appropriate for this horrific crime, and that's the sentence called for by the United States sentencing guidelines, a sentence of life in prison.

Thank you, very much, your Honor.

THE COURT:  Mr. Romano, please rise, whatever you want to say, sir, you tell me.

THE DEFENDANT:  Well...

THE COURT:  If you're more comfortable talking through the microphone, you can sit down.

THE DEFENDANT:  I think I'm loud enough.

THE COURT:  Okay.  Fine.

THE DEFENDANT:  I don't like the vibration.

THE COURT:  Okay.  Go ahead.

THE DEFENDANT:  Thank you, your Honor.

Before I get started, I just want to read something here real quick, it's just, you know, I read a book on prosecuting; actually, I read three books.  And in

PROCEEDINGS                                    25

one of the books it said that well, if you win a trial, you reserve the right to tell the story, and that's just what Mr. Marshall does, he tells stories.  I will hand it to him, he told a really good story, it made sense, it was plausible.

But before I get into that, he just said -- and so, you know, all the things that he said, I'm not addressing, I didn't come here to address what he has to say about that, but he did just say anything about Rusty, Rusty Barnes, that he says I held a knife to his throat, okay? You heard it on the tape, you heard me say that.

Perhaps you don't realize that there is a survival technique in prison, it's something that I wouldn't have realized, if I had been in this courtroom and sat as a juror six years ago, there is a lot of things I wouldn't have realized.  I would have sat there and I would have listened to your instruction when you said you have to give citizens the same credibility as you do police officers.  And I would say to you, I would be the guy that you might hold me in contempt.  I would say no, absolutely not, I believe the police.  I believe the police.  And I did, I really did.

You want to call something a coin fraud, I'll play the game, I'll call it a coin fraud.  That's the only crimes I've committed, with an exception of nonsense that you've seen in the PSR that I'm not even going to mention in here,

it's absolutely ridiculous, and I'm glad the language of it was changed.

But I wanted to read this, I don't know whose handwriting this is, but I know that Mr. Hessle -- I don't see -- oh, there he is, Mr. Hessle.  He said that he testified about the phone calls.  And I don't know whose handwriting this is, but I just want to read this to you. It says, on August 5th, this is the notes, this is the notes from the agent, "Just found out about Rusty, the Iowa Times, distraught over Rusty.  Joe is crying."

The day that I missed court, if you remember, Mr. Hessle testified that I -- when Mr. Goltzer asked if -- during the trial if he -- if I was every disrespectful to a judge.  And he says well, without showing up to court twice.

One of the times I didn't show up was because I just learned that my friend had died.  Held a knife to his throat.  I'm going to get I'm going to come back to Rusty Barnes in just a little bit.

I first wanted to just say, is it my right to speak here today or is this a courtesy by his Honor?

THE COURT:  It's your right.

THE DEFENDANT:  It's my right?  Is there a time limitation?

THE COURT:  Reasonable time.

THE DEFENDANT:  And that is?

PROCEEDINGS                    27

THE COURT:  As long as you stick to the subject of the sentence, it's reasonable.  If you start reading the Declaration of Independence or reciting the alphabet or singing songs, it's not relevant.  If you stick to the facts of the case and why you think that I should be lenient, it's relevant.

Go ahead.  I haven't stopped you.  Go ahead.

The thing I do want to observe -- since you stopped yourself, is this -- you said something while Mr. Goltzer was speaking about you didn't have an opportunity to present your side of the case.  That's not true.  Before the defense rested I specifically asked if you wanted to testify and if you decided not to testify and if you discussed it with your lawyers and you said that you had discussed it, and I was very careful in bringing that out, and you chose not to testify and not to give your side of the case.

I just wanted the record to be 100 percent accurate.  Go ahead and you finish what you want to say.

THE DEFENDANT:  Your Honor, I don't want to banter back and forth about that.

THE COURT:  I don't want to banter either, I just put on the record what is a fact.  Go ahead.

THE DEFENDANT:  Okay.  During the trial Ms. Dean and Marshall Miller brought up my previous case, which was

PROCEEDINGS                                    28

the -- as they call it, the coin fraud.

I wouldn't have gone down that route, but since they did, I really need to touch on that.  You know, I don't know if you've ever read the book by Charles Dickens, a Christmas Carol, you know, Scrooge.  Well, he says in the first couple of pages, he says that to tell the story of Scrooge, you first have to talk about the three spirits that visited him.  And the ghost of Jacob Marley otherwise, it makes no sense.  The guy wakes up Christmas morning, he's a generous individual, he buys turkeys and gives people money and celebrates with his family.

