# DANIEL S. NOOTER

1380 MONROE STREET NW, # 427, WASHINGTON, DC 20010
202.215.0512 ● DANNOOTERESQ@GMAIL.COM


September 24, 2014

**VIA EMAIL**

The Honorable John F. Keenan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

**Re: United States v. Joseph Romano,**
Docket No: 12-cr-691

Dear Judge Keenan:

Undersigned counsel respectfully requests this opportunity briefly to respond to the government's "reply" letter, dated September 23, 2014. That letter presents numerous allegations, mostly involving witness tampering "plots," that were not raised in the government's initial motion and to which undersigned counsel has had no prior opportunity to respond.

*A. The government still has not identified any material respect in which Exhibit B differs from documents already in the public record.*

As a threshold matter, the government still does not identify any material fact connected with Exhibit B that is not already a matter of public record and easily available either through trial transcripts or through ordinary newspaper reporting. The government asserts that Exhibit B serves as better "proof" than the publicly available materials, although "proof "of *what*, precisely, the government does deign to elaborate.[1]

The government disingenuously argues that having Exhibit B would preserve a would-be observer from having to "wad[e] through hundreds of pages of trial transcripts to gather information." Yet in fact, the trial testimony at issue consists of about 12 pages, with most of the relevant testimony contained in just three pages from 1427–29, and is quite easily located in the record. Doubly so when combined with the extensive newspaper reporting on the matter. Thus, to suggest Machacek's testimony was somehow buried far from the public eye in stacks of trial transcripts until Mr. Romano happened to mail Exhibit B to his wife is just not persuasive. Indeed, the only distinguishing factor the government notes about Exhibit B, in comparison with the publicly-available transcripts and newspaper reporting, is that Exhibit B is written "in a cooperating witness's handwriting." The government fails to explain, however, how Machacek's handwriting is germane to any interest it seeks to vindicate through its present motion for sanctions.[2]

---

[1] Exhibit B is certainly not "better proof" of the fact that Machacek testified against Mr. Romano at trial, which is presumably the basis for the government's concerns about witness retaliation.

[2] The government also asserts that Exhibit B "outlin[es] exactly what information the witness provided

Although the government does not itself identify any material difference between Exhibit B and the publicly available transcripts and reporting, the government nevertheless argues that *Mr. Romano* must have been able to discern some material difference between them, or else he would have simply "sen[t] these other documents to his wife . . . rather than the actual Trial Discovery." The government makes it sound as though Mr. Romano were sitting in prison, perusing the unlimited library of options available to him in that context, and finally selecting Exhibit B from among them all as the best "proof." The more realistic explanation is that unlike these other documents unavailable to him in prison, Mr. Romano simply had Exhibit B in his possession. Unlike undersigned counsel, Mr. Romano cannot simply print out *Newsday* articles or trial transcript pages from the internet.[3] Thus, the fact that Mr. Romano mailed Exhibit B, rather than other materials essentially identical in content that the government concedes raise no issues under the Protective Order, offers no support for the government's contention that Exhibit B is materially different from information already in the public's possession.

*B. The government's speculation concerning Mr. Romano's alleged "plotting" is not germane to the question of whether mailing Exhibit B justifies an extreme discovery sanction.*

Section C of the government's letter contains the government's various allegations that Mr. Romano "continues to plot from within jail." To the extent the government uncovers evidence of continuing criminality on Mr. Romano's part, the government is certainly justified in prosecuting the matter accordingly. Indeed, that is the government's job. But here, where the government forthrightly concedes it "has not established that this call [between Mr. Romano and his wife] in fact related to the dissemination of Trial Discovery to the defendant's wife," it is unclear how these allegations shed any light on the issue presently before this Court: whether Mr. Romano's mailing publicly-available information to his wife — that was nevertheless covered under the Protective Order — ought to justify this Court's dispossessing him of all the discovery documents to which he is entitled under 18 U.S.C. § 3500 and *United States v. Giglio*, 405 U.S. 150 (1972).