In order for me to give you a clear picture of what went on and the things that I have said and done and things that you've seen me say on the tape, you would first have to understand a whole lot of background to this. That's where I need to go.

I was -- I was attacked by this government.  They put a red shirt on me and they came at me, and Mr. Goltzer did prove his case that they came at me.  The problem that I have with that defense is saying that the government made me do it:  I got to tell you, if I'm a juror and somebody committed a crime and they want to turnaround and blame somebody else for making them do something, whether I think those people made them do it or not, I've got to find them guilty.  And the reason is, is because I don't like people

committing crimes.

Now, I have to start from the beginning when this first happened with my coin case. I hired a Charles Carnesi. Charles Carnesi, unbeknownst to me, because I knew nothing, I knew nothing about the law, and now that I started reading, I realize that I probably know even less. But Charles Carnesi is represents mafia people.

The government already thinks for the most part everybody that's Italian is associated with some sort of mob. God forbid if they have a few dollars.

Now, I hired Charles Carnesi. I don't get offered a plea deal. I meet with Charles Carnesi at my apartment in Manhattan. I tell Mr. Carnesi I said listen, listen, I have roughly about $8 million in assets. Let's go to the government and give it to them, give it to the people, give them what they want. If there is -- if my salesmen took advantage to the point that it's fraud, then give it back to them.

And you may say to yourself, who gives away money like that? Well, I do. I give away a lot of money. I gave away millions of dollars in charities.

Mr. Carnesi came back with no pleas to me. Mr. Carnesi didn't do anything. I told him, listen, I'm going to have to have money that they seized, all my assets. I happened roughly about $2 million in liquid, and that was

seized, I couldn't use it.  With that there is all statements about Dave Mirkovic told me to go into business, I told him to go into business.  The government contends that it's my business.  I don't know how we decide it was my business or not.  My name is not on it.  It is not mine. Whether Mirkovic owes me money or wants to give me money, that's another arrangement; the business is not mine.

I'm not going to pretend that I didn't get money through that business.  I received money through that business because I consulted for that company.  He came to my house after I was indicted and he said, what happened?  I told him, I don't know.  We started talking, and whether it's my suggestion or his suggestion, that's a ridiculous conversation to even talk about.

Anybody knows you put two people in the room, who decided it, who made the final decision of who's going to go into business?  The people are responsible for themselves. I got involved in that, I got involved in that coin company, and I shouldn't have.  I did it because I needed money because I didn't want my whole world to cave in.  I don't want to be late on a mortgage payment.  I don't want to owe people money.

And I know you didn't, but if you look at my records, it shows that of my net worth, I only owed one percent.  Most of the houses and the properties that I

PROCEEDINGS                                    31

forfeited to the government were paid for, there were no mortgages on this.

Ms. Dean said I lived like a king during the trial.  I lived like a king.  I don't know how a king lives, but I have never stopped working, even when I retired from my coin company, I never stopped working my whole life.  I took two vacations during a 12-year period.

When I got out of the -- when I left the United States Navy, I had an apartment, I was in the process of buying a house, I moved home.  I moved home for about three months.  I told my father, I said --

THE COURT:  This has nothing at all to do with this case.

THE DEFENDANT:  I have to give you a little background.

THE COURT:  What you told your father has nothing to do with the case.  Let's limit it to what you want to tell me.

THE DEFENDANT:  Okay.  I didn't live like a king, I lived like a man who had a lot of money and worked.  I worked all the time, I built these houses, I built everything, I gave it over to the government.

I didn't want to watch it fall apart.  I told what I told you to Carnesi.  Carnesi -- I asked him, I said, well, what if I go into the coin business?  He said well

then, they're going to take away your bail. I says, and then what? He says well, I'll go in there and he says, I'll get you bail again. Okay. I'm going to take that chance, and I gave Carnesi checks through that business. I paid him $300,000. I paid him cash. I paid him all always.

I was sold out to the government because they -- when they went and arrested me again for breaking my terms of bail, they found out that Carnesi was paid through that business. Carnesi made a deal with the government and handed me over. He handed me over while I was picking the jury. He told me, you get five years, you and your brothers will get five years.

This is what happens. I give him $300,000, he hangs me out and tells me I'm getting five years.

Now, I need a new attorney. I hired the Ansanelli firm. The Ansanelli firm bills me another $300,000 plus $60,00 that I have to pay a Brian Aryai, who is going to do an investigation.

Mr. Aryai went -- I told Mr. Aryai, I told him what Carnesi did, my wife started taping Carnesi on the phone telling him you took $300,000. She has a tape on this. Aryai tells my wife to go into the prosecutor's office and hand over these tapes. In the meanwhile, in the meanwhile they made other tapes, they made other tapes, and Aryai went down to Florida to interview Mirkovic.

PROCEEDINGS                    33

Mirkovic was testifying against me for Lara Gatz and Mr. Hessle.

Now, give me just one moment here.

What I have in front of me is I have letters from Mirkovic's attorney and to Mr. Mirkovic's attorney Mr. Jason Wander, Jason Wander was given to Mirkovic was by Carnesi, he's one of Mr. Carnesi's colleagues.  Well --

THE COURT:  I'm not clear what this has to do with the charges in this case.  I understand that this has a lot to do with your upset.

THE DEFENDANT:  It has to do.

THE COURT:  Alleged upset with the alleged mishandling of your case by Carnesi and Mr. Ansanelli, but I don't understand what that has to do with the charges in this case relating to Judge Bianco and Ms. Gatz.

THE DEFENDANT:  I'm leading up to that, your Honor.

THE COURT:  You told me you wanted to talk about background.  You've given my plenty of background, why don't we get to this case.  Go ahead.

THE DEFENDANT:  It's the -- the crux of the whole thing is quite simple, and I'll shorten it up.  Mr. Mirkovic was going to testify against me for collectible coins in Florida.

I got picked up on March 25th, on my daughter's

birthday, that came out in the trial. I went to the Nassau County Jail. Mirkovic disappeared. He disappeared for awhile. What happened was he wrote a statement about me, which is dated, and this is very important -- I know it doesn't seem like it is, but it's very important, because it goes to the heart of the people who came in here on my trial and testified.

You see, I know Mr. Ryan read people an oath and they're supposed to take that oath to their conscious, but I somehow think that that whole thing missed, they missed that whole point, no fault of Mr. Ryan's, but this is what the point is: Is that there is evidence that came into this case that was manufactured, corrupted, it was dangerous evidence, it had no right being in this courtroom.

What happened was Mr. Mirkovic wrote a statement about me. Mr. Hessle's handwritten notes are here. Mr. Hessle followed it, he followed every bit of these notes exact, except -- and this first meeting on April 28, 2010, took place with Ms. Lara Gatz, Mr. Sullivan and Mr. Hessle. He was being interviewed presence of his attorney Jason Wander, he was referred to by, again, I said Carnesi.

Now, what happened was -- is Mr. Hessle puts in here "Romano told him to speak of investors when selling coins to clients." Who we're referring to, and I skipped over the whole thing, was Russell Barnes, my friend, who

PROCEEDINGS                                    35

came -- who went from New York -- he came from New York and came down to Florida, he stayed with me.  He was sick.  He made a decision, not me.  He had been my friend for 24 years, I took care of this man from the United States Navy, I lived with him in Iceland, in Bermuda.  I lived all over the world with him, he was a brother to me.  He made the decision to sell collectible coins.  I don't force people to do anything.  Did I facilitate it when he wanted to?  Yes, absolutely I did.

Now, it says in the notes that he told him about the investor's pitch.  It's not in his notes.  That's the only thing that's not in the notes, I can't understand that.

THE COURT:  But that doesn't have anything to do with this case.

THE DEFENDANT:  It has a lot to do, your Honor, because Mr. Hessle testified over here, and everything that comes out of his mouth is fabricated.

Now, I understand that the Second Circuit is not going to look at the fact that these people came up here and testified and they lied, but every last one of them did and I have notes on it, there is paper trials on every drop of this.  I even asked Mr. Goltzer during the trial, can I cross-examine these people, because I'm the one that knows the story.  And, you know, they lied and they were induced to lie by the prosecution.

PROCEEDINGS                36

Now, after he came back August 17th of 2010, this time he's in the presence of Jack Goldberger and Jason Wander and he passed him off as his attorney.  He's in the presence of Mr. Hessle, Tom Sullivan and Lara Gatz.  Again, he gave his statement.  He talked about -- he talked about the indictment.  He talked about some crack headed salesman.  He said -- he said that -- he said Mirkovic stated Romano admitted he knew his employees were lying and using an investor's pitch in Florida.

There is none of that in his notes.  I searched his notes over.  I searched them from top to bottom, they're not there.  With that I sent an investigator down to Florida.  I don't know how --

THE COURT:  Mr. Romano, what you're trying to do is to re-try the coin fraud case, which was everybody's --

THE DEFENDANT:  I know.  I just want to establish --

THE COURT:  No, that's what you are trying to do, and you pleaded guilty in that case, that case is all over with.

THE DEFENDANT:  Your Honor, I'm aware of that.  I pled guilty and I asked --

THE COURT:  I permitted you to go on now for quite awhile, it's now 11:30, and you're nowhere near our case yet.  Go ahead.

PROCEEDINGS                              37

THE DEFENDANT:  I'm close.

THE COURT:  Well, let's get there.

THE DEFENDANT:  I sent an investigator down to Florida, okay?  And again, I'm going to skip over all of this.  I sent an investigator down to Florida, and he starts to interview Mirkovic.  He asks Mr. Mirkovic a bunch of questions.  Mirkovic says in his statement, he never -- he never -- I never stated that Joseph Romano had told Russell Barnes to use whatever the investor's pitch.  I never stated Romano admitted that he knew employees who wanted customers in New York on the investor's pitch.  I told Gatz and Hessle that Romano became aware of these misinterpretations only subsequent to the his indictment.

While this interview is going on, the phone rings and it's Wander.  Wander is the previous attorney of Dejvid Mirkovic, and he's -- and Wander says on the phone, listen, I just got a call from Lara Gatz' office, Carnesi is under investigation, don't talk to any investigator that comes down.

Your Honor, that -- you know, Mr. Marshall talks about people obstructing justice.  This woman got on the phone and warned that I had Carnesi under there, it was prosecutorial misconduct, and that's the reason why these people put a red shirt on me and came after me with this absurd charge, because I wanted to tell them that I wanted

PROCEEDINGS                          38

to tell the courts that she -- that Lara Gatz had done this.

Now, just so you know, that doesn't mean because I don't like a person, because I hate a person, you've heard the tapes, you've heard the tapes during the trial. You know my position, there is some people in here that I've actually said worse things about. That doesn't mean that I want to kill somebody. That does not mean murder.

Now, if you'll permit me to carry on, your Honor, I'm up to the present case. What I have here --

THE COURT: That's good, because you've been going about a half hour. Go ahead.

THE DEFENDANT: But I didn't recite the alphabet yet.

THE COURT: Not yet.

THE DEFENDANT: I said yet.

THE COURT: And you've got to -- with everything else, you still have a sense of humor. Go ahead, move along.

THE DEFENDANT: That's all you can do.

What I have here are the pin numbers, are the pin numbers and the people from the Nassau County jail and also the Queens Detention Center.

THE COURT: Are these the guys you paid to use their phone?

THE DEFENDANT: Allegedly paid. Now, I just --

I'm not going to go into all of that. The government cannot bring anybody in here to say I paid someone to use their phone, it's ridiculous, nobody does that.

Mr. Hessle testified that I didn't call anybody, that I didn't call any of my family from one of these different numbers. He said that I only did this from -- I only called my family from my pin number. It's not true. I called everybody from all these pins, it's right here, it's in one of these gentleman's handwriting. It's just lie after lie.

And what they did was at the trial is they created something sinister. You see, I'll let you in on a little piece of information about being in prison. If you plan on committing a crime, you must most certainly do not get on the phone. Mr. Hessle testified that well, during his investigation we did a reserve directory.

Your Honor, I own a phone company, a phone room, a telemarketing company that the government alleges that I made 50, sometimes it's 100, sometimes it's $80 million. Do you think I don't know that someone can do something like that? It's absurd. It's absurd. I don't know that you can put the number in? Come on, give me a little more credit than something like that.

Now, you heard some tapes, you heard a lot of $40,000, you heard a lot of things.

PROCEEDINGS                    40

THE COURT:  I saw money too.

THE DEFENDANT:  That's the first I've seen it, too.  That's the first of it that I've seen.

I want to go back a little bit, not that far, just into this --into this hearing that we had here about my Miranda rights.

You know, as you learned during the trial I'm a pilot and there is what they call a checklist, I don't know how familiar you are with aviation, there is a checklist. And you don't attempt to fly a helicopter or an airplane or anything without first going over a checklist, you always have a checklist there.

I would imagine that if you are in law enforcement that you would have a Miranda card, and I think Mr. Goltzer pointed out that every one of these gentlemen probably have one in their wallet right now; what happens with the Miranda rights?  I asked Mr. Davies, am I under arrest?  I need to talk to an attorney.  Mr. Heslin, who I haven't seen came up here, I don't know, there was lot of talking I think with Heslin, I haven't seen him.  He told me, wait until we get outside.  We got outside I said, do I get an attorney?  He says, well, you represent yourself, you're your own attorney.  We get into the car, they handcuffed me, they bring me into the car, they start talking to me about cooperation.

PROCEEDINGS                              41

Now, I have a problem with a couple of things here, because they asked me if I wanted to cooperate, and I said to them, yeah, we spent a lot of time in the car. What they seemed to have done was everything that I told them about, they twisted it around like I'm part of. In other words, I'm being approached by someone in jail. Again, I don't know how familiar you are with the jail, but these people that are in prison come up and ask me, and I brought letters with me, they come up and ask me if I want them to do a hit, if I need them in my gang, they think -- they think you're mafia because you're Italian. They twisted the whole entire thing around and used it against me.

I told them that I would cooperate with them. In order to -- I have information. I know who killed these young kids in Freeport. Not because of the way Mr. Marshall tried to present it in here that I'm involved in some kind of criminal activity, I found out about it, because I spoke to a guy, not that I'm friends with, not the type of people as Mr. Marshall said that I'm trying to seek out. I spoke with this guy. He wanted to do hits. He wanted to kill people. So the way you find out about the why you would find out and get someone to trust you is you make up a story about a crime you did. When, in fact, I didn't do any crimes.

You've read the letters there. Before this whole

thing happened to me, I babysat for people's small children, they knew I was home a lot of times and they would ask me if I would babysit.

I know about those murders.  I know who killed those guys, I know the whole entire story.  They wanted it and I was going tell it.

Previous, the Ansanelli firm wanted to know the Goidell, but it's a shame that the family's not going to get closure on something like that because the government has -- they have other plans.  They want to bury me.  They want to shut me up.  They want to shut me up, but they cannot shut the paperwork up.  They cannot shut it up, because the paperwork tells the truth.

So if we transfer all this, all these he said this and she said that and he said that, if we transfer it all, what it boils down to is if I told Mirkovic to kill someone and I'm telling you that I did not do that.  I'm going to say that again.  I'm innocent of that.

I might have done a lot of things and I'm not going to make up a story for you or try and explain some of my improprieties.  I mean, Charles Manson could make up a reason why he does the things he does.  That, I'm innocent of.

And I told my attorneys, when they handed over the tapes, they handed me these tapes of listening to myself.

PROCEEDINGS                                          43

Ms. Dean said nobody could put on an act like that.  I most certainly can, because this is who I am.  I'm not some idiot that sits around talking about crimes all day.

I asked my attorneys, I told my attorneys, I'm not listening to all of that crap.  I'm not listening to it. I'm not listening to hundreds of hours of the most absurd things, you've listened to it, I don't have to bring up the content of it, the most absurd things.  I'm not listening to it.  I told Mr. Bachrach, I said, I don't know about all the crap I did say, but I know about what I didn't say.

While I was at the Nassau County Jail and I went there, I was there for about a year and a half, and I was going -- I was going crazy over there.  I couldn't handle it.  The people, they do nothing but talk about crime, that's what they talk about.  It's really sick.  And I've evolved on my position.  Maybe a year ago I might have said yeah, these criminals are right.  No, they're not.  I read a lot of people's law work and they ask me, is there any way you can help me, is there anything that you can see?

I'm not helping you.  I know you killed this guy. I know you shot this guy.  I know you robbed the store.  I'm not doing that, because that's not me.  I can't make up excuses about what anybody else does or why they do it, I just know about what I do.

And Mr. Marshall could not bring, with his whole

entire army of people, with his whole entire army of people, that even the magistrate judge in the previous case said, they'll come after you with a thousand people. The government, with unlimited amount of funds did not bring one person in here to testify against me.

And I challenge them to bring one person in here who they don't have in their pocket, who they are not giving time off of a crime or who is addicted to crack cocaine, bring one person in here that has a bad word to say about me, that includes the many ex-girlfriends I had, because I don't have an enemy in the world and I have never committed crimes.

They brought me in, they're the authors of all this. I went to the Nassau County Jail. I'm there a year and a half, I'm going crazy. I decide they have a DARK program there, drug and alcohol rehabilitation. I tell a couple of guys I talk to over there. I tell them, I'm going to that DARK program over there. They're like why, there's all drug addicts over there? I said, I don't know care, I'm going to help them and I'm going to do what I'm going to do.

I went to the drug and alcohol program. Mr. Marshall came up here and he made -- he talked about a drug and alcohol program as if I was addicted to something. There are people that have problems, I'm not judging that, I'm not judging anything like that. But don't turn it

around and maybe like the charitable work that I was doing was because of some problems that I had.

I went to the drug and alcohol program, I became one of their expediters in charge of the dorm. I worked on the food cart. I cleaned the whole entire jail because it's filthy and it's infested with vermin. I wrote letters for people. I helped them study for their GED. I taught an instrument pilot's class. I gave money to people who were getting -- they were leaving prison, I gave money to them, I put money on their accounts. Call them in here, I put money on their accounts because they had no money for a jacket, and they're leaving in the wintertime. I'm not buying people's pin numbers. I put money -- you name people like Cabrejal. I took -- I helped these kids when they were in there. That's what my life is, is charity.

I had a friend in Levittown, he told me stop giving the bums in Levittown all this money, they don't want to leave. I am a charitable guy just like my mother, just like my father, and my brothers and sisters.

My company may have done a lot of things that were wrong. And in hindsight, when you tell me -- when Mr. Hessle comes here and he tells me that I put someone in a nursing home, I preyed on defenseless people, that's the furthest from the truth.

I'm a 300-pound man. I look scary, I guess to

PROCEEDINGS                                      46

some people.  I have never put my hands on another human being.  I have trained in boxing.  Ms. Dean went on with what I think of these guys.  I think people in prisons are cowards.  I think anyone that gangs up on someone is a coward and I've protected people like that my whole life.

Again, I don't know what's going on through the brain of other people, but I'm talking about me.

THE COURT:  Okay.  Let's finish up now.  You've been going for quite awhile.  I told you I would give you all the time that was reasonable.  It's -- you're starting to take a lot of time and you're becoming a little bit repetitious.  Let's finish up.

THE DEFENDANT:  I'm sorry, I'm a little passionate, your Honor, about this.

THE COURT:  I don't object to your passion, I object to your being repetitious and you're not sticking to the subject, which is this case.

THE DEFENDANT:  You brought Mr. Strecker up here to testify.  He sat up here and he talked about how he stood on the top of a courthouse of Hauppauge Court and he had all kinds of problems with the phone.  It's interesting, if you listen to the context of that, he heard what the man was saying on the other end of the phone, he heard it.  That's why he answered it in a different way.

Mr. Strecker came up here and testified on a

second tape that was put out here from the Nassau County Jail. Now, what I realize after that second tape, Mr. Marshall, he didn't sit here and just well, we lost a tape, the tape is broken, there is something wrong with the tape. He didn't do that. A professional liar takes the tape, doesn't hide behind it, and he has the audacity to bring it in here when he knows -- when he knows that tape wasn't a goodbye when I said goodbye. I walked up to the booth, I walked up to the officers' booth. I said I don't want to visit. Mr. Strecker came up to me at that point and he said to me, do you want me to cut someone's finger off? Do you want me to break his hands? Don't you have a bigger guy that you -- don't you have bigger people that you want me to kill? Isn't that right, Mr. Strecker? But nobody cross-examined him on that.

Mr. Goltzer made a good point, and I'm not taking that out on him, he said that guy is bulletproof over there. He testified, he testified on a tape, but not of me, not of me. If you listen to the tape in the car, I told you I didn't watch those tapes. If you listen to the tape, he induces -- he induces Mirkovic into doing the crime, because Mirkovic wanted to do something down in Florida. And basically, he said we're not doing that, we're working for Romano. We're working for Romano, so we need to get a big job. No matter what, Mirkovic was coming into that jail and

he was doing some type of a big job, no matter what it was.

Ms. Dean said that I told Mirkovic everything.  I didn't tell Mirkovic everything, almost everything.  I told him about Gerry.  I told him about all the things that Gerry said.  Last night I spent the night reading this Gerry Machacek.  Machacek?  That's -- his attorney came in here and says I'm threatening him.  What would anyone expect a guy like Machacek to do?  The only thing problem is, is it justice that we're looking for here?  Is that what we want?  We want justice?  We're going to take Machacek and we're going to put Machacek out in the street.  I hope he moves into one of their neighborhoods.  Because if you think that Machacek didn't kill anybody yet, come on, you said you've been doing, you've been a Judge for 31 years, almost 32 years.

THE COURT:  No, I said 30 years, nearly 31.

THE DEFENDANT:  Okay.  October I think would be 31?

THE COURT:  That's right.

THE DEFENDANT:  October 3rd?

THE COURT:  October 19th, 1983, that is correct, but that has nothing to do with the sentence in this case.

THE DEFENDANT:  Yes.  The government -- the government has a bunch of letters here that they have put into evidence.  I mean, maybe I'm using the wrong

PROCEEDINGS                          49

terminology, it's written here as 3500 Gerry Machacek 15

JFK.  That would be your --

THE COURT:  Those are my initials.

THE DEFENDANT:  -- your initials.  They didn't put
it in here.  I started reading this and I thought --

THE COURT:  Maybe it wasn't admissible.  That may
have been one of the reasons they didn't offer it.  Usually
3500 material is not admissible as evidence, but go ahead,
let's wrap this up now, come on, nearly an hour now, come
on.

THE DEFENDANT:  Your Honor, Machacek writes down
here, he writes down whether it's admissible or not, he
writes down here that I'm killing this guy, and this guy,
and this guy, and this guy.  He lists down here that I'm
killing some 20 guys.  This is the most absurd crap that
I've ever written, ever read, pardon me.  And there are
reports that mirror that from these, from these, these are
FBI guys, they made up the crime, they are the authors of
it, they are the authors of this crime.

Mind you, I would never, I told Mr. Goltzer when
he came to visit me he said, he wanted to try and -- he
wanted to try this case -- he wanted to defend this case,
I'm sorry, as a -- entrapment, I'm sorry.  Thank you.  As an
entrapment case.  I told Mr. Goltzer, I'll let you go and
try it as an entrapment case, except for one thing, there is

no way we're going to go in there and pretend that I'm entrapped because I committed a crime. So we have -- after all this paperwork and all of these hours and the overtime that these gentlemen put in for, what does it boil down to? Did you tell Mirkovic to go and kill someone? You know what I told my wife? I said, you know what, Karen, somewhere, somewhere in the dungeon of MDC I became myself again. It's my conscience that gives me strength. And I said in the PSI report -- or PSR or PSI, I don't care what sentence you give me, I really don't. You know why? As long as I know one thing, I'm innocent. I did not tell Mirkovic to do that.

I'm going to wrap this up. One last note. If -- I don't know if you've ever read Moby Dick?

THE COURT: In college, that's many years ago.

THE DEFENDANT: Okay. Well, Melville says in that, he uses a word and it's called galley, galley or gallow and what that word is, it's an old Saxon word, and what happened was these old sailors, they would come out of Nantucket and a whale would become scared and it would run into a pack. And this Leviathan, this big strong person, person, this big strong whale, this beast will be scared of a guy in a boat. And they would all run into each other and they stayed there. And the sailors walked by and they poked their spears into them in buckets, okay? And what the sailors say is they're gallant, you see, they're confounded

with fear.

Now, I don't -- I don't know why I would even enter into some type of half ass agreement, especially with Heslin who smelled like booze in a car, I would never enter into an agreement with these people without my lawyer present. I don't know why I would say these things, the only thing I can say is there is no textbook on when a person is scared. And when these guys come rolling up on you, as tough as you may think you are, they throw handcuffs on you, they throw chains around you, and you're scared, you're scared. And nobody can say what you're going to do, what you're going to say, how you're going to react. I wasn't thinking clear and I should never have said something like that. They were going to lock up my wife and all this scared me.

Your Honor, I have never -- you've read those letters and they're old, I have never hurt anybody. I've been to some 25 different countries. I lived in Iceland, I lived in Bermuda. I've been above the Artic Circle, I'm well traveled, I've been everywhere. I've never hurt anybody. I'm always the guy who helps the person, the next guy. I'm the designated driver. Oh, yeah, you come into the federal system, you have to tell them yeah, I did drugs, yeah. Why? To get a year off your sentence. They force you into this, they force you into that position. I had

PROCEEDINGS                              52

something here I was going to read, but I'm not going to do it, it was about Judge Block talking about sentencing of real people, real people, not some guidelines.

Mr. Marshall coming in here, I don't know what his evil designs are against me, I can only imagine that, maybe he's looking to become a judge or something; nothing worse than a person trying to get ahead on someone else's back. And they'll all sit here, and they can all stick together and they can -- they're all buddies, the good old boys, right? They can sit here and make me seem crazy. I don't make this stuff up, it's in the paperwork, it's all there.

Your Honor, thank you for giving me the extra time. I do appreciate it.

THE COURT: I told you after please stay standing, sir.

THE DEFENDANT: I'm sorry?

THE COURT: Please stay standing, sir.

All right. I've read the presentence report, the original report dated March 4th, 2014. I've also read the second addendum. We have before the Court a 51-year old American citizen who plotted with an accomplice, Dejvid Mirkovic, to murder a federal Judge and an Assistant United States Attorney.

The Judge had sentenced Mr. Romano to 15 years because of his involvement in another case, what has been

PROCEEDINGS                                53

referred to as the coin fraud case, and that case had netted Mr. Romano millions of dollars.  The prosecutor in that case was one of the federal prosecutors who handled the prosecution of the coin fraud case, Lara Gatz is her name, and she was the intended victim in Count Two here.  The Judge in that case was a Judge by the name of Bianco, and he was the intended victim in Count One here.

I recognize that the guidelines, the sentencing guidelines are advisory and not mandatory.  I have carefully considered 18 United States Code Section 3553(a) and its subdivisions and its requirements.

I agree with the probation department and I agree with what was said by Mr. Miller; the total offense level here is 49 and the criminal history category of III, that calls for a guideline range of life in prison.

The probation department recommends a sentence of 35 years on each count to run consecutively to the sentence in the coin fraud case, which is 09-CR-170 of the Eastern District.

I've read the defense submission, which was carefully prepared and well-prepared by the defense counsel. As Mr. Goltzer said, the defense is seeking the same sentence as was received by Dejvid Mirkovic, the codefendant who pleaded guilty, they want 24 years.  And they also submitted to me, material previously submitted to Judge

Bianco in the other case, as well a thorough psychological report on the defendant's wife and his children.  I've read all of that very carefully.

I've read the defendant's submission of March 28th, which asks for a life sentence on each count consecutive to the 15-year coin fraud sentence or at least the undischarged portion of that.

MR. GOLTZER:  Forgive me, Judge, you misspoke, you said the defendant's submission, you meant the government's submission.

THE COURT:  I mean the government's.  Thank you very much for correcting me.  The government's submission of March 28th, as I said, seeks life on each count consecutive to the sentence in the so-called coin fraud case.

The conduct and the plots designed to kill a judge and a prosecutor cannot be tolerated in a civilized society.  Such activity is designed to destroy and undermine our system of justice.  And, if successful, would turn us into a third-world country where there is no justice.

As the government urges, this is a case where general deterrence is a prime consideration.  Other would be assassins must be taught and must understand that behavior such as engaged in by Mr. Romano is punished severely and will not be tolerated.

Accordingly, the sentence is as follows:  On

PROCEEDINGS                                          55

Count One, the defendant is sentenced to life in prison.  On Count Two, the defendant is sentenced to life in prison. Both the sentences on Counts One and Count Two are to run consecutively and not concurrently with the undischarged portion of the sentence imposed by Judge Bianco in the coin fraud case 09-CR-170.  Forfeiture is ordered, as is set forth in paragraph 128 of the presentence report, and I'm incorporating that.  Two special assessments of $100 each are ordered as is required by the law.  The defendant's advised of his right to appeal the sentence as well as the conviction in the case, and I direct defense counsel to file a Notice of Appeal on Mr. Romano's behalf.

MR. GOLTZER:  We will do so, of course.  May I ask the Court to recommend to the Bureau of Prisons that the Mr. Romano be lodged in an area as close as possible to New York City so that he can --

THE COURT:  I'm not going to do that, because of the severity of the charges, and I don't know anything about the population problems at the Bureau of Prisons.

That's the sentence of the Court.  Thank you.

THE DEFENDANT:  Have a good afternoon, your Honor.

THE COURT:  Good afternoon.  All right.  The Court is in recess.  Thank you.

(Proceedings adjourned at 12:03 p.m.)

***

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
Official Court Reporter