Indeed, none of the government's allegations establishes a connection between Mr. Romano's alleged "plotting" and the particular discovery sanction it seeks for this purely technical Protective Order violation. Thus, in addition to cryptic statements the government recorded Romano making to his wife, the government attaches a (similarly-cryptic) letter mailed to Mr. Romano from someone in Orlando, which the government offers as further proof that Mr. Romano "continues to plot." The government does not explain, however, how such inchoate "plotting," even if true, is germane either to the Protective Order in general or to the particular alleged breach predicating the instant motion for sanctions. Indeed, for all its concerns about Mr. Romano's alleged "plotting," the mailing of Exhibit B presently before the Court is the first and only evidence of any breach of Mr. Romano's obligations under the Protective Order.

To this latter issue, the government asserts, "The instant breach also begs the question of whether the defendant has shared Trial Discovery material with other inmates inside the jail." In fact, "the instant breach" raises no such question. Rather, the government simply engages in naked speculation, unsupported by evidence, that other breaches of the Protective Order *may* have occurred. The

---

to law enforcement." Exhibit B, however, was addressed to Machacek's *attorney*, not to "law enforcement." It is rather Machacek's *trial testimony*, not the letter to his attorney, that evidences what Machacek told law enforcement, and subsequently testified to the entire world in open court.

[3] The government acknowledges that "inmates are indeed not permitted to print electronic materials within jail."

government's quote from an unrelated case, to the effect that 3500 materials are sometimes shared among inmates in other cases, establishes nothing whatsoever about whether Mr. Romano in particular has done so in *this* case.

Accordingly, notwithstanding the alarmist allegations in Section C of its letter, the government *still* has not identified any way in which the security of witnesses — or any other government interest — was placed at risk as a result of Mr. Romano mailing the public information contained in Exhibit B.

*C. The draconian sanction the government seeks would be counterproductive.*

Finally, the government asserts an extreme sanction is necessary both to protect its own witnesses and to send a warning message to other defendants who may seek to violate their protective orders. To the contrary, undersigned counsel respectfully suggests that if a message is to be sent, it is the opposite of what the government urges.

Obviously, both the government and this Court are much, much more familiar with the facts and proceedings of this case than undersigned counsel.[4] But it is undersigned counsel's understanding that this entire matter is essentially a vicious, escalating circle of Mr. Romano violating his legal obligations and then receiving an extremely harsh punishment, which only further functions enrages and humiliates Mr. Romano and predicates his continuing to act out. Once upon a time, this matter was a relatively unremarkable coin-fraud case — which, while not meaning to minimize the real harm inhering to fraud victims, is nevertheless not ordinarily what one would deem a matter of the utmost criminal importance, not to mention deserving of the extremely harsh 15-year sentence Mr. Romano received in that case upon pleading guilty. From there, this matter has simply escalated, with the government apparently intent to prove to Mr. Romano that it can win any arm's-race Mr. Romano would like to engage in. As Section C of the government's letter indicates, however, this has hardly been a successful strategy.

If this Court really wants to "send a message" to Mr. Romano and other similarly-situated inmates, undersigned counsel respectfully suggests the best way to do so would be by stopping this cycle of escalation. Rather, send the message to Mr. Romano that the administration of justice can be fair *without* being draconian, and that what is at most a merely technical violation of the Protective Order here will occasion a commensurate sanction.

Respectfully submitted,

/s/
Daniel S. Nooter, Esq.
*CJA Counsel for Joseph Romano*

[4] Not only has undersigned counsel not yet received all the documents relevant to Mr. Romano's appeal — including the documents covered under the Protective Order, but undersigned counsel also had three briefs as well as a petition for writ of certiorari due in other matters on September 15, September 17, September 23, and September 25 of this year. Accordingly, undersigned counsel has had scant opportunity even to review the materials presently in his possession. Undersigned counsel thus respectfully begs the Court's indulgence and apologizes in advance concerning any misstatements or misunderstandings concerning the prior proceedings in this case.

cc: AUSA Una Dean (by email)
August Marziliano,
Case Administration Supervisor, E.D.N.Y (by email)
Joseph Romano (by U.S. mail